**2014-1384**

In The

# United States Court Of Appeals
# For The Federal Circuit

## LEXINGTON LUMINANCE LLC,

*Plaintiff - Appellant,*

v.

## AMAZON.COM INC.,
## AMAZON DIGITAL SERVICES, INC.,

*Defendants - Appellees.*

**Appeal from the United States District Court for the
District of Massachusetts**

_____

**BRIEF OF APPELLANT**

_____

Robert D. Katz
KATZ PLLC
6060 North Central Expressway
Suite 560
Dallas, TX 75206
(214) 865-8000
rkatz@katzlawpllc.com

David S. Godkin
BIRNBAUM & GODKIN LLP
280 Summer Street
Boston, MA 02210
(617) 307-6100
godkin@birnbaumgodkin.com

*Date: May 27, 2014*    *Counsel for Plaintiff - Appellant*    *Counsel for Plaintiff - Appellant*

## <u>CERTIFICATE OF INTEREST</u>

Pursuant to Federal Circuit Rule 47.4, the undersigned counsel for Appellant hereby certifies that:

1.  The full names of every party or amicus represented by me is:

Lexington Luminance LLC.

2.  The names of the real parties in interest  represented by me is:

Lexington Luminance LLC.

3.  All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are: None.

4.  The names of all law firms and the partners or associates that appeared for any of the parties represented by me in the trial court or are expected to appear in this court are as follows, representing the Plaintiff-Appellant, Lexington Luminance LLC:

Katz PLLC, Robert D. Katz

Birnbaum & Godkin LLP, David S. Godkin and Andrew A. Caffrey III

Respectfully Submitted,

KATZ PLLC

Dated:  May 27, 2014                    By: /s/ Robert D. Katz

                                                  Robert D. Katz

i

# TABLE OF CONTENTS

**PAGE:**

CERTIFICATE OF INTEREST ...............................................................i

TABLE OF CONTENTS.................................................... ii

TABLE OF AUTHORITIES ................................................ vii

STATEMENT OF RELATED CASES .............................................. xiii

JURISDICTIONAL STATEMENT ...........................................1

STATEMENT OF THE ISSUES.............................................1

STATEMENT OF THE CASE..................................................1

    Statement of Facts.............................................................2

        A.    District Court Proceedings......................................2

        B.    Technology Background.............................................3

        C.    The District Court's Decision ...................................6

SUMMARY OF THE ARGUMENT ..........................................7

    A.    The District Court Erred In Granting Judgment On The Pleadings Of Invalidity Due To Indefiniteness...................................7

    B.    The District Court Erroneously Construed Several Claim Terms Of The '851 Patent ...............................................8

ARGUMENT .................................................................9

    I.    THE DISTRICT COURT ERRED IN GRANTING JUDGMENT ON THE PLEADINGS OF INVALIDITY DUE TO INDEFINITENESS.................................9

        A.    Standard of Review.................................................9

B.      Legal Standards ........................................................................9

        1.      Motion for Judgment on the Pleadings............................9

        2.      Indefiniteness ................................................................10

C.      The Correct Construction of the Limitation is Not
        Indefinite ................................................................................13

D.      The District Court Mistakenly Believed That A Claim
        Limitation Must Limit The Number Of Allowable
        Combinations ..........................................................................16

E.      The District Court Erred By Finding That The Claim
        Included A Markush Group......................................................18

F.      Similar Claim Terms Have Been Held Definite ......................19

G.      Other    Claim    Limitations    Further    Narrow    The
        Composition Of The Substrate.................................................21

H.      The District Court Erred by Failing To Require Evidence
        Regarding The Understanding Of A Person Having
        Ordinary Skill In The Art ........................................................23

I.      Appropriate Construction.........................................................27

II.     THE DISTRICT COURT INCORRECTLY CONSTRUED
        SEVERAL CLAIM TERMS OF THE '851 PATENT ......................27

A.      Standard of Review..................................................................27

B.      "Trenches" ...............................................................................28

        1.      "Trenches" must be construed as understood by a
                person having skill in the art..........................................28

        2.      "Trenches" are the three-dimensional areas that are
                removed from the surface of the substrate ....................29

        3.      "Trenches" as used in the art of semiconductor
                fabrication are not "bounded on the sides and
                bottom and open at the top"............................................32

4. Two categories of substrate features are described in the specification: mesas and stripes.......34

5. The term "trench" is not intended to describe the shape-related properties of the substrate pattern .......36

6. The hierarchy of the claim limitations.............................37

C. "Having" .......................................................................39

1. The term "having" is usually open ..................................39

2. The disclosed embodiments confirm that "having" is an open term........................................................................40

3. The District Court erred by excluding disclosed embodiments, concluding that they conflicted with the purpose of the invention ................................................41

4. The District Court erred by conflating the requirement that a "textured district" must include one or more surface features, and instead incorrectly understood the claim to require that the "textured district" consist entirely of the surface features, with no substrate base portion ........................44

D. "Microfacets"....................................................................46

1. The District Court erred by failing to provide context for the "very small" qualifier.............................46

E. "Sloped etching profile with a smooth rotation of microfacets" ............................................................................49

1. The District Court erred by including the bottom walls of the etched trenches in the "sloped etching profile"........................................................................49

2. The District Court erred by distorting the infringement analysis through the addition of the qualifier "when viewed in cross-section" when potentially limitless cross-sections exist ........................52

3.      The District Court erred by reading the word
        "sloped" out of the term..................................................56

4.      The District Court erred by requiring that
        microfacets have "a_gradual, incremental rotation
        in slope from micro-facet to micro-facet".....................56

5.      The District Court erred by excluding a disclosed
        embodiment of the invention, finding a flat
        substrate bottom to be inconsistent with the
        purpose of the invention ................................................56

6.      The District Court's construction erroneously
        requires that individual microfacets must be visible......57

7.      The specification makes clear that a "sloped
        etching profile with a smooth rotation of
        microfacets" indicates the absence of sharp corners......58

8.      Appropriate construction ...............................................59

F.   "Sloped etching profile… without a prescribed angle of
     inclination"...............................................................................61

1.      The District Court erred by including the bottom
        walls of the etched trenches in the "sloped etching
        profile".........................................................................61

2.      The District Court erred by distorting the
        infringement analysis through the addition of the
        qualifier "when viewed in cross-section" when
        potentially limitless cross-sections exist .......................61

3.      The District Court erred by reading the word
        "sloped" out of the term..................................................62

4.      The District Court erred by requiring that
        microfacets have "a gradual, incremental rotation
        in slope from micro-facet to micro-facet".....................62

5.     The District Court erred by excluding a disclosed embodiment of the invention, finding a flat substrate bottom to be inconsistent with the purpose of the invention ..................................................62

6.     The District Court erred by interpreting "without a prescribed angle of inclination" as "without linear portions" .......................................................................63

7.     Appropriate construction ...............................................64

CONCLUSION ...........................................................................................65

ADDENDUM

CERTIFICATE OF FILING AND SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**PAGE(S):**

## CASES:

*3M Innovative Properties Co. v. Tredegar Corp.*,
    725 F.3d 1315 (Fed. Cir. 2013) ....................................................27

*Abbott Labs. v. Baxter Pharm. Prods., Inc.*,
    334 F.3d 1274 (Fed. Cir. 2003) ....................................................18

*Agilent Techs, Inc. v. Affymetrix, Inc.*,
    567 F.3d 1366 (Fed. Cir. 2009) ....................................................56

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
    314 F.3d 1313 (Fed. Cir. 2003) ...........................................12, 24

*Athletic Alternatives, Inc. v. Prince Mfg., Inc.*,
    73 F.3d 1573 (Fed. Cir. 1996) ..............................................26, 27

*Bancorp Services, LLC v. Hartford Life Ins. Co.*,
    359 F.3d 1367 (Fed. Cir. 2004) ....................................................11

*Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc.*,
    796 F.2d 443 (Fed. Cir. 1986) .......................................... 32-33, 58

*Bayer Schering Pharma AG v. Lupin, Ltd.*,
    676 F.3d 1316 (Fed. Cir. 2012) ....................................................10

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)........................................................................10

*Bell Atlantic Network Services v. Covad Communications*,
    262 F.3d 1258 (Fed. Cir. 2001) ....................................................55

*Bridgelux, Inc. v. Cree, Inc.*,
    No. 9:06-cv-00240-HFG,
    Docket No. 121-1 (E.D. Tex. Sep. 14, 2007) ..........................19, 20

*C.R. Bard, Inc. v. United States Surgical Corp.*,
    388 F.3d 858 (Fed. Cir. 2004) ........................................................... 41

*Carmen Industries, Inc. v. Wahl*,
    724 F.2d 932 (Fed. Cir. 1983) ........................................................... 12

*Comark Communications v. Harris Corp.*,
    156 F.3d 1182 (Fed. Cir. 1998) ........................................................ 17

*CoreBrace LLC v. Star Seismic LLC*,
    566 F.3d 1069 (Fed. Cir. 2009) ........................................................ 10

*Crystal Semiconductor v. Tritech Microelectronics*,
    246 F.3d 1336 (Fed. Cir. 2001) ........................................................ 13

*Cybor Corp. v. FAS Techs., Inc.*,
    138 F.3d 1448 (Fed. Cir. 1998) ..........................................................9

*Datamize, LLC v. Plumtree Software, Inc.*,
    417 F.3d 1342 (Fed. Cir. 2005) ........................................................ 21

*Dippin' Dots, Inc. v. Mosey*,
    476 F.3d 1337 (Fed. Cir. 2007) ........................................................ 13

*Elena v. Municipality of San Juan*,
    677 F.3d 1 (1st Cir. 2012) ................................................................. 10

*E-Pass Techs., Inc. v. 3Com Corp.*,
    343 F.3d 1364 (Fed. Cir. 2003) .................................................... 28, 42

*Ex parte Frank J. Hughes and Edward Travnicek*,
    No. 1998-0653, 2002 WL 465369 (Bd. Pat. App. & Inter. 2002) ............... 19

*Exxon Research & Eng'g Co. v. United States*,
    265 F.3d 1371 (Fed. Cir. 2001) ................................... 11, 12, 16, 24

*GE Lighting Solutions, LLC v. AgiLight, Inc.*,
    No. 2013-1267 (Fed. Cir. May 1, 2014) ............................................. 51

*Gen. Elec. Co. v. Hoechst Celanese Corp.*,
    698 F. Supp. 1181 (D. Del. 1988) ..................................................... 13

*Haemonetics Com, v. Baxter Healthcare Corp.*,
    607 F.3d 776 (Fed. Cir. 2010) .......................................................................11

*Halliburton Energy Servs., Inc. v. M-I LLC*,
    514 F.3d 1244 (Fed. Cir. 2008).......................................................... 25, 26

*Home Diagnostics, Inc. v. LifeScan, Inc.*,
    381 F.3d 1352 (Fed. Cir. 2004) .................................................................29

*Honeywell Int'l. Inc. v. International Trade Comm'n.*
    341 F.3d 1332 (Fed. Cir. 2003) .................................................................11

*Housey Pharms., Inc. v. Astrazeneca UK Ltd.*,
    366 F.3d 1348 (Fed. Cir. 2004) .............................................................39, 40

*In re Katz Interactive Call Processing Patent Litig.*,
    639 F.3d 1303 (Fed. Cir. 2011)..................................................................41

*In re Lowry*,
    93 F.2d 909 (CCPA 1938) ..........................................................................19

*In re Packard*,
    No. 2013-2014 (Fed. Cir. May 6, 2014)......................................................25

*In re Skvorecz*,
    580 F.3d 1262 (Fed. Cir. 2009) .................................................................15

*Inverness Med. Switz. GmbH v. Princeton Biomeditech Corp.*,
    309 F.3d 1365 (Fed. Cir. 2002) .................................................................42

*Invitrogen Corp. v. Biocrest Mfg., LP*,
    327 F.3d 1364 (Fed. Cir. 2003) .................................................................29

*LNP Eng'g Plastics, Inc. v. Miller Waste Mills, Inc.*,
    275 F.3d 1347 (Fed. Cir. 2001) .................................................................12

*Merck & Co. v. Hi-Tech. Pharmacal Co.*,
    482 F.3d 1317 (Fed. Cir. 2007) ............................................................ 9-10

*Metrologic Instruments, Inc. v. PSC Inc.*,
    No. 99-4876 (JBS) (D. N.J. May 6, 2004) ..................................................20

*Microsoft Corp. v. i4i P'ship*,
 131 S. Ct. 2238 (2011)...............................................................23

*Microsoft Corp. v. Multi-Tech. Sys.*,
 357 F.3d 1340 (Fed. Cir. 2003) .............................................34

*Miles Lab., Inc. v. Shandon. Inc.*,
 997 F.2d 870 (Fed. Cir. 1993) .................................................11

*Minn. Mining and Mfg. Co. v. Chemque, Inc.*,
 303 F.3d 1294 (Fed. Cir. 2002) .............................................53

*Mobil Oil Corp. v. Amoco Chemicals Corp.*,
 779 F. Supp. 1429 (D. Del. 1991) *aff'd* 980 F.2d 742 (Fed. Cir. 1992).......39

*Moleculon Research Corp. v. CBS, Inc.*,
 793 F.2d 1261 (Fed. Cir. 1986) ........................................13, 17

*Moore U.S.A., Inc. v. Standard Register Co.*,
 229 F.3d 1091 (Fed. Cir. 2000) ......................................... 46-47

*Motorola, Inc. v. Analog Devices, Inc.*,
 No. 1:03-CV-131 (E.D. Tex., March 23, 2004) .............................31

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
 715 F.3d 891 (Fed. Cir. 2013), *cert. granted*,
 82 U.S.L.W. 3195 (U.S. Jan. 10, 2014) (No. 13-369)..................24

*Oatey Co. v. IPS Corp.*,
 514 F.3d 1271 (Fed. Cir. 2008).........................................41

*Orion IP LLC v. Xerox Corporation*,
 No. 07-00138 (E.D. Tex. Aug. 21, 2008)....................................13

*Pérez–Acevedo v. Rivero–Cubano*,
 520 F.3d 26 (1st Cir. 2008)...........................................10

*Personalized Media Communications LLC v. International Trade Comm'n.*
 161 F.3d 696 (Fed. Cir. 1998) ..........................................11, 25

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) .............................................................29, 42

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*,
182 F.3d 1298 (Fed. Cir. 1999) ....................................................................47

*Praxair, Inc. v. ATMI, Inc.*,
543 F.3d 1306 (Fed. Cir. 2008) .................................................................9, 27

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
242 F.3d 1337 (Fed. Cir. 2001) ....................................................................42

*Smith v. Snow*,
294 U.S. 1 (1935).................................................................................15, 41

*SmithKline Beecham Corp. v. Apotex Corp.*,
403 F.3d 1331 (Fed. Cir. 2005) ....................................................................16

*Source Search Tech. LLC v. Lending Tree, LLC*,
588 F.3d 1063 (Fed. Cir. 2009) ....................................................................12

*Spectrum Int'l, Inc. v. Sterilite Corp.*,
164 F.3d 1372 (Fed. Cir. 1998) ....................................................................17

*STMicroelectronics, Inc. v. Broadcom Corp.*,
No. 4:02-CV-362 (E.D. Tex. Jan. 2, 2004) ....................................................30

*Swierkiewicz v. Sorema N.A.*,
534 U.S. 506 (2002)....................................................................................10

*The Gillette Co. v. Energizer Holdings, Inc.*,
405 F.3d 1367 (Fed. Cir. 2005) ....................................................................18

*UniRAM Technology, Inc. v. Monolithic System Technology, Inc.*,
2006 U.S. Dist. LEXIS 21661 (N.D. Cal., March 30, 2006) ................. 30-31

*Water Technologies Corp. v. Calco, Ltd.*,
850 F.2d 660 (Fed. Cir. 1988) ....................................................................39

*Yoon Ja Kim v. ConAgra Foods, Inc.*,
465 F.3d 1312 (Fed. Cir. 2006) ....................................................................42

## **STATUTES**:

28 U.S.C. § 1295(a)(1).................................................................1

28 U.S.C. § 1331..........................................................................1

28 U.S.C. § 1338(a)......................................................................1

35 U.S.C. § 112..............................................................11, 21, 25

35 U.S.C. § 271 *et. seq.*.............................................................1

MPEP § 2173...............................................................................25

MPEP § 2173.02...........................................................................15

MPEP § 2173.02(I)......................................................................25

MPEP § 2173.05...........................................................................18

MPEP § 2173.05(h).......................................................................24

## **RULES**:

Fed. R. Civ. P. 12(b)(6)..............................................................10

Fed. R. Civ. P. 12(c)....................................................................9

## **OTHER**:

2 D. Chisum Patents
  § 8.06[1][b] (1991) ..................................................................39

Dictionary of Electronics (7th ed. 1999) ...................................30

Dictionary of Physics, edited by S. Barnert *et al*, 2004...........22

Stephen A. Becker, Patent Applications Handbook
  § 2:17 (9th ed. 2000)................................................................18

Wikipedia, Isotropic etching, at http://en.wikipedia.org/wiki/Isotropic_etching
  (last visited May 22, 2014) .....................................................55

## STATEMENT OF RELATED CASES

(a)     No other appeal in or from the same civil action was previously filed before this or any other appellate court.

(b)     The title and number of any case known to counsel to be pending in this or any other court that will directly affect or be directly affected by this court's decision in the pending appeal are:

1.     *Lexington Luminance LLC v. Google, Inc.*, 1:12-cv-12218-GAO (D. Mass., 2012).  The Intervenor in the *Google* case, Formosa Epitaxy, also filed an *ex parte* reexamination of the patent-in-suit, which bears application no. 90/012,964.

2.     *Lexington Luminance LLC v. Amazon.com Inc. and Amazon Digital Services, Inc.*, 1:12-cv-12216-DJC (D. Mass., 2012).

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) and 35 U.S.C. § 271 *et. seq.* The District Court entered a final judgment dismissing the case on March 19, 2014. This timely appeal to the Federal Circuit was filed on March 19, 2014. This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## STATEMENT OF THE ISSUES

1.  Did the District Court err in concluding that the limitation "said substrate is selected from the group comprising group III-V, group IV, group II-VI elements and alloys, ZnO, spinel and sapphire" rendered claim 1 of United States Patent No. 6,936,851 invalid on the basis of indefiniteness?

2.  Did the District Court err in its claim construction of United States Patent No. 6,936,851?

## STATEMENT OF THE CASE

Appellant, Lexington Luminance LLC ("Lexington") is a limited liability company organized under the laws of Massachusetts that is the sole owner of U.S. Patent No. 6,936,851 ("the '851 patent") entitled "Semiconductor Light-Emitting Device and Method for Manufacturing the Same." A57. The '851 patent discloses and claims a semiconductor light-emitting device. A26-A40. Lexington has alleged infringement by Amazon's e-reader devices including the "Kindle Paperwhite" and the "Kindle Fire." A57 ¶12, A392, A839-40.

Amazon moved for judgment on the pleadings on its invalidity defense to Lexington's claim of infringement and its counterclaim for a declaration of invalidity. The United States District Court for the District of Massachusetts ("District Court") heard the parties on these matters and on claim construction. The District Court later issued an order construing the disputed claim terms and granting Amazon's motion for judgment on the pleadings, finding the asserted claim indefinite.  A2-25.  Lexington appeals the District Court's claim construction and order granting judgment on the pleadings.

### Statement of Facts

### A.    District Court Proceedings

On November 29, 2012, Lexington filed suit against Amazon.com, Inc. and Amazon Digital Services, Inc. (collectively, "Amazon") in the District Court for patent infringement of the '851 patent.  D.I. 1.  Lexington's complaint alleged, *inter alia*, that certain of Amazon's e-reader devices including the Amazon Kindle, infringe claim 1 of the '851 patent.  A57.  On August 14, 2013, Amazon filed a motion for judgment on the pleadings of invalidity of the '851 patent.  D.I. 49.  On August 28, 2013, Lexington filed its opposition in response to Amazon's motion for judgment on the pleadings.  D.I. 54.  On September 16, 2013, Amazon filed a reply in support of its motion for judgment on the pleadings.  D.I. 65.  On

September 25, 2013, Lexington filed a surreply in opposition to Amazon's motion for judgment on the pleadings. D.I. 73.

On August 14, 2013, the parties filed their opening claim construction briefs. D.I. 50-51. On September 4, 2013, the parties filed their claim construction reply briefs. D.I. 58-59. On September 18, 2013, the parties filed the joint claim construction and prehearing statement. D.I. 67. On November 14, 2013, the parties filed their technology tutorials. D.I. 81-82. On the same day, Lexington also filed its claim construction presentation charts that it used during the claim construction hearing. D.I. 83.

On November 21, 2013, the District Court held a hearing regarding both claim construction and Amazon's motion for judgment on the pleadings. D.I. 84. On March 18, 2014, the District Court entered an Order granting Amazon's motion for judgment on the pleadings allowing Amazon's motion. D.I. 87 and A2-25. The District Court also entered judgment on March 19, 2014 in favor of Amazon. D.I. 89 and A1. On March 19, 2014, Lexington filed a Notice of Appeal to this Court regarding the District Court's Order construing the claim terms of the '851 patent and granting Amazon's motion for judgment on the pleadings. D.I. 90.

### B. Technology Background

The '851 patent, entitled "Semiconductor Light-Emitting Device and Method For Manufacturing The Same," concerns technology relating to semiconductor

devices, including light-emitting diodes or "LEDs." LEDs are devices that convert electricity into light. LEDs generally consist of layers of different semiconductor material that are grown on a base material known as a "substrate." The '851 patent is directed to a novel use of etched patterns on the substrate to improve the operation of certain semiconductor devices including LEDs. LEDs use an active layer of semiconductor material formed between two oppositely doped layers, one being "p-type" and the other being "n-type," to produce light.

Much recent LED fabrication has used a crystalline layer, e.g., gallium nitride (GaN), on top of a crystalline substrate, e.g., sapphire ($Al_2O_3$). However, the combination of these materials has led to what is called a "lattice mismatch" problem between the layers. A lattice mismatch between layers exists when two materials exhibit different lattice constants, that is, an unequal distance between the unit cells that comprise a crystal lattice. A693-96. This mismatch leads to dislocations in the material system in which the atoms in the grown crystalline semiconductor layers do not exactly line up with those in the substrate, causing cracks or dislocations to form in the layers. A770. Lattice mismatch, measured by the difference of the lattice constants of two adjoining materials, leads to strain where the materials meet. This strain prevents the growth of thicker layers without the introduction of defects which limit the size of the wafers that may be reliably produced.

4

The inventor of the '851 patent, Dr. Tien Wang[1], recognized that the direction of such defect propagation is generally perpendicular to the plane where the two materials meet.  He determined that if the surface of the substrate were etched to form certain types of trenches, the defect propagation could be confined to a particular location.  A708-709.  By restricting where the defects could propagate, the number of defects that could propagate into the active layer and affect the operation of the LED was substantially reduced.  Dr. Wang made use of an etching of the substrate surface that resulted in a textured district made up of smooth trenches.  A708, A738.  Because the trenches are smooth, the angle of orientation of the surface of the trench varies over the inclined portions of the trench so that there is no particular angle of orientation as there might be if the trenches followed a sharp saw-tooth pattern.  Put another way, if one assumes that the surface of the trench was modeled by many very tiny facets, the angle of orientation of these microfacets would approximate a smooth surface.  A727-28.  Dr. Wang found that by using the smooth trenches, the defect propagation from one side of the trench would counter the defect propagation from the other side of the trench, and the defect propagation from the two sides would combine in the trench region, thus minimizing the propagation of defects into the active layer.

---

[1] Dr. Tien Y. Wang was born in Taiwan, obtained his PhD. in Material Science and Engineering from the University of Utah in 1990 and since that time has worked in many capacities related to the design and development of LED technology.  He prosecuted the '851 patent *pro se*.

## C.     The District Court's Decision

The District Court construed the disputed claim terms and also considered Amazon's motion for judgment on the pleadings, in which Amazon alleged that the '851 patent was invalid for indefiniteness on two grounds.  A2-25.  Amazon argued that ". . . so as to guide the extended lattice defects away from propagating into the active layer" is indefinite because it does not explain to which "extended lattice defects" the claim refers.  A17.  The District Court found that the goal of the invention was to "reduce" the manifestation of the lattice defects into the active layer.  A19.  The District Court found that there was only one definition for lattice defects, and therefore the claim was not indefinite on that basis.  A19-20.

Turning to Amazon's second basis for its allegation of indefiniteness, the District Court considered Amazon's assertion that the claim language "said substrate is selected from the group comprising group III-V, group IV, group II-VI elements and alloys, ZnO, spinel and sapphire" is indefinite because it allows for an unlimited amount of alternative embodiments.  A20.  The District Court concluded that the limitation constituted a Markush group.  A21.  However, the District Court also concluded that a Markush group using the term "comprising" instead of "consisting of" was not closed and therefore the list may also include an indeterminate number of other elements of alloys.  A22-23.  The District Court concluded that because the claim failed to narrow down the composition of the

claimed substrate to any degree of substantial certainty, it was therefore indefinite. A23-24.

## SUMMARY OF THE ARGUMENT

### A.   The District Court Erred In Granting Judgment On The Pleadings Of Invalidity Due To Indefiniteness.

The District Court evaluated the following limitation: "said substrate is selected from the group comprising group III-V, group IV, group II-VI elements and alloys, ZnO, spinel and sapphire".

The District Court appeared to conclude that the use of the term "group" in the claim required it to be a Markush group, even though such a construction was not required by the plain language of the term or the prosecution history. Having strained to construe this term as a Markush group, the District Court then pushed the limits of language even further by construing the elements of the group as an open set, which it viewed as having no limits. The District Court then concluded that the claim was indefinite because, in the District Court's view, the claim fails to narrow the composition of the substrate to any degree of substantial certainty. The District Court's reasoning here was antithetical to the notion that courts should adopt a construction that will preserve the patentee's invention, rather than invalidate it. Moreover, in reaching its finding, the District Court failed to require evidence regarding the understanding of a person having ordinary skill in the art

and effectively insisted that a claim term be plain on its face in order to avoid a

determination of indefiniteness.

**B.    The District Court Erroneously Construed Several Claim Terms Of The '851 Patent.**

Lexington appeals the District Court's construction of the following claim

terms:

| Term | District Court's Construction |
|---|---|
| trenches | depressions bounded on the sides and bottom and open at the top |
| having | consisting of |
| microfacets | very small planar crystal surfaces |
| sloped etching profile with a smooth rotation of microfacets | when viewed in cross-section, the side and bottom walls of the etched trenches are made up of micro-facets with a gradual, incremental rotation in slope from micro-facet to micro-facet such that there are no sharp corners |
| a sloped etching profile… without a prescribed angle of inclination | when viewed in cross-section, the side and bottom walls of the etched trenches have no constant angle of inclination, and so they have no linear portions |

In doing so, the District Court:

1.    Inappropriately imported limitations from the specification;
2.    Ignored plainly-disclosed embodiments of the invention;
3.    Adopted lay definitions instead of those known and used in specific fields of art; and
4.    Overlooked claim terms.

For ease of reference, claim 1 of the '851 patent reads as follows:

1.      A semiconductor light-emitting device comprising:

a substrate;

a textured district defined on the surface of said substrate comprising a plurality of etched trenches having a sloped etching profile with a smooth rotation of microfacets without a prescribed angle of inclination;

a first layer disposed on said textured district; comprising a plurality of inclined lower portions so as to guide the extended lattice defects away from propagating into the active layer, said first layer and said substrate form a lattice-mismatched misfit system, said substrate is selected from the group comprising group III-V, group IV, group II-VI elements and alloys, ZnO, spinel and sapphire; and

a light-emitting structure containing an active layer disposed on said first layer.

A38, A40.

## **ARGUMENT**

## I.      **THE DISTRICT COURT ERRED IN GRANTING JUDGMENT ON THE PLEADINGS OF INVALIDITY DUE TO INDEFINITENESS**

### A.      **Standard of Review**

This Court's standard of review of a district court's judgment on claim construction of patent claims and indefiniteness is *de novo*. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1451 (Fed. Cir. 1998); *Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1319 (Fed. Cir. 2008).

### B.      **Legal Standards**

#### 1.      Motion for Judgment on the Pleadings

In a patent case, a district court applies the rule of the regional circuit in deciding a motion to dismiss on the pleadings under Rule 12(c). *See Merck & Co.*

*v. Hi-Tech. Pharmacal Co.*, 482 F.3d 1317, 1320 (Fed. Cir. 2007). A motion for judgment on the pleadings is treated like a Rule 12(b)(6) motion to dismiss. *Pérez–Acevedo v. Rivero–Cubano*, 520 F.3d 26, 29 (1st Cir. 2008); *Elena v. Municipality of San Juan*, 677 F.3d 1, 5 (1st Cir. 2012). Pleading standards are a matter of regional circuit law. *See CoreBrace LLC v. Star Seismic LLC*, 566 F.3d 1069, 1072 (Fed. Cir. 2009) ("The question ... whether a Rule 12(b)(6) motion was properly granted is a purely procedural question not pertaining to patent law, to which this court applies the rule of the regional ... circuit."). Review of the substantive patent law embodied in the pleadings is, however, in accordance with the law of this Court. *Bayer Schering Pharma AG v. Lupin, Ltd.*, 676 F.3d 1316, 1327 (Fed. Cir. 2012) (Newman, J., dissenting). Lexington's nonconclusory factual allegations must be taken as true at this stage. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 n.1 (2002). Thus, this Court should only affirm the District Court's finding if, taking all the complaint's well-pled allegations as true and viewing the other facts in the light most favorable to Lexington, the complaint does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

## 2. <u>Indefiniteness</u>

Because patented claims are presumed valid, to prove indefiniteness "[a]n accused infringer must... demonstrate by clear and convincing evidence that one of

ordinary skill in the relevant art could not discern the boundaries of the claim based on the claim language, the specification, the prosecution history, and the knowledge in the relevant art." *Haemonetics Com, v. Baxter Healthcare Corp.*, 607 F.3d 776, 783 (Fed. Cir. 2010); *see also Honeywell Int'l. Inc. v. International Trade Comm'n*. 341 F.3d 1332, 1338-39 (Fed. Cir. 2003) (quoting *Exxon Research & Ene'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001)) ("Because a claim is presumed valid, a claim is indefinite only if the 'claim is insolubly ambiguous, and no narrowing construction can properly be adopted.'"). To resolve an allegation of indefiniteness, a district court must determine whether "one skilled in the art would understand the bounds of the claim when read in light of the specification. If the claims read in light of the specification reasonably apprise those skilled in the art of the scope of the invention, § 112 demands no more." *Personalized Media Communications LLC v. International Trade Comm'n*. 161 F.3d 696, 705 (Fed. Cir. 1998) (quoting *Miles Lab., Inc. v. Shandon. Inc.*, 997 F.2d 870, 875 (Fed. Cir. 1993)) (alteration in original); *see also Bancorp Services, LLC v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1376 (Fed. Cir. 2004) (reversing a district court's finding on an issue of indefiniteness for failure to consider evidence probative of the understanding of those skilled in the art regarding the use of a term). Indefiniteness is judged not according to the subjective impressions of any one person, but objectively based on how a person skilled in the art would

11

understand the term. *Source Search Tech. LLC v. Lending Tree, LLC*, 588 F.3d 1063, 1077 (Fed. Cir. 2009) ("[T]his court measures indefiniteness according to an objective measure that recognizes artisans of ordinary skill are not mindless 'automatons.'").

"Claims are considered indefinite when they are not amenable to construction or are insolubly ambiguous. Thus, the definiteness of claim terms depends on whether those terms can be given any reasonable meaning. Absolute clarity is not necessary." *Source Search*, 588 F.3d at 1076. A claim term is not indefinite simply because "it poses a difficult issue of claim construction"; rather, the claims are indefinite "only if reasonable efforts at claim construction prove futile." *Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001).

Close questions of indefiniteness in litigation involving issued patents are properly resolved in favor of the patentee. *See, e.g.*, *Exxon*, 265 F.3d at 1380. "Claims should be so construed, if possible, as to sustain their validity." *Carmen Industries, Inc. v. Wahl*, 724 F.2d 932, 937 n.5 (Fed. Cir. 1983). "The standard of indefiniteness is somewhat high; a claim is not indefinite merely because its scope is not ascertainable from the face of the claims." *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1343 (Fed. Cir. 2003); *cf., e.g.*, *LNP Eng'g Plastics, Inc. v. Miller Waste Mills, Inc.*, 275 F.3d 1347, 1359-60 (Fed. Cir. 2001)

(affirming district court finding that patent was not indefinite, despite testimony from a co-inventor that he did not understand the meaning of a claim limitation).

## C.   The Correct Construction of the Limitation is Not Indefinite

The District Court found the following limitation indefinite: "said substrate is selected from the group comprising group III-V, group IV, group II-VI elements and alloys, ZnO, spinel and sapphire".

This Court has held that the term "comprising" raises a presumption that the list of elements is nonexclusive.  *Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337, 1343 (Fed. Cir. 2007); *Crystal Semiconductor v. Tritech Microelectronics*, 246 F.3d 1336, 1348 (Fed. Cir. 2001) ("When a patent claim uses the word 'comprising' as its transitional phrase, the use of 'comprising' creates a presumption that the body of the claim is open").   Nontransitional occurrences of "comprising" and "comprises" are "interpreted according to the normal rules of claim interpretation." *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1272 n.8 (Fed. Cir. 1986). The analysis of transitional phrases in the claims "is based on how the terms are used… not merely where they are used." *Orion IP LLC v. Xerox Corporation*, No. 07-00138 (E.D. Tex. Aug. 21, 2008) (construing the term "comprising" used in the claim body as "including or containing") citing *Gen. Elec. Co. v. Hoechst Celanese Corp.*, 698 F. Supp. 1181, 1189 n.5 (D. Del. 1988).

The claim language reads: "said substrate is selected from the group comprising group III-V, group IV, group II-VI elements and alloys, ZnO, spinel and sapphire".[2] The reasonably ascertainable meaning is that the substrate must contain at least one of the following:

a group III-V alloy,
a group IV element or a group IV alloy,
a group II-VI alloy,
ZnO,
spinel, or
sapphire.

The skilled artisan would also recognize that, based on the intrinsic record, the limitation properly allows for combinations of the list elements.[3] In addition, the materials in the list above are consistent with the exemplary substrate materials disclosed in the specification. For example, as to the exemplary substrates cited in the specification, GaAs, InP, GaN are group III-V alloys, while Si, SiC, and SiC-on-Si are group IV elements or alloys. A36(3:52-54). It would therefore be

---

[2] Emphasis added. Also, the groups preceding the Roman numerals refer to groups in the Periodic Table of the Elements.

[3] Note that in identifying "Si-on-insulator" as an exemplary substrate, the specification provided for the possibility that a combination of multiple list members could be used because Si-on-insulator can be Si-on-sapphire with sapphire as the insulator. In addition, by identifying SiC-on-Si as another exemplary substrate, the specification provided for the possibility that a combination of elements or alloys from a single list member could be used because SiC-on-Si is a combination of a group IV alloy (SiC) on a group IV element (Si). A36(3:53-54); A658-659.

apparent to one skilled in the art, based on the specification, that the invention set forth in the claim is what the patentee regarded as his invention.

"Some latitude in the manner of expression and the aptness of terms should be permitted even though the claim language is not as precise as the examiner might desire." *In re Skvorecz*, 580 F.3d 1262, 1269 (Fed. Cir. 2009) citing MPEP § 2173.02. Reasonable disagreement over the scope of a claim is not a basis to invalidate the claim. For example, the District Court found that "the substrate could be made of any number of these elements and alloys, but can also include any other element or alloy." A21. The District Court further stated that "Lexington argues that the proper way to interpret the claim is to say that the substrate must include one of the enumerated elements or alloys but may include others." A24. Accused infringers may argue that different interpretations of a patent terms mean that the patentee's property right is forfeited however clear the infringer's misappropriation. But there is nothing in the Patent Act that supports such a test, and no court should embrace it. *Smith v. Snow*, 294 U.S. 1, 14 (1935) ("if the claim [is] fairly susceptible of two constructions, that should be adopted which will secure to the patentee his actual invention rather than to adopt a construction fatal to the grant.")

**D.**   **The District Court Mistakenly Believed That A Claim Limitation Must Limit The Number Of Allowable Combinations**

The District Court erred in finding that the patent "claims an infinite number of possibilities for the nature of the substrate, rendering the claim indefinite." A22. Similarly, the District Court stated "since the claim fails to narrow the composition of the substrate to any degree of substantial certainty, claim 1 of the '851 patent is indefinite." A25.

The District Court's misconception of indefiniteness doctrine is plain from this passage of its opinion:

> Lexington argues that the proper way to interpret the claim is to say that the substrate must include one of the enumerated elements or alloys but may include others. D. 54 at 9-10. Even if true, the claim would still envision an infinite number of combinations from which the substrate can be derived, because it uses the word "comprising."

A24.

Even if there were an infinite number of combinations, it would not make a claim indefinite. Any open claim has infinite possibilities, but is not indefinite for that reason. As this Court has explained "A patent claim to a fishing pole would not be invalid on indefiniteness grounds if it contained a limitation requiring that the pole be 'at least three feet long,' even though a 50 foot long fishing pole would not be very practical." *Exxon*, 265 F.3d at 1382. Breadth is not indefiniteness. *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1340-41 (Fed. Cir. 2005).

The District Court concluded that the claim limitation did nothing to narrow the scope of the claim and, in doing so, abrogated the claim limitation. A person having ordinary skill in the art would not arrive at that conclusion. And this Court has also rejected that conclusion, for the simple reason that "comprising" is not a "weasel word with which to abrogate claim limitations." *Spectrum Int'l, Inc. v. Sterilite Corp.*, 164 F.3d 1372, 1379-80 (Fed. Cir. 1998) citing *Moleculon*, 793 F.2d at 1271.

Moreover, even if the limitation were abrogated, the overall claim would not necessarily be indefinite. Nothing in the specification requires that the substrate be made of any particular crystalline material. The specification merely identifies exemplary substrates and the claim is not limited to them. *See Comark Communications v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998) (refusing to import limitations from the specification to the claims). The addition of the limitation during prosecution was not responsive to a pertinent rejection and was not added to overcome prior art.[4] There is no suggestion anywhere in the intrinsic record that the limitation conferred novelty to the invention. The only

---

[4] *See* A182-87 (office action dated July 30, 2004 citing a rejection based on the written description requirement); A188-97 (amendment dated August 13, 2004 adding the limitation found indefinite by the District Court); A198-203 (office action dated August 30, 2004 rejecting the August 13, 2004 amendment and citing a rejection based on the written description requirement); A205-16 (amendment dated December 24, 2004 adding the limitation found indefinite by the District Court); A217-19 (office action dated January 14, 2005 rejecting the December 24, 2004 amendment because it raised new issues); A220-29 (RCE dated January 21, 2005 with amendment adding the limitation found indefinite by the District Court); A230-37 (notice of allowance with examiner's amendment dated April 7, 2005).

requirements are that the substrate be crystalline, that is, have a crystal lattice structure, and exhibit a lattice mismatch with the first layer, as the other limitations of the claim require.  *See* A840-41.

### E.    The District Court Erred By Finding That The Claim Included A Markush Group

Notwithstanding the District Court's own finding that "[a] Markush group by its nature is closed" and "[i]f a Markush group uses the term 'comprising' rather than 'consisting of,' it is not closed", the District Court erroneously concluded that the limitation constituted a Markush group.  A22 citing *Abbott Labs. v. Baxter Pharm. Prods., Inc.*, 334 F.3d 1274, 1280-81 (Fed. Cir. 2003) ("[a] Markush group, incorporated in a claim, should be `closed,' i.e. it must be characterized with the transition phrase 'consisting of,' rather than 'comprising' or 'including.'") citing Stephen A. Becker, Patent Applications Handbook § 2:17 (9th ed. 2000). This Court has held that the alternative claim language "a group of first, second, and third blades" is not a Markush group because it did not contain the word "consisting of."  *The Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1372 (Fed. Cir. 2005).

A Markush group is merely one acceptable form of alternative expression. *See* MPEP § 2173.05.  There are others.  The Board of Patent Appeals and Interferences acknowledged that alternative expressions may be open-ended and found that "selected from the group consisting essentially of" is not a Markush

group but instead is definite, is open-ended, and includes the specific members of
the grouping plus other members which do not affect pertinent characteristics of
the claimed compound. *Ex parte Frank J. Hughes and Edward Travnicek*, No.
1998-0653, 2002 WL 465369 at *3-8 (Bd. Pat. App. & Inter. 2002).

In short, the District Court erred in finding that the limitation included a
Markush group that was not closed.

### F.  <u>Similar Claim Terms Have Been Held Definite</u>

No redrafting of the claim is sought nor necessary. Other courts have
interpreted the phrase "selected from the group comprising" with no suggestion of
indefiniteness. In one example, the Court of Customs and Patent Appeals
considered the limitation:

> An element for an electron discharge device composed of an alloy
> comprising a base *selected from the group comprising* nickel and
> cobalt and constituting at least 90% of the alloy, and an added
> quantity of silicon, the silicon constituting at least ½ to 1% of the
> alloy.

*In re Lowry*, 93 F.2d 909, 911 (CCPA 1938) (emphasis added).

The CCPA found no suggestion of indefiniteness. *Id.* Additionally, other
litigants have dealt with very similar claim language with no suggestion that the
term was indefinite. For example, in *Bridgelux, Inc. v. Cree, Inc.*, claim 9 of U.S.
Patent No. 6,869,812, another LED patent, read: "The device as recited in claim 1,
wherein the substrate comprises a material <u>selected from the group comprising</u>:

19

sapphire; spinel; ZnO; SiC; MgO; GaN; AlN; and AlGaN." *Bridgelux, Inc. v. Cree, Inc.*, No. 9:06-cv-00240-HFG, Docket No. 121-1 at 3 (E.D. Tex. Sep. 14, 2007) (emphasis added). In that case, both BridgeLux and Cree, leading semiconductor manufacturers, simply agreed that "comprises" is "a term of art used in claim language that means the recited limitations are essential but that other limitations may be added and still form a device within the scope of the claim." *Id*. *Bridgelux* provides probative evidence that persons having ordinary skill in the art had no difficulty understanding the scope of this very similar claim term.

Yet another district court construed claim 12 of U.S. Patent No. 5,081,342:

> 12. The device of claim 5 wherein said input means is <u>selected from the group comprising</u> counter top scanners, hand-held scanners, light pen scanners, wand scanners, and magnetic readers.

*Metrologic Instruments, Inc. v. PSC Inc.*, No. 99-4876 (JBS) at *4 (D. N.J. May 6, 2004) (emphasis added).

The district court detected nothing indefinite regarding the "group comprising" language — instead it found that "claim 12 serves to more specifically describe the nature of the input signals that are processed by the claimed device." *Id*.

### G.  Other Claim Limitations Further Narrow The Composition Of The Substrate

The test for definiteness is whether the claim <u>as a whole</u>, not its individual elements, provides reasonable notice to the public of its bounds.  *See* 35 U.S.C. § 112, ¶ 2 (stating that the "<u>claims</u>" must particularly point out and distinctly claim the invention (emphasis added)).  The limitation examined by the District Court should have been analyzed in the context of the entire claim, that is, the <u>other</u> limitations of the claim.  *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1348 (Fed. Cir. 2005).  Other limitations of claim 1 further narrow the composition of the substrate, specifically: "<u>said first layer and said substrate form a lattice-mismatched misfit system</u>, said substrate is selected from the group comprising group III-V, group IV, group II-VI elements and alloys, ZnO, spinel and sapphire;… ."  A person having ordinary skill in the art would realize that for a lattice-mismatch to exist between the first layer and the substrate, they both must be made of crystal lattice materials.  *See* A935-36.[5]  Otherwise, there could be no lattice-mismatch.[6]  Further, the lattice constant of the first layer must differ from the lattice constant of the substrate, so as to produce a lattice-mismatched misfit

---

[5] Lexington contends that the level of ordinary skill in the art at the time of filing of the patent application (2003) would have been someone with a Master's degree in Material Science and Engineering, or in a related field, as well as about two years of experience with semiconductor fabrication; preferably in the fabrication of III-V compound semiconductor materials.  *Cf.* A936.

[6] This is explained in greater detail in the tutorials at A693-696, A735-A736, and A769-770.

system.  *See* A213, A228, and A251.  That means that for the lattice constants to

differ, the material of the first layer cannot be the same as the material used for the

substrate.  The District Court failed to consider the other limitations.  A21 (finding

that the substrate material "could be made of any number of these elements and

alloys, but <u>can also include any other element or alloy</u>") (emphasis added).

Indeed, the prosecution history reveals the focus of the limitation:

> Claim 1 now strictly specifies that the first layer and the substrate comprise at least two different materials, i.e., the first layer and the substrate are made of different materials, selected from the group comprising group III-V, group IV, group II-VI elements and alloys, ZnO, spinel and sapphire. This limitation is definite since the boundary of the patent protection sought is clear.

A197, amendment of August 13, 2004.

A subsequent amendment, filed January 21, 2005, changed the limitation to

its as-issued language.  A224.  The stated reason for the amendment was to explain

that the first layer and the substrate were required to be different materials:

> Claim 1 and 9 now clearly specify that the first layer and the substrate form a lattice-mismatched misfit system (line 3 and line 9, page 1). It is well known to anyone skilled in this art that the lattice parameter at the heterojunction must be matched as closely as possible in order to avoid misfit dislocation formation that is deleterious to device performance. The misfit or lattice mismatch is defined as the ratio of the difference of the lattice constant between the epilayer and substrate to the lattice constant of the substrate (Dictionary of Physics, edited by S. Barnert et al, 2004, v.2, pg. 1095 and v.3. page 1313).

A228, amendment of January 21, 2005.

To summarize, the claim as a whole limited the composition of possible substrate materials, which the District Court failed to recognize when it concluded that the claim was indefinite.

### H.     The District Court Erred by Failing To Require Evidence Regarding The Understanding Of A Person Having Ordinary Skill In The Art

The issue of indefiniteness is not about how lawyers understand the claim terms — it's about how a person skilled in the art would understand the terms. Amazon moved the District Court to determine the issue of indefiniteness without setting forth any evidence regarding how a person skilled in the art would understand the terms.  In doing so, Amazon failed to meet its clear and convincing evidentiary burden.   The law is clear that the accused infringer must prove invalidity clearly and convincingly, and all reasonable inferences will be resolved in favor of validity.   *Microsoft Corp. v. i4i P'ship*, 131 S. Ct. 2238, 2247-48 (2011).  Amazon not only failed to prove indefiniteness clearly and convincingly, it failed to present any evidence whatsoever in support of its position.[7]  Amazon's evidentiary failure alone should have been fatal to its motion for judgment on the pleadings for indefiniteness.

---

[7] Lexington requested that if Amazon submitted matters outside of the pleadings, or if the District Court otherwise treated Amazon's motion as a motion for summary judgment, then Lexington be afforded the opportunity to submit evidence outside of the pleadings.  A594.

This Court has "not insisted that claims be plain on their face in order to avoid a determination of invalidity for indefiniteness." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 715 F.3d 891, 901 (Fed. Cir. 2013), *cert. granted*, 82 U.S.L.W. 3195 (U.S. Jan. 10, 2014) (No. 13-369) citing *Exxon*, 265 F.3d at 1375. Further, this Court has held that a District Court's inquiries "miss the mark" and "do not support an indefiniteness analysis" when "the district court found nothing in evidence that provided how a skilled artisan" would have evaluated a claim limitation. *Nautilus*, 715 F.3d at 901.

Here, the District Court, in effect, spoke for the person having ordinary skill in the art, stating:

> The Manual of Patent Examining Procedure ("MPEP") recognizes that "a Markush group may be so expansive that persons skilled in the art cannot determine the metes and bounds of the claimed invention." MPEP § 2173.05(h). *That is exactly the case here*, where the claim fails to narrow down the composition of the claimed substrate to any degree of substantial certainty. It is therefore indefinite.

A23-24 (emphasis added).

First, the District Court improperly limited its analysis to the face of the claims. This Court has held that a claim is not indefinite merely because its scope is not ascertainable from the face of the claims. *Amgen*, 314 F.3d at 1343. The District Court, in considering no evidence outside of the pleadings, clearly erred by failing to make a determination of "whether one skilled in the art would understand

the bounds of the claim when read in light of the specification." *See Personalized Media*, 161 F.3d at 705.

Second, the District Court used the PTO's approach to reviewing patent applications as a basis for its indefiniteness determination. This Court has recently held that the PTO can apply a lower indefiniteness standard during patent prosecution. *In re Packard*, No. 2013-2014 at \*9 (Fed. Cir. May 6, 2014) (*per curiam*). According to its own internal guidelines, the PTO will reject a claim containing language "such that a person of ordinary skill in the relevant art would read it with more than one reasonable interpretation." MPEP § 2173.02(I). The PTO's test is not mandated by § 112, and is not a formal interpretation of the Patent Act's requirements. Instead, it serves the PTO's mission of encouraging that patents be of the highest quality attainable. *See* MPEP § 2173 ("issuing patents with clear and definite claim language is a key component to enhancing the quality of patents and raising confidence in the patent process.")

Third, the District Court cited *Halliburton* as support for its determination. *Halliburton* is very distinguishable. In *Halliburton*, the patentee differentiated his invention from the prior art only through the use of "fragile gels." *See Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1253 (Fed. Cir. 2008). Halliburton, however, failed to define the fragility of its invention, which was presumably distinguishable from the prior art. *Id*. In

*Halliburton* this Court contemplated a narrowing instruction that would serve the notice function of the claims. *Id.* at 1253-54. However, Halliburton asked this Court to resolve any ambiguity in the claim in a way that would have given Halliburton the broadest possible construction. This Court recognized that doing so would have allowed Halliburton to benefit from the ambiguity and therefore held that the term "fragile gel" was not sufficiently definite if construed in accordance with Halliburton's proposed definition. *Id.* In contrast, in the present case, it is crucial to note that Lexington's proposed construction for the term was not a broadening construction. A20, A667. Instead, Amazon had proposed a broadening construction. *Id.*; A417. This Court has held that the notice function of patent law is satisfied by adopting the narrower of two possible constructions.[8] *Athletic Alternatives, Inc. v. Prince Mfg., Inc.*, 73 F.3d 1573, 1581 (Fed. Cir. 1996).

> Were we to allow [plaintiff] successfully to assert the broader [construction] against [defendant], we would undermine the fair notice function of the requirement that the patentee distinctly claim the subject matter disclosed in the patent from which he can exclude others temporarily. Where there is an equal choice between a broader and a narrower meaning of a claim, and there is an enabling disclosure that indicates that the applicant is at least entitled to a claim having

---

[8] Before the District Court were two proposals: "Lexington argues that the proper way to interpret the claim is to say that the substrate must include one of the enumerated elements or alloys but may include others." (*see* A24); while "Amazon posits that use of the word "comprising" rather than "consisting" provides for a substrate selected from a group that has no limits." (*see* A22).

the narrower meaning, we consider the notice function of the claim to be best served by adopting the narrower meaning.

*Id.*

## I.    Appropriate Construction

For all of the above reasons, this Court should reverse the decision of the District Court and find the claim limitation not indefinite.  In addition, this Court should construe the claim term as "said substrate containing at least one of the following".[9]

## II.    THE DISTRICT COURT INCORRECTLY CONSTRUED SEVERAL CLAIM TERMS OF THE '851 PATENT.

### A.    Standard of Review

This Court's standard of review of a district court's judgment on claim construction of patent claims is *de novo*.   *Praxair*, 543 F.3d at 1319.   Claim construction is a question of law that is reviewed without deference.   *3M Innovative Properties Co. v. Tredegar Corp.*, 725 F.3d 1315 (Fed. Cir. 2013).

---

[9] While a slightly different proposed construction appears in the parties' joint claim construction statement, the proposed construction "having at least one of a group consisting of" was recognized by the District Court as Lexington's claim construction position.  A24 ("Lexington argues that the proper way to interpret the claim is to say that the substrate must include one of the enumerated elements or alloys but may include others. D. 54 at 9-10."); *see also* A599-600, A931-36.

27

## B.   "Trenches"

| Term | Lexington's Proposed Construction | Amazon's Proposed Construction | District Court's Construction |
|---|---|---|---|
| trenches | [No construction required] otherwise, areas in the surface of the substrate from which some amount of material is removed in order to create a pattern on the surface of the substrate | generally elongated depressions bounded on the sides and bottom and open at the top | depressions bounded on the sides and bottom and open at the top |

The District Court erred by construing "trench" in lay terms instead of the meaning used by a person having ordinary skill in the art of semiconductor fabrication.

> 1.   "Trenches" must be construed as understood by a person having skill in the art.

The District Court erroneously used a lay definition of "trench", stating:

> Ultimately, when construing a claim, the Court must look to the ordinary meaning of trench first. *E-Pass Technologies, Inc. v. 3Com Corp.*, 343 F.3d 1364, 1368 (Fed. Cir. 2003) (citation and internal quotation marks omitted) (applying the "heavy presumption that a claim term carries its ordinary and customary meaning"). The Court agrees with Amazon, that by their plain and ordinary meaning, trenches are "depressions bounded on the sides and bottom and open at the top."

A10 (citation omitted).

"While this 'ordinary meaning' rule is usually expressed as a pat formula, the context supplied by the field of invention, the prior art, and the understanding of skilled artisans generally is key to discerning the normal usage of words in any

claim." *Invitrogen Corp. v. Biocrest Mfg., LP*, 327 F.3d 1364, 1367 (Fed. Cir. 2003). The "ordinary meaning" of a claim term is that which is understood by a person having ordinary skill in the art. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (*en banc*); *Home Diagnostics, Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1358 (Fed. Cir. 2004) ("customary meaning refers to the customary meaning in the art field").

A lay person may think of a trench as a ditch in the ground, perhaps made by a backhoe, for the purposes of laying wire or pipe.[10] However, a trench in semiconductor parlance has a specialized meaning. It is therefore instructive to review the specification as well as relevant publications in the field, i.e., semiconductor fabrication.

> 2. "Trenches" are the three-dimensional areas that are removed from the surface of the substrate.

It is crucial to understand that the substrate features are formed by beginning with some thickness of substrate and etching away certain areas, while leaving the substrate patterns behind, much like the way a sculptor begins with a solid piece of material and removes certain areas of material to leave behind the contour of his

---

[10] Amazon's claim construction brief cited to the lay dictionaries Oxford English Dictionary (defining "trench" as "A long narrow (usu. deep) ditch or furrow cut out of the ground"), American Heritage (defining "trench" as "a deep furrow or ditch" or "a long narrow ditch embanked with its own soil and used for concealment and protection in warfare") and Merriam-Webster's Collegiate Dictionary ("a long cut in the ground"). A401.

sculpture. *See* A35-36(2:27-34, 3:47-4:36); A843-45. A substrate feature is an area where the substrate material still exists, while a trench is an area where substrate material has been removed. *Compare id. with* A35-36(2:64-3:1, 4:13-16, 4:35-37). Substrate features include "mesa" or "stripe" features. A36(47-50). The District Court misapprehended the relationship, incorrectly concluding that the specification described the trenches as stripes or mesas. A9.

The specification teaches that a trench is formed by removing material from the substrate. A35-36(2:27-34, 3:47-4:36). The specification describes how etchants are used to remove areas from the surface of the substrate. *Id*; *e.g.*, A36(4:21-23) (describing how a masked substrate may be dipped in an etchant to produce trenches with a curved etching profile). Extrinsic sources also show that a trench is an area in the surface of the substrate from which some amount of material is removed in order to create a pattern on the surface of the substrate. "The term 'trench' is unambiguous in the semiconductor arts… ." *STMicroelectronics, Inc. v. Broadcom Corp.*, No. 4:02-CV-362 at *132 Special Master's Report and Recommendation on Claim Construction Part Two (E.D. Tex. Jan. 2, 2004) (construing "trench" as "a cavity, or recess, formed in the semiconductor substrate.") [11] ; *see also*, e.g., *UniRAM Technology, Inc. v. Monolithic System Technology, Inc.*, 2006 U.S. Dist. LEXIS 21661 (N.D. Cal.,

---

[11] Involving U.S. Patent No. 6,087,709, relating to semiconductor fabrication and assigned class 257, the same class assigned to the '851 patent.

March 30, 2006) (construing a trench as "a recess in the surface of the substrate")[12]; *see also Motorola, Inc. v. Analog Devices, Inc.*, No. 1:03-CV-131 (E.D. Tex., March 23, 2004) ("[b]oth parties agree that 'trench' is defined in the Sematech Dictionary as 'a deeply etched area used to isolate one area from another or to form a storage capacitor on a silicon wafer.'").[13]

United States Patent No. 6,855,620 ("Koike") describes the relationship between trenches and mesa structures.[14] *See* A724. As another example, the Kang article describes gallium nitride grown on patterned sapphire substrates, the same art at issue here. *See* A292-293. As shown below, Kang uses a two-dimensional schematic diagram to illustrate the location of the trench area vis-à-vis the substrate feature, while the same figure also reveals an image of the resulting three-dimensional pattern around the trenched area. *Id*. at A293.[15]

---

[12] Involving U.S. Patent Nos. 6,108,229 and 6,687,148, both relating to semiconductor fabrication.

[13] Involving U.S. Patent No. 5,479,048, relating to semiconductor fabrication and assigned class 257, the same class assigned to the '851 patent; *cf*. Sematech Dictionary, available at http://www.sematech.org/publications/dictionary/ti_to_tz.htm (last visited May 22, 2014) (defining "trench" as "a deeply etched area used to isolate one area from another or to form a storage capacitor on a silicon wafer").

[14] Lexington also used a model depicting exemplary substrate mesa features during the claim construction hearing. The model appearing on the right side of A942 was used during the Markman hearing in this case. The District Court described the model as resembling "snow moguls." A9.

[15] Similar trenches appear in Amazon's tutorial. A778.



Fig. 1.  Schematic diagram of GaN on PSS. The SEM micrograph shows the patterned sapphire substrate after dry etching.

### 3. "Trenches" as used in the art of semiconductor fabrication are not "bounded on the sides and bottom and open at the top".

A trench may not exhibit a complete set of clear sides.  Based on the District Court's construction, the degree to which trenches must be bounded on the sides is unclear.  This could distort the infringement analysis.  While a lay definition of trench, e.g., a ditch dug in the ground in which to place a pipe, may accompany the requirement that a trench be "bounded on the sides and bottom and open at the top", in semiconductor fabrication parlance, a trench is an area removed from the substrate surface and may not have fully-enclosed or clear sides.  *See supra*, § II.B.2 (p. 29).  Individual trenches may combine with adjacent or intersecting trenches, especially at the top of the trench area, making boundaries ambiguous and allowing an infringer to argue that its trenches are not sufficiently bounded on the sides.  *See Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc.*, 796 F.2d

443, 450 (Fed. Cir. 1986) (an improper claim construction may distort the infringement analysis).  Even if trenches were considered grooves mechanically excavated into the substrate surface, there is no suggestion that all such grooves be parallel to one another, and no reason why the use of grooves running at perpendicular or obtuse angles cannot be used to produce island-shaped mesa features.  *See* A453, A465(9:16-24), A724, A787.  When such grooves run perpendicular to one another, then the sides of grooves running in one direction intersect with and combine with the grooves running in the perpendicular direction. *Id*.  In addition, the etching process could run to the edges of the substrate wafer, leaving no clear "sides" at the edges of the wafer and an opportunity for an infringer to argue non-infringement based on the lack of sides that bound the edge of the wafer. *See* A148, A794.

The intrinsic evidence confirms that there need not be distinct <u>side</u> and <u>bottom</u> trench walls, and also that there need not be a bottom wall at all, as revealed by the figures (A28-29):



Fig. 1A                    Fig. 2A

The requirement that a trench area have an open top is also not supported by the specification.  Again, the trench area is the area that has been removed

from the top of the substrate. After the surface of the substrate has been etched, it is impossible to determine the location that had been the top of the trench (the original top surface of the substrate). Put another way, there is no way to know how much of the substrate had been etched away. Therefore, by examining an LED, it is impossible to determine where the top of the trench area might have been. In addition, as part of the LED fabrication process, the trench area is subsequently filled in with the first layer. *See* A795. Indeed, the claim requires "a first layer disposed on said textured district". A38(8:43). It is therefore counterintuitive to refer to the removed substrate material as "open" because the trench areas are subsequently filled in with other layers of the LED.

4.   Two categories of substrate features are described in the specification: mesas and stripes.

As described above, trenches are the areas removed from the substrate surface, which leaves behind the substrate features. By disclosing stripe and mesa features in the Summary of the Invention section of the specification, the patentee described the entire invention and not just a preferred embodiment. A35(2:27-34); *see Microsoft Corp. v. Multi-Tech. Sys.*, 357 F.3d 1340, 1348 (Fed. Cir. 2003)); *see also* A36(3:33-37, 3:47-52). Mesas and stripes are two types of substrate surface features. *Id.* A "stripe" is one example of a substrate pattern remaining on the surface of the substrate after etching

(removing material from the surface of the substrate). *See* A787. A "mesa" is another example of a substrate pattern remaining on the surface of the substrate after etching.[16] A substrate surface feature and a trench share a common border, that is, the side of the substrate feature directly abuts the side of the trench, in three dimensions. *See* A332, A790. This is obvious because it was the etched trench that created the substrate feature. Thus, trenches and substrate surface features are formed side-by-side during the substrate etching process. Therefore, the shape along the edge of the substrate feature and edge of the trench is the same at the boundary. As an analogy, consider that the shape of the top of a rock embedded in a seabed has the same shape as the surface of the water around the sides of the rock – both the water and the sides of the rock share a common three-dimensional border. *See* A846-47.

Thus the sloped profiles of the trenches will correlate to the sloped profiles of the protruding substrate surface features. The specification references the complementary profiles of the "surface features" on the substrate. A36(4:32-36) ("This [surface feature polishing process] effectively converts the sharp corners into a sloped *profile* comprising a smooth rotation of micro-facets. The smooth *surface feature* in the present invention is

---

[16] The Modern Dictionary of Electronics (7th ed., 1999) defines "mesa" as "In certain transistors, the raised area (somewhat resembling a geological mesa) left when semiconductor material is etched away to allow access to the base and collector regions." *See* A778, A788, A790.

essential for the deposition of low defect density structures suitable for device applications.") (emphasis added); *see also* A36(4:13-16) ("The *surface features* in the present invention can be defined on the surface of various substrates using wet etching, dry etching and photoelectrochemical etching.") (emphasis added).

While stripe features would likely be formed using etched stripes, mesa features can be formed by using resist dots. *See* A789. The resulting trench around the mesa substrate feature could be in the shape of a donut. Trenches can take many shapes.

5. <u>The term "trench" is not intended to describe the shape-related properties of the substrate pattern.</u>

As it is used in the claim, the term "trench" is not intended to describe the shape-related properties of the substrate pattern claimed in the invention. Again, the term simply describes the areas of removed material from the surface of the substrate. The shape aspects of the removed areas are left to other aspects of the claim, e.g., "having a sloped etching profile with a smooth rotation of microfacets without a prescribed angle of inclination".

6. <u>The hierarchy of the claim limitations</u>.

The organization of the remaining claim terms is as follows:



Fig. 1A

Fig. 2A

Fig. 2B

Fig. 1A, 1B, 1C
Exemplary Trench
Region

Fig. 2A Exemplary
Trench Region

Fig. 2B Exemplary
Trench Region

Textured district

comprising a plurality of

Etched trenches

having a

Sloped etching
profile

1A, 1B, 1C

2A

with a

Smooth rotation
of microfacets

without a

Prescribed angle
of inclination

2B

Note that the "<u>sloped</u> etching profile" does not include any horizontal

portions of the trench that have no slope.

In contrast, distinguishable substrate patterns include the following:

U.S. Patent No. 6,452,216 ("Tsuda") Fig. 3 (A607-08, A707-13, A729):



United States Patent No. 7,683,386 ("Tanaka") Fig 5A (A344-88):



United States Patent No. 7,759,140 ("Niki") Fig 9 (A710, A729, A851-52):



For the reasons above, the term "trenches" should be construed as "areas in the surface of the substrate from which some amount of material is removed in order to create a pattern on the surface of the substrate".

### C.     "Having"

| Term | Lexington's Proposed Construction | Amazon's Proposed Construction | District Court's Construction |
|------|-----------------------------------|-------------------------------|------------------------------|
| having | [No construction required] otherwise, comprising | consisting of | consisting of |

The District Court erred by construing "having" as "consisting of", giving it a closed construction.

### 1.     The term "having" is usually open.

When a claim recites the transitional term "having", it generally indicates that the claim is open.  *Mobil Oil Corp. v. Amoco Chemicals Corp.*, 779 F. Supp. 1429, 1450 (D. Del. 1991) *aff'd* 980 F.2d 742 (Fed. Cir. 1992) ("When a claim recites the transitional term 'having,' it generally indicates that the claim is open.") citing 2 D. Chisum Patents § 8.06[1][b] (1991) (having is an open transitional term).  An open claim covers any invention which has all the elements of the claim, regardless of whether the invention has elements in addition to those specified in the claim. *See Water Technologies Corp. v. Calco, Ltd.*, 850 F.2d 660, 666 (Fed. Cir. 1988).  Furthermore, "words or expressions of 'manifest exclusion' or 'explicit' disclaimers in the specification are necessary to disavow claim scope." *Housey Pharms., Inc. v. Astrazeneca UK Ltd.*, 366 F.3d 1348, 1352 (Fed. Cir. 2004).

2.     <u>The disclosed embodiments confirm that "having" is an open term</u>.

Claim 1 reads, in relevant part, "a textured district defined on the surface of said substrate comprising a plurality of etched trenches *having* a sloped etching profile… ." A38(8:38-40) (emphasis added).[17]

The claim should not be construed as requiring that the "etched trenches" consist entirely and exclusively of a "sloped etching profile." The patent discloses embodiments where the trenches "are spaced by a base feature" as illustrated in patent figures 2B and 4B. A37(5:16-17) ("The results are similar when the trenches are spaced by a base feature as illustrated in FIG. 2B"); A37(6:10-11) ("The results are similar when the trenches are spaced by a base feature as illustrated in FIG. 4B"). Figure 2B, showing the base feature, is reproduced below:



Fig. 2B

Flat Substrate Base Feature     Sloped Etching Profiles

Thus, the trench may include flat portions that adjoin the flat substrate base features. Accordingly, the District Court's construction requiring that the etched

---

[17] A Certificate of Correction deleted the comma that originally appeared at col. 8, l. 38 after the word "surface". A40.

trenches consist only of a sloped etching profile must be rejected.  *See, e.g., Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1276-77 (Fed. Cir. 2008) ("We normally do not interpret claims in a way that excludes embodiments disclosed in the specification" absent a clear disclaimer).  Similarly, the Supreme Court has held that "if the claim were fairly susceptible to two constructions, that should be adopted which will secure to the patentee his actual invention."  *Smith*, 294 U.S. at 14 (1935).  The patent specification clearly disclosed embodiments with and without a flat base substrate feature.  There is no restriction regarding the shape of the bottom of the trenches.  A trench can "have" a flat bottom in addition to a sloped side.  "[T]here is a strong presumption against a claim construction that excludes a disclosed embodiment."  *In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303, 1324 (Fed. Cir. 2011); *see also C.R. Bard, Inc. v. United States Surgical Corp.*, 388 F.3d 858, 865 (Fed. Cir. 2004) ("[A] construction that excludes a preferred embodiment 'is rarely, if ever, correct.'") "[W]here claims can reasonably [be] interpreted to include a specific embodiment, it is incorrect to construe the claims to exclude that embodiment, absent probative evidence on the contrary."  *Oatey*, 514 F.3d at 1277.  No such evidence exists to exclude the embodiment depicted in Figure 2B of the patent.

### 3.  The District Court erred by excluding disclosed embodiments, concluding that they conflicted with the purpose of the invention.

"The court's task is not to limit claim language to exclude particular devices because they do not serve a perceived 'purpose' of the invention. Rather, the

district court's function is to interpret claims according to their plain language unless the patentee has chosen to be his own lexicographer in the specification or has clearly disclaimed coverage during prosecution." *E-Pass Techs., Inc. v. 3Com Corp.*, 343 F.3d 1364, 1370 (Fed. Cir. 2003) citing *Inverness Med. Switz. GmbH v. Princeton Biomeditech Corp.*, 309 F.3d 1365, 1371-72 (Fed. Cir. 2002). Even if the patent's disclosure discussed the advantages of substrate surface features with sloped etching profiles, it would not mean that the claims limit the textured district to consisting only of sloped etching profiles. *See Yoon Ja Kim v. ConAgra Foods, Inc.*, 465, F.3d 1312, 1319 (Fed. Cir. 2006) (refusing to limit claim based on an "object of the invention".)

Here, the District Court erred by excluding clearly-disclosed embodiments of the invention by importing what it believed were claim limitations from the specification.[18] *Phillips*, 415 F.3d at 1319-20 (quoting *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1340 (Fed. Cir. 2001)) (articulating that a "cardinal sin" of patent law is reading limitations into the claims from the specification).

---

[18] The efficacy of the invention described by the '851 patent is supported by test results reported in United States Patent No. 7,759,140 ("the Lee patent") at col. 6, ll. 34-55. Note that in the Lee Patent, Fig. 3a depicts a cross-sectional view of the substrate pattern while Fig. 3b depicts a more oblique view. Both views clearly indicate the presence of a flat base substrate portion between the mesa features.

The District Court found that the object of the invention is "to 'reduce' the number of lattice defects." A19. The District Court opined that the embodiment shown in Figure 2B would "leave a proportionately higher amount of space between the features such that defects would propagate directly up at a 90 degree angle." A12. The District Court therefore improperly excluded the embodiment of Figure 2B, finding that it was "antithetical to the purpose of the patent." *Id*.

Moreover, in concluding that the object of the invention precluded flat portions of the substrate surface, the District Court overlooked the clear teaching of the specification: "[t]he results are similar when the trenches are spaced by a base feature as illustrated in FIG. 2B… ." A37(5:16-17). If the presence of a substrate base feature undermined the object of the invention, the results (with or without a flat bottom) would not be "similar". *See id*.

Another reason why "having" must be open is that the patent does not restrict the spacing of the substrate surface features, and some amount of flat substrate base will be exposed between the mesa features, as depicted below:



4.    <u>The District Court erred by conflating the requirement that a "textured district" must include one or more surface features, and instead incorrectly understood the claim to require that the "textured district" consist entirely of the surface features, with no substrate base portion.</u>

Lexington does not dispute that the "textured district" is an essential element of the patent. The specification states that the textured surface district is essential for the growth of smooth layers without the occurrence of chaotic micro-faceting. A35(2:32-34). The surface features described by the specification do not include the flat substrate base portion:



A719.  Indeed, the specification makes clear that it is the smooth *surface features* that are essential.  A36(4:35-37).

The District Court misapprehended the issue, stating "opening the claim to encompass embodiments without a 'sloped etching profile' would frustrate the purpose of the invention."  A11.  However, there is no suggestion that the claim encompasses embodiments without a "sloped etching profile," i.e., an entirely flat substrate.  The actual issue is whether the surface of the substrate could also include portions that were not sloped, an embodiment clearly described in the specification and disclosed by disclosed embodiments of the invention.  A29(Fig. 2B), A37(5:16-17).  The District Court erroneously concluded that the object of the invention was in tension with the embodiments clearly disclosed in the figures.

Construction of the term "having" as open comports with the clear language of the specification, which disclosed embodiments with and without a flat base

substrate feature.  For all of the reasons explained above, the term "having" should be construed as open.

### D.     "Microfacets"

| Term | Lexington's Proposed Construction | Amazon's Proposed Construction | District Court's Construction |
|------|------------------------------------|---------------------------------|--------------------------------|
| microfacets | very small planes that make up a surface contour | planar crystal surfaces | very small planar crystal surfaces |

The District Court construed "microfacets" as "very small planar crystal surfaces".  Lexington does not object to the inclusion of the word "crystal" in the construction.

### 1.    The District Court erred by failing to provide context for the "very small" qualifier.

The invention deals with defect propagation arising from a mismatch in the lattice structures of two crystalline materials, those making up the substrate and the first layer of an LED.  A26(Abstract), *see also* A693-96, A770.  The edges of crystalline materials are made up of flat faces known as "facets" owing to their atomic composition as a crystal lattice.  A726-727, A769.  Lexington proposes that the District Court's construction be amended to provide scope and context to the "very small" qualifier by indicating that microfacets are very small in relation to the surface contour of the substrate pattern features.  *See* A805.  This proposal places the proper amount of scope on the term and helps the jury to understand the role and location of microfacets.  *See Moore U.S.A., Inc. v. Standard Register Co.*,

229 F.3d 1091, 1111 (Fed. Cir. 2000) ("We note that there is nothing wrong with defining the dimensions of a device in terms of the environment in which it is to be used.")

The specification confirms that a surface contour exists on the processed substrate surface, together with its substrate surface features.  A36-37(4:67-5:2). Accordingly, the substrate features are three-dimensional, and the substrate features have a surface contour.  *Id*.  The trenches that create the substrate features are also three-dimensional and have a surface contour.  *See supra*, § II.B.2 (p. 29). The first layer that is deposed on the textured substrate surface inherits the shape of the trenches and conforms to the shapes of the textured substrate surface.  *See supra*, § II.B.4 (p. 34).  Both the first layer and the substrate are made of crystalline materials and their surfaces consist of planar crystal surfaces.  *See supra*, § I.G (p. 21).

With that in mind, it is crucial to differentiate the very small planar crystal surfaces that *individually* constitute the flat substrate base portions between the substrate surface features (which are also very small) from the very small planar crystal surfaces that *collectively* make up the sloped profile of the crystalline substrate surface features themselves.[19]  *See Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1311 (Fed. Cir. 1999) (requiring that terms be interpreted

---

[19] The flat planar portions between the substrate surface features could be one micron, a millionth of an inch.  *See* A148.

according to their context).  By clarifying that microfacets are the very small planes that make up a surface contour, the jury will be able to distinguish them from the planes between the surface features.  The diagram below summarizes the issue:



Fig. 2B  Embodiment

Before the District Court, Lexington proposed that the term should be construed as "very small planes that make up a surface contour".  Lexington does not dispute that the planes and surfaces involved are crystalline materials.  Therefore, Lexington acknowledges that another reasonable construction would be "very small *planar crystal surfaces* that make up a surface contour".  Lexington also explains *infra*, § II.E.5 (p. 58), that a sloped etching profile "with a smooth rotation of microfacets" is equivalently and more simply explained using the phrase "without sharp corners."  If this Court agrees, then construction of the term "microfacets" may be unnecessary.

E.  **"Sloped etching profile with a smooth rotation of microfacets"**

| Term | Lexington's Proposed Construction | Amazon's Proposed Construction | District Court's Construction |
|---|---|---|---|
| sloped etching profile with a smooth rotation of microfacets | [No construction required] otherwise, sloped surface contour without sharp corners | when viewed in cross-section, the side and bottom walls of the etched trenches are made up of micro-facets with a gradual, incremental rotation in slope from micro-facet to micro-facet such that there are no sharp corners | when viewed in cross-section, the side and bottom walls of the etched trenches are made up of micro-facets with a gradual, incremental rotation in slope from micro-facet to micro-facet such that there are no sharp corners |

1.  The District Court erred by including the bottom walls of the etched trenches in the "sloped etching profile".

The "sloped etching profile" refers to the sloped sides of the etched trenches.

The following diagrams reflecting the shape of the "sloped etching profiles" is from *supra*, § II.B.6 (p. 37):



49

First, it is apparent from the renderings above, the sloped etching profile of the embodiments described by Figures 1A, 1B, and 1C do not have distinct side and bottom walls. Second, the sloped etching profile of the embodiments described by Figures 2A and 2B have no bottom wall at all (the sloped etching profile of Figure 2B does not include the flat bottom, which is not sloped.)

The "*sloped* etching profile" cannot include the *flat* bottom of the trench. The trenches depicted in the patent's Fig. 2B clearly consist of a sloped etching profile and something else – a flat bottom. The *flat* bottom cannot be part of the *sloped* etching profile. They are two different things.[20] Therefore, the trench may consist of a flat bottom portion (or an unsloped etching profile) *and* a sloped etching profile. Accordingly, the sloped etching profile does not include the flat bottom portion. And as required by the claim, it is the "sloped etching profile" that has the "smooth rotation of microfacets."

---

[20] The etching profile is described in the specification as both "sloped" and "curved", providing evidence that a "sloped etching profile" is curved. A36(4:21-23) ("Alternatively, the masked substrate is directly dipped in an isotropic etchant to produce trenches with a curved etching profile.") (emphasis added); *see also* A36(3:58-59) ("the etching is diffusion limited resulting in a curved etching profile.") (emphasis added).



Fig. 2B

Flat Substrate Base Feature          Sloped Etching Profiles

Extrinsic evidence reveals that a profile may be construed as either an outline or a contour.  *See* A343 (defining a profile as, *inter alia*, "a view of anything in contour; outline".)  In addition, other patents in related fields of art have used two-dimensional drawings to represent three-dimensional substrate surface features.  *Compare, e.g.*, A361 with A362.

This Court recently considered the word "profile" in connection with a patent involving an optical element that houses an LED.  *See GE Lighting Solutions, LLC v. AgiLight, Inc.*, No. 2013-1267 at *8-11 (Fed. Cir. May 1, 2014).  *AgiLight* is referenced to make two points.  First, in *AgiLight* the term "profile" was used to describe spherical and ellipsoidal profiles, both being three-dimensional shapes relating to LEDs.  *Id*. at *9.  Second, this Court held that the term "profile" did not need to apply to every portion of a cross-sectional outline.  *Id*. at *10-11.  In reaching its decision, this Court declined to exclude a disclosed embodiment.  *Id*.  The present case is not nearly as close as *AgiLight*.  Here, Lexington is simply submitting that an infringement determination be based on the

51

*sloped* sides of the *sloped* etching profile, as the term itself clearly contemplates. This makes perfect sense, and is fully supported by the intrinsic evidence, including the disclosed embodiments.

For all of the above reasons, the claim language makes clear that the "sloped etching profile" does not include the flat, linear portions that exist when the trenches are spaced by a base feature. Instead, the intrinsic evidence clearly reveals that the "sloped etching profile" refers to the "sloped sides" of the etched trenches.

> 2.    The District Court erred by distorting the infringement analysis through the addition of the qualifier "when viewed in cross-section" when potentially limitless cross-sections exist.

The District Court's adoption of the term "cross-section" in place of "profile" fundamentally distorts the infringement analysis. While the patent has consistently used "profile" to apply to the sloped etching profile and substrate patterns, a "cross-section" can be taken along any arbitrary plane of a substrate feature. A substrate feature that has a smooth cross-section may, in fact, have sharp edges that do not appear as part of one cross-section, but would appear in another cross-section. Hence, use of the term "cross-section" invites ambiguity and confusion.

There are an infinite number of cross-sections that may be taken of the three-dimensional substrate patterns from an infinite number of perspectives. While

"etching profile" is a term of art to describe how the etching process proceeds over a three-dimensional face of the substrate surface, a "cross-section" is a two-dimensional rendering of the resulting substrate face. The same face cross-sectioned along various planes will result in several different cross-sectional renderings. Because the District Court's construction places no limitation on the angle of the cross-section or the number of cross-sections, the textured district may concurrently both meet and not meet the claim limitation because its cross-sectional shape is dependent upon the plane of the cross-section. This Court has held that a claim limitation cannot be concurrently both met and not met. *Minn. Mining and Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1299 (Fed. Cir. 2002). The following illustrates the effect of the selection of the cross-sectioning plane on stripe and mesa substrate features (*see* A787):



The following shows the various cross-sections that are available by cross-sectioning disclosed embodiments across different planes:



That the patent drawings depict two-dimensional cross-sectional views does not imply that the claims refer to trenches that only contain a specific cross-section or trenches that only exist in a particular configuration. A review of the specification reveals that it uses "cross-section" to refer to the figures. In fact, the only use of "cross-section" is in the phrase "cross-sectional <u>view</u>."[21] In other words, the specification provides evidence that references to "cross-sections" are merely views or renditions – not the actual three-dimensional physical realization of the surface topography of the trenches or the processed substrate. The claim limitations are directed to the physical realization, not the two-dimensional rendition.

---

[21] *See* A35(2:59, 2:64); A36(3:1, 3:7, 3:11, 3:26-27, 4:47); A37(5:11, 5:66); A38(8:20).

Each reference to "profile" in the specification refers to the three-dimensional contour of the trenches and substrate surface features. "[W]hen a patentee uses a claim term throughout the entire patent specification, in a manner consistent with only a single meaning, he has defined that term "by implication." *Bell Atlantic Network Services v. Covad Communications*, 262 F.3d 1258, 1271 (Fed. Cir. 2001).

The District Court's substitution of "cross section" for "profile" is at odds with the very essence of the invention. Both the etched trenches and the substrate surface features that are left behind on the surface of the substrate after etching are three-dimensional. *See* A806. Likewise, the smoothing of a three-dimensional substrate pattern results in both a smoothed etched trench and a smooth surface contour on the surface of the substrate feature.[22] *See* A806-08.

For the above reasons, the construction of the "sloped etching profile" should not ambiguously refer to "when viewed in cross-section" or otherwise refer to a cross-section. Instead, "profile" is used in the specification to denote a three-dimensional contour. However, the word "profile" should not be read in isolation. It should be read as part of the phrase "sloped etching profile". "Sloped" means that it applies to the sloped portion of the etched trench. "Etching" means that

---

[22] The specification also describes the use of isotropic etching, which provides for the (non-directional) removal of substrate material in three dimensions. *See* Wikipedia, Isotropic etching, at http://en.wikipedia.org/wiki/Isotropic_etching (last visited May 22, 2014).

material has been removed from the surface of the substrate using, for example, acid, as described in the specification. Taken together, the phrase "*sloped etching profile*" refers to the three-dimensional *sloped sides* of the *etched trenches*.

### 3. The District Court erred by reading the word "sloped" out of the term.

Without justification, the District Court's construction improperly read the word "sloped" out of the term. *See Agilent Techs, Inc. v. Affymetrix, Inc.*, 567 F.3d 1366, 1378 (Fed. Cir. 2009) (rejecting claim construction that rendered a claim term superfluous noting that "[a] claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so.") (internal citation omitted).

### 4. The District Court erred by requiring that microfacets have "a gradual, incremental rotation in slope from micro-facet to micro-facet".

There is no support anywhere in the specification for a requirement that there be a "gradual, incremental rotation in slope from micro-facet to micro-facet."

### 5. The District Court erred by excluding a disclosed embodiment of the invention, finding a flat substrate bottom to be inconsistent with the purpose of the invention.

As described above in the context of the "having" term *supra*, § II.C.3, (p. 41), the District Court improperly found that a substrate having any flat portion was inconsistent with the purpose of the invention. The District Court then erroneously ignored disclosed embodiments.

The District Court's construction also requires that the bottoms of the trenches must contain a smooth rotation of microfacets, in effect requiring that the bottoms must be curved. The construction ignores disclosed embodiments where the trenches "are spaced by a base feature" as illustrated in patent figures 2B and 4B. A37(5:16-17) ("The results are similar when the trenches are spaced by a base feature as illustrated in FIG. 2B") and A37(6:10-11) ("The results are similar when the trenches are spaced by a base feature as illustrated in FIG. 4B"). Figure 2B, showing the base feature, is reproduced below:



Fig. 2B

6. The District Court's construction erroneously requires that individual microfacets must be visible.

The District Court combined the phrase "when viewed in" with "microfacets". In doing so, the construction confusingly suggests that the microfacets may need to be visible when *viewed in* cross-section. Individual microfacets may be too small to be seen in a cross-section depicting the substrate pattern feature. It is error to require that a claim element needs to be visible in a specific orientation. Indeed, the visibility of microfacets, which themselves are very small crystal planes, may depend upon their orientation in relation to the

chosen planar cross-section. Thus, requiring that microfacets be visible along an arbitrary cross-section distorts the infringement analysis. *See Bausch & Lomb*, 796 F.2d at 450.

7.     The specification makes clear that a "sloped etching profile with a smooth rotation of microfacets" indicates the absence of sharp corners.

The invention is distinguished by the use of trenches and substrate surface features that have a smooth sloped etching profile. *See* A708, A710-713, A725, A739, A773. The specification describes how the substrate is processed to "polish off sharp corners and etching defects." A36(4:25-32). The specification further states that the substrate processing "converts the sharp corners into a sloped profile comprising a smooth rotation of micro-facets." A36(4:32-34). This recitation provides probative evidence that the phrase "sloped profile comprising a smooth rotation of micro-facets" indicates the absence of "sharp corners." Moreover, the specification recites that both the trenches and the mesas have a "smooth rotation of micro-facets." A36(3:35-37). Of course, this makes sense because they share common borders. *See supra*, § II.B.4 (p. 34). Therefore, in view of the specification, "sloped etching profile with a smooth rotation of microfacets" means that the contour of the sides of the etched trench are sloped and are without sharp corners.

8. <u>Appropriate construction</u>.

For all of the reasons explained above, the term "sloped etching profile with a smooth rotation of microfacets" could reasonably be construed as "sloped trench side without sharp corners." Before the District Court, Lexington proposed that no construction was required, but otherwise the term should be construed as "sloped surface contour without sharp corners." While the sloped etching profile refers to the sloped sides of the trench, as described above, the sides of the substrate surface features adjoin the sloped sides of the trenches. Therefore the sides of the removed area and the remaining area have the same shape as illustrated below:



Fig. 1A, 1B, 1C Exemplary Trench Region: The shapes of the sloped sides of the trenches are the same as the shapes of the sloped sides of the substrate surface contour.

59



Fig. 2A        Fig. 2B

Fig. 2A        Fig. 2B

As illustrated above, the sloped angle or curve of both the trench and the substrate feature will be the same along every point of the common border. Accordingly, both the trenches and the substrate surface features share the same shape along the sloped sides of the trench. The specification confirms that a surface contour exists on the processed substrate surface, together with its substrate surface features. A36-37(4:67-5:2). Hence, both the sloped etching profile of the trench and the sloped sides of the substrate surface features exhibit a "sloped surface contour." A jury may find it more straightforward to assess infringement in the context of the substrate surface features that remain after the etching process instead of the shape of the substrate material removed, that is, the trench. In any case, Lexington proposes that no construction is required, but otherwise proposes that the term be construed as "sloped surface contour without sharp corners."

## F. "Sloped etching profile… without a prescribed angle of inclination"

| Term | Lexington's Proposed Construction | Amazon's Proposed Construction | District Court's Construction |
|------|-----------------------------------|-------------------------------|------------------------------|
| a sloped etching profile… without a prescribed angle of inclination | [No construction necessary], otherwise: a sloped surface contour... without a specific angle of inclination | when viewed in cross-section, the side and bottom walls of the etched trenches have no constant angle of inclination, and so they have no linear portions | when viewed in cross-section, the side and bottom walls of the etched trenches have no constant angle of inclination, and so they have no linear portions |

1.  The District Court erred by including the bottom walls of the etched trenches in the "sloped etching profile".

The claim language makes clear that the "sloped etching profile" does not include the flat, linear portions that exist when the trenches are spaced by a based feature.  Instead, the intrinsic evidence clearly reveals that the "sloped etching profile" refers to the "sloped sides" of the etched trenches.  *See supra*, § II.E.1, (p. 49).

2.  The District Court erred by distorting the infringement analysis through the addition of the qualifier "when viewed in cross-section" when potentially limitless cross-sections exist.

The District Court's adoption of the term "cross-section" in place of "profile" fundamentally distorts the infringement analysis.  While the patent has consistently used "profile" to apply to the sloped etching profile and substrate patterns, a "cross-section" can be taken along any arbitrary plane of a substrate

feature.  Hence, use of the term "cross-section" invites ambiguity and confusion, and distorts the infringement analysis.  *See supra*, § II.E.2, (p. 52).

      3.      <u>The District Court erred by reading the word "sloped" out of the term</u>.

Without justification, the District Court's construction improperly read the word "sloped" out of the term.  *See supra*, § II.E.3, (p. 56).

      4.      <u>The District Court erred by requiring that microfacets have "a gradual, incremental rotation in slope from micro-facet to micro-facet"</u>.

There is no support anywhere in the specification for a requirement that there be a "gradual, incremental rotation in slope from micro-facet to micro-facet."

      5.      <u>The District Court erred by excluding a disclosed embodiment of the invention, finding a flat substrate bottom to be inconsistent with the purpose of the invention</u>.

As described above in the context of the "having" term *supra*, § II.C.3, (p. 41), the District Court improperly found that a substrate having any flat portion was inconsistent with the purpose of the invention.  The District Court then erroneously ignored disclosed embodiments.  *See supra*, § II.E.5, (p. 56).

6.  The District Court erred by interpreting "without a prescribed angle of inclination" as "without linear portions".

The phrase "angle of inclination" means that the angle is inclined – not horizontal.[23]  Simply, put, the horizontal portions of both the etched trenches and the substrate surface are linear portions, but do not have an angle of inclination. Hence, the District Court erred by concluding that the lack of a constant angle of inclination meant that there are no linear portions.  *See* A729, A822.



United States Patent No. 7,683,386 ("Tanaka") Fig 5A (A344-88):



In addition, the "no linear portions" construction must be rejected because the patent discloses embodiments where the trenches "are spaced by a base

---

[23] The parties agreed that "inclined" meant "inclined relative to the overall plane of the substrate" in the context of the term "comprising a plurality of inclined lower portions."  A7-A8.

feature" as illustrated in patent figures 2B and 4B. *See* A37(5:16-17) ("The results are similar when the trenches are spaced by a base feature as illustrated in FIG. 2B") and A37(6:10-11) ("The results are similar when the trenches are spaced by a base feature as illustrated in FIG. 4B").

### 7.    Appropriate construction.

For all of the reasons explained above, the term "sloped etching profile… without a prescribed angle of inclination" could reasonably be construed as "sloped trench sides without a constant angle of inclination."[24]  Before the District Court, Lexington proposed that no construction was required, but otherwise the term should be construed as "sloped surface contour… without a specific angle of inclination."  The sloped etching profile of the trench and the sloped sides of the substrate surface features exhibit a common "sloped surface contour."  *See supra*, § II.E.8, (p. 59).  Accordingly, Lexington proposes that no construction is required, but otherwise proposes that the term be construed as "sloped surface contour… without a constant angle of inclination."

---

[24] The parties had identified the term "prescribed" as a separate claim term.  A664. The District Court construed "prescribed" as "constant".  A16.  Lexington is not appealing the construction of the term "prescribed".

## CONCLUSION

This Court should reverse the invalidity finding and final judgment of the District Court and remand with instructions to the District Court to vacate its claim construction and enter those constructions proffered by Lexington:

| Term | Lexington's Proposed Construction |
|---|---|
| trenches | [No construction required] otherwise, areas in the surface of the substrate from which some amount of material is removed in order to create a pattern on the surface of the substrate |
| having | [No construction required] otherwise, comprising |
| microfacets | very small planes that make up a surface contour |
| sloped etching profile with a smooth rotation of microfacets | [No construction required] otherwise, sloped surface contour without sharp corners |
| a sloped etching profile… without a prescribed angle of inclination | [No construction required] otherwise, sloped surface contour… without a constant angle of inclination |
| said substrate is selected from the group comprising | said substrate containing at least one of the following |

Respectfully Submitted,

Dated:  May 27, 2014          By:  */s/ Robert D. Katz*_____
                                   Robert D. Katz
                                   Katz PLLC
                                   6060 N. Central Expressway, Suite 560
                                   Dallas, Texas 75206
                                   214-865-8000 (Firm)
                                   888-231-5775 (Fax)
                                   rkatz@katzlawpllc.com

                                   David S. Godkin
                                   Birnbaum & Godkin LLP
                                   280 Summer Street
                                   Boston, MA 02210
                                   617-307-6100 (Firm)
                                   617-307-6101 (Fax)
                                   godkin@birnbaumgodkin.com

                                   *Counsel for Plaintiff-Appellant*
                                     *Lexington Luminance LLC*

CASE PARTICIPANTS ONLY     Case: 14-1384     Document: 7     Page: 81     Filed: 05/27/2014

# __ADDENDUM__

# ADDENDUM TABLE OF CONTENTS

**PAGE**

Judgment
       filed March 19, 2014........................................................................................A1

Order of
The Honorable Denise J. Casper
Construing Claim Terms and Granting Defendant's
Motion for Judgment on the Pleadings
       filed March 18, 2014.......................................................................................A2

United States Patent No. 6,936,851
       dated August 30, 2005 ................................................................................A26

Case 1:12-cv-12216-DJC   Document 89   Filed 03/19/14   Page 1 of 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

**LEXINGTON LUMINANCE LLC**
                          Plaintiff(s)

                v.                                    CIVIL ACTION NO. **12-12216-DJC**

**AMAZON.COM INC., ET AL**
                          Defendant(s)

**JUDGMENT IN A CIVIL CASE**

CASPER, D.J.

☐   **Jury Verdict.**  This action came before the court for a trial by jury.  The issues have been tried and the jury has rendered its verdict.

X   **Decision by the Court**.  In accordance with the Memorandum and Order dated March 18, 2014;

   **IT IS  ORDERED AND ADJUDGED**

   Judgment for the defendants Amazon.com Inc. and Amazon Digital Services, Inc.

                                                Robert M. Farrell, Clerk

Dated:  March 19, 2014                          __/s/ Lisa M. Hourihan_____
                                                ( By )  Deputy Clerk

NOTE:  The post judgment interest rate effective this date is ____%.

**A1**

## UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

_____

                                                    )
                                                    )
LEXINGTON LUMINANCE LLC,                            )
                                                    )
       Plaintiff,                                   )
                                                    )
       v.                                           )        Civil Action No. 12-cv-12216-DJC
                                                    )
AMAZON.COM, INC. and                               )
AMAZON DIGITAL SERVICES, INC.,                      )
                                                    )
       Defendants.                                  )
                                                    )
_____)

## MEMORANDUM AND ORDER

**CASPER, J.**                                                    **March 18, 2014**

## I.     Introduction

Plaintiff Lexington Luminance LLC ("Lexington") has filed this lawsuit for patent infringement against Amazon.com, Inc. and Amazon Digital Services, Inc. (collectively "Amazon").  Amazon has now moved for judgment on the pleadings.  D. 49.  In addition, the parties have argued their proposed claim constructions before the Court and the Court's claim constructions follow.  For the reasons stated below, the Court ALLOWS Amazon's motion for judgment on the pleadings.

## II.    Standard of Review

### A.     Claim Construction

Claim construction is a question of law for the determination by the court.  Markman v. Westview Instruments, Inc., 517 U.S. 370, 388-89 (1996).  The Court assigns claim terms the ordinary and customary meaning that a person of ordinary skill in the art in question would have

assigned to the terms at the time of the invention.  Phillips v. AWH Corp., 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc) (citations omitted).  "[T]he person of ordinary skill in the art is deemed to read the claim term . . . in the context of the entire patent, including the specification."  Id. at 1313.

The patent specification "'is always highly relevant to the claim construction analysis.  Usually it is dispositive; it is the single best guide to the meaning of a disputed term.'"  Id. at 1315 (quoting Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996)).  In fact, "the claims themselves provide substantial guidance as to the meaning of particular claim terms."  Id. at 1314.  Because the purpose of the specification is to "teach and enable those of skill in the art to make and use the invention and to provide the best mode for doing so," Phillips, 415 F.3d at 1323, it is "entirely appropriate for a court, when conducting claim construction, to rely heavily on the written description for guidance as to the meaning of the claims."  Id. at 1317.

The patent's prosecution history "can [also] often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be."  Id. (citations omitted).  Although courts generally do not accord extrinsic evidence the weight that they accord to intrinsic evidence, the Court may consider extrinsic evidence "if the court deems it helpful in determining the true meaning of language used in the patent claims."  Id. at 1318.  Ultimately, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention [in the specification] will be, in the end, the correct construction."  Id. at 1316 (citation omitted).

## B.    Indefiniteness

The Patent Act requires that every patent's specification must "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112(b).  "Because the claims perform the fundamental function of delineating the scope of the invention, the purpose of the definiteness requirement is to ensure that the claims delineate the scope of the invention using language that adequately notifies the public of the patentee's right to exclude," Datamize, LLC v. Plumtree Software, Inc., 417 F.3d 1342, 1347 (Fed. Cir. 2005) (citations omitted), and the boundaries of the patentee's invention, Halliburton Energy Servs., Inc. v. M-I LLC, 514 F.3d 1244, 1253 (Fed. Cir. 2008).  The patentee has satisfied this requirement only when the claims "clearly distinguish what is claimed from what went before in the art and clearly circumscribe what is foreclosed from future enterprise." United Carbon Co. v. Binney & Smith Co., 317 U.S. 228, 236 (1942).

Patents are presumed valid.  35 U.S.C. § 282(a).  "By finding claims indefinite only if reasonable efforts at claim construction prove futile, [courts] accord respect to the statutory presumption of validity and we protect the inventive contribution of patentees, even when the drafting of their patents has been less than ideal." Exxon Research & Eng'g Co. v. United States, 265 F.3d 1371, 1375 (Fed. Cir. 2001).  A party seeking a declaration of invalidity must prove same by clear and convincing evidence. Budde v. Harley–Davidson, Inc., 250 F.3d 1369, 1376 (Fed. Cir. 2001).

## C.    Motion for Judgment on the Pleadings

Pursuant to Rule 12(c), a party may move for judgment on the pleadings.  "A motion for judgment on the pleadings is treated much like a Rule 12(b)(6) motion to dismiss." Perez-Acevedo v. Rivero–Cubano, 520 F.3d 26, 29 (1st Cir. 2008) (citing Curran v. Cousins, 509 F.3d

36, 43-44 (1st Cir. 2007)).  When considering a motion under Rule 12(c), a court must view the

facts in the pleadings and the reasonable inferences therefrom in the light most favorable to the

nonmovant.  Perez-Acevedo, 520 F.3d at 29 (citation omitted).  In reviewing the motion, the

Court may also "consider 'documents the authenticity of which are not disputed by the parties; . .

. documents central to plaintiffs' claim; [and] documents sufficiently referred to in the

complaint.'"  Curran, 509 F.3d at 44 (quoting Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993)).

To survive a Rule 12(c) motion, "a complaint must contain factual allegations that 'raise a right

to relief above the speculative level, on the assumption that all the allegations in the complaint

are true. . . .'"  Perez-Acevedo, 520 F.3d at 29 (quoting Bell Atlantic Corp. v. Twombly, 550

U.S. 544, 555 (2007)).  "[A]n adequate complaint must provide fair notice to the defendants and

state a facially plausible legal claim."  Ocasio-Hernandez v. Fortuño-Burset, 640 F.3d 1, 12 (1st

Cir. 2011).

## III.    Factual Background and Procedural History

Lexington is a limited liability company organized under the laws of Massachusetts that

is the sole owner of U.S. Patent No. 6,936,851 ("the '851 patent") entitled "Semiconductor

Light-Emitting Device and Method for Manufacturing the Same."  D. 1 ¶ 1, 9.  The '851 patent's

specification describes the invention as relating to "the fabrication of semiconductor devices

such as light-emitting devices in misfit systems."  Col. 1:9-10.[1]  A light-emitting diode ("LED")

is a semiconductor light source that is used in various pieces of electronic equipment, especially

for displaying readings on digital displays.  D. 50 at 3; D. 51 at 6; D. 82-1 at 7-22.  Part of the

process for creating an LED includes applying a semiconductor layer on a substrate.  Col. 2:12-

---

[1] References to "Col. _:_" refer to column and line numbers for the '851 patent.  As the patent is attached to the complaint, the Court may consider it in its resolution of Amazon's motion.  Watterson, 987 F.2d at 3.

26.  The atomic structures of these two layers both form a matrix or "lattice" pattern, but do not align perfectly and therefore form what the patent refers to as a "lattice misfit system."  Col. 1:9-10.  One of the drawbacks of the "misfit system" is that "the quality of the directly disposed layer is inferior to the penetration of the threading dislocations in this material system."  Col. 1:19-23.  Elsewhere in the patent these are referred to as "lattice defects."  Col. 1:11.  That is, as Lexington contended at the Markman hearing, because the atoms in these structures do not align perfectly, these defects propagate in the active layer of the LED construct and manifest themselves by decreasing the efficacy and longevity of the device.   D. 84 (argument at 11/21/2014 Markman hearing).  The patented invention teaches the user to "guide" "the lattice defects" such that they are "contained in designated locations," which results in "the free propagation of extended defects . . . [being] restricted and the overall defect density of the system [being] reduced."  Col. 1:12-15.  The invention accomplishes this feat by creating a curved surface or "textured district" atop the substrate.  Col. 8:38.  Accordingly, the defects do not all rise directly upward into the active layer of the LED device, but instead bounce to the side, as demonstrated in Figure 2A of the patent:



Fig. 2A

Only one of the patent claims is at issue in this litigation, claim 1, which reads:

A semi conductor light-emitting device comprising:  a substrate; a textured district defined on the surface, of said substrate comprising a plurality of etched trenches having a sloped etching profile with a smooth rotation of microfacets

without a prescribed angle of inclination; a first layer disposed on said textured district; comprising a plurality of inclined lower portions so as to guide the extended lattice defects away from propagating into the active layer, said first layer and said substrate form a lattice-mismatched system, said substrate is selected from the group comprising group III-V, group IV, group II-VI elements and alloys, ZnO, spinel and sapphire; and a light-emitting structure containing an active layer disposed on said first layer.

Col. 8:35-52.

Amazon markets e-reader devices and tablet computers, including the "Kindle Fire." D. 1 ¶ 12. Lexington filed this lawsuit on November 29, 2012 and alleges that these Amazon products infringe the '851 patent. Id. Amazon filed its answer and counterclaims on February 15, 2013, asserting an invalidity defense, D. 13 at 4 ¶ 16, and a counterclaim for a declaratory judgment that that the '851 is invalid. Id. at 7 ¶ 17. Amazon moved for judgment on the pleadings on its invalidity defense to Lexington's claim of infringement and its counterclaim for a declaration of invalidity. D. 49. The Court heard the parties on these matters and on claim construction on November 21, 2013 and took this matter under advisement. D. 84.

## IV. Discussion

### A. Undisputed Terms

As an initial matter, the Court adopts the undisputed constructions jointly proposed by the parties. These terms shall be construed as follows:

| Term | Construction |
| --- | --- |
| Substrate | The supporting material upon which the other layers of an light-emitting device are grown |
| Layer | A thickness of material, which may be made up of sublayers, but does not refer to a substrate |
| Disposed on | Applied directly or indirectly above |

Case: 14-1384 Case: 14-1384 CASE PARTICIPANTS ONLY Document 16 Document 91 Page: 90 Page: 90 Filed: 05/27/2014 Filed: 05/27/2014

Case 1:12-cv-12216-DJC   Document 87   Filed 03/18/14   Page 7 of 24

| Comprising a plurality of inclined lower portions | Including one or more lower portions that are inclined relative to the overall plane of the substrate |
|---|---|
| Lattice-mismatched misfit system | A system in which a crystal layer exhibiting one lattice constant is disposed on a substrate that exhibits a different lattice constant |
| Group III-V . . . elements and alloys | an alloy of at least one group III element (i.e., boron, aluminum, gallium, indium, thallium, scandium, yttrium) and at least one group V element (i.e., nitrogen, phosphorous, arsenic, antimony, bismuth, vanadium, niobium, tantalum, dubnium) |
| Group IV . . . elements and alloys | a group IV element alone (i.e., carbon, silicon, germanium, tin, lead, titanium, zirconium, hafnium, rutherfordium), or an alloy of two or more group IV elements |
| group II-VI . . . elements and alloys | an alloy of at least one group II element (i.e., beryllium, magnesium, calcium, strontium, barium, radium, zinc, cadmium, mercury, copernicium) and at least one group VI element (i.e., oxygen, sulfur, selenium, tellurium, polonium, livermorium, chromium, molybdenum, tungsten, seaborgium) |
| active layer | the layer in the light-emitting device that emits the light |

**B.**     **Disputed Terms**

The parties dispute the meaning of the following terms and the Court resolves these

disputes as discussed below:

1.     *"Trenches"*

| Term | Lexington's Proposed Construction | Amazon's Proposed Construction |
|---|---|---|
| trenches | [No construction required] otherwise, areas in the surface of the substrate from which some amount of material is removed in order to create a pattern on the surface of the substrate | Generally elongated depressions bounded on the sides and bottom and open at the top |

The parties' disagreement regarding "trenches" lies at the heart of the dispute as to how the Court should construe the claim. At oral argument, Lexington argued that Figure 2B and Figure 4B of the patent support its proposed construction.



Fig. 2B                    Fig. 4B

Extrapolating from this figure, and relying on language from the specification that describes the trenches as "stripes" or "mesas," Col. 3:48, Lexington's position is that the surface of the substrate can appear as "stripes," as shown in Fig. 7A,



Fig. 7A

or as "mesas." D. 50 at 7-10. An aerial view of "mesas," however, does not appear in the specification. Accordingly, at oral argument, counsel for Lexington brought his own model of such a construct, resembling the following three-dimensional image of snow moguls:



Lexington argues that if this is a potential embodiment of the patent-in-suit, then the trenches could not be generally elongated if the "textured district" is a mesa pattern.  D. 58 at 4-6. Amazon, at oral argument, noted that a visual rendering of mesas does not appear in the specification, and that if Lexington wanted to claim such a feature, it could have done so.  D. 84. Amazon also points to the "ordinary meaning" of trench – a depression in an otherwise flat surface, which is bounded on the side and open on the top.  D. 51 at 10.

Ultimately, when construing a claim, the Court must look to the ordinary meaning of trench first.  E-Pass Technologies, Inc. v. 3Com Corp., 343 F.3d 1364, 1368 (Fed. Cir. 2003) (citation and internal quotation marks omitted) (applying the "heavy presumption that a claim term carries its ordinary and customary meaning").  The Court agrees with Amazon, that by their plain and ordinary meaning, trenches are "depressions bounded on the sides and bottom and open at the top."  D. 51 at 10.  However, the Court declines to go so far as to limit "trenches" to being "generally elongated," in the absence of any claim language supporting this proposition and where the ordinary meaning of "trench" does not necessarily support such a limitation.  See Aventis Pharma S.A. v. Hospira, Inc., 675 F.3d 1324, 1330 (Fed. Cir. 2012) (noting that "[i]t is . . . not enough that the only embodiments, or all of the embodiments, contain a particular limitation" to limit a claim term beyond its ordinary meaning) (internal citations omitted).

Accordingly, the Court construes "trenches" to mean "depressions bounded on the sides and bottom and open at the top."

2.      *"Having"*

| Term | Lexington's Proposed Construction | Amazon's Proposed Construction |
|------|-----------------------------------|--------------------------------|
| Having | [No construction required] otherwise, comprising | Consisting of |

The claim provides that the "textured district" is comprised of "etched trenches having a sloped etching profile."  Col. 8:39-40.  The parties agree that "comprising" is an open term, meaning "including but not limited to," whereas "consisting of" is a closed term, meaning "including and limited to."  See Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc., 212 F.3d 1377, 1382-83 (Fed. Cir. 2000).  The patent clearly contemplates that the "etched trenches" have a "sloped etching profile."  The patentee viewed the shape of these trenches as "essential" to guide the lattice defects away from the active layer.  Col. 2:33.  Thus, opening the claim to encompass embodiments without a "sloped etching profile" would frustrate the purpose of the invention.

Again, relying on Figure 2B and Figure 4B, Lexington argues that the patent claims "textured districts" with flat spaces between surface features.  The Court, however, agrees with Amazon that such an embodiment conflicts with the purpose of the invention.  A comparison of Figure 2A, which has no space between surface features and Figure 2B, which does, illustrates this:



Fig. 2A                              Fig. 2B

Whereas the embodiment shown in Figure 2A only leaves enough room between surface features for a single lattice defect to propagate directly upward at a 90 degree angle from the substrate, the spaces between the features shown in Figure 2B leave a proportionately higher amount of space between the features such that defects would propagate directly up at a 90 degree angle. See D. 51 at 8.  In this way, Lexington's proposed construction is antithetical to the purpose of the patent.  See, e.g., Col. 1:12-15 (discussing lattice defect reduction).  This fact weighs against Lexington's proposed construction even where Figure 2B is a disclosed embodiment, because "[a]lthough reluctant to exclude an embodiment, this court must not allow the disclosed embodiment to 'outweigh the language of the claim, especially when the court's construction is supported by the intrinsic evidence.'"  Rolls-Royce, PLC v. United Technologies Corp., 603 F.3d 1325, 1334-35 (Fed. Cir. 2010) (quoting TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc., 529 F.3d 1364, 1373 (Fed. Cir. 2008)); see also Ascion, LLC v. Ruoey Lung Enter. Corp., No. 09-10293-GAO, 2010 WL 4183834, at *4 (D. Mass. Oct. 25, 2010) (construing claims in light of purpose of invention over disclosed embodiments, noting that "[n]one of those features [in disclosed embodiments] is necessary to achieve the purpose of the invention").

In addition, the Court notes that while there is certainly no presumption of "having" being an open or closed term, it is clear that a closed construction is more consistent with the context of the specification and claims.  See Crystal Semiconductor Corp. v. Tritech Microelectronics Int'l, 246 F.3d 1336, 1347 (Fed. Cir. 2001) (noting that a construction of "having" depends on context).  Accordingly, the Court construes "having" to mean "consisting of," consistent with Judge Young's construction of same in Lexington Luminance LLC v. Feit Elec. Co., No. 12-11554-WGY, D. 43 (D. Mass. Jun. 25, 2013) (construing same claim).

3.    *"Microfacets"*

| Term | Lexington's Proposed Construction | Amazon's Proposed Construction |
|------|-----------------------------------|--------------------------------|
| Microfacets | Very small planes that make up a surface contour | Planar crystal surfaces |

The parties apparently agree that a "facet" is a "planar crystal surface" or a "plane surface of a crystal." D. 50 at 17; D. 51 at 18. The parties dispute, however, whether the addition of "very small" to the construction of microfacets is appropriate. Amazon argues that "very small" adds an unnecessary layer of ambiguity to the claim. D. 51 at 18. The Court disagrees. First, the Court agrees with Lexington that courts have used "qualitative" terms in prior claim constructions. D. 50 at 16 (citing Inpro II Licensing, S.A.R.L. v. TMobile USA, Inc., et al., No. 03-1047 (GMS), 2004 U.S. Dist. LEXIS 29773, at *1 (D. Del. Nov 29, 2004) (construing the term "digital assistant module" as "a small portable computing device"); Southwest Efuel Network, L.L.C. v. Transaction Tracking Technologies, Inc., No. 07-cv-311-TJW, 2009 U.S. Dist. LEXIS 103395, at *40 (E.D. Tex. Oct. 23, 2009) (construing the term "keypad" as "a small hand held keyboard")). Second, the Court notes that to simply construe "microfacets" to mean "planar crystal surfaces" would be to ignore a descriptive part of the term. The Court declines to do so here, where the claim construction process begins with term's ordinary meaning. Phillips, 415 F.3d at 1312. Accordingly, the Court construes "microfacets" to mean "very small planar crystal surfaces."

4.    *"Sloped etching profile with a smooth rotation of microfacets"*

| Term | Lexington's Proposed Construction | Amazon's Proposed Construction |
|------|-----------------------------------|--------------------------------|
| Sloped etching profile with a smooth rotation of microfacets | [No construction required] otherwise, sloped surface contour without sharp corners | when viewed in cross-section, the side and bottom walls of the etched trenches are made up of micro-facets with a gradual, incremental rotation in slope from micro-facet |

| | | to microfacet such that there are no sharp corners |
|---|---|---|
| | | |

The proposed constructions indicate the parties' agreement that the claim's reference to a "smooth rotation" of microfacets means that there are no sharp corners in the "textured district." The parties disagree as to whether the "sloped etching profile" refers to a "surface contour" or the "etched trenches." The Court must construe the claim in light of the specification. Phillips, 415 F.3d at 1315. The specification does not refer to a "surface contour," but repeatedly refers to "trenches." See, e.g., Col. 2:24, 2:37, 3:63. The Court therefore finds that Amazon's proposed construction is more consistent with the specification.

Lexington argues that Amazon's construction is inconsistent with Figure 2B, because a "flat bottom [as indicated in Figure 2B] cannot be part the sloped etching profile." D. 50 at 20. As the Court has indicated above, however, a flat bottom is inconsistent with the purpose of the invention. Moreover, the parties have agreed that there are to be no sharp corners. Id. at 17. The Court agrees with Amazon that an absence of sharp corners is inconsistent with flat bottoms of trenches. D. 59 at 15. Even if the Court's adoption of Amazon's construction is inconsistent with Figures 2B and 4B, the Court is empowered to exclude a disclosed embodiment when it is required by the claim's language. Lucent Techs., Inc. v. Gateway, Inc., 525 F.3d 1200, 1215-16 (Fed. Cir. 2008) (concluding that because "the claim language is unambiguous, we have construed the claims to exclude all disclosed embodiments").[2]

---

[2] As discussed above, there is a "strong presumption" against constructions that excludes disclosed embodiments. In re Katz Interactive Call Processing Patent Litig., 639 F.3d 1303, 1324 (Fed. Cir. 2011); see also C.R. Bard., inc. v. U.S. Surgical Corp., 388 F.3d 858, 865 (Fed. Cir. 2004). Nevertheless, where inconsistent with the specification and claims, the disclosed embodiments must give way. Elekta Instrument S.A. v. O.U.R. Scientific Int'l, Inc., 214 F.3d 1302, 1308 (Fed. Cir. 2000) (excluding disclosed embodiment "in light of the prosecution history and the unambiguous language of the amended claim").

Lexington also argues that Amazon's proposed construction is improper because a "sloped etching profile" cannot be a "two-dimensional cross-section." D. 50 at 18. However, almost all of the figures in the specification show the etching profile from a cross-sectional view, see, e.g., Figs. 1C, 2B, 3C, which is best apt to demonstrate the nature in which the surface features have no sharp corners. Amazon's construction does not limit the claim to a two-dimensional view; it merely demonstrates how the textured district should look from a side-view. Finally, Amazon's construction is consistent with the plain and ordinary meaning of profile, that is, the side-view.

Accordingly, the Court construes "sloped etching profile with a smooth rotation of microfacets" to mean "when viewed in cross-section, the side and bottom walls of the etched trenches are made up of micro-facets with a gradual, incremental rotation in slope from micro-facet to microfacet such that there are no sharp corners."

5.    *"A sloped etching profile . . . without a prescribed angle of inclination"*

| Term | Lexington's Proposed Construction | Amazon's Proposed Construction |
|---|---|---|
| a sloped etching profile . . . without a prescribed angle of inclination | [No construction necessary], otherwise: a sloped surface contour... without a specific angle of inclination | when viewed in cross-section, the side and bottom walls of the etched trenches have no constant angle of inclination, and so they have no linear portions |

For the reasons discussed above, the Court adopts Amazon's construction of "sloped etching profile."   What remains, then, is "without a prescribed angle of inclination."  Lexington argues that "prescribed" must mean specific," whereas Amazon asks the Court to construe the term to mean "constant."  Consistent with its earlier constructions, the Court looks to the purpose of the invention itself.   As discussed above, the patentee was interested in removing sharp corners from the surface of the substrate.  Col. 4:27-34.  To accomplish this, the profile of the trench must always be curved.  As counsel for Amazon noted at oral argument, if the etching profile were not curved, the angle of inclination would be constant – an angle of zero or 180 degrees.  Accordingly, the Court agrees with Amazon that "prescribed" should be construed to mean "constant."  Similarly, the Court agrees that a constant angle of inclination necessarily requires there to be "no linear portions" on the "sloped etching profile."  Although Lexington again argues that the "no linear portions" requirement ignores plainly-disclosed embodiments, D. 50 at 23, the Court finds for the same reasons as discussed above that both the claim language itself and the purpose of the invention run counter to the embodiments disclosed in Figures 2B and 4B.

**A16**

Accordingly, the Court construes "a sloped etching profile . . . without a prescribed angle of inclination" to mean "when viewed in cross-section, the side and bottom walls of the etched trenches have no constant angle of inclination, and so they have no linear portions."

> 6.    *"So as to guide the extended lattice defects away from propagating into the active layer"*

| Term | Lexington's Proposed Construction | Amazon's Proposed Construction |
|------|-----------------------------------|--------------------------------|
| so as to guide the extended lattice defects away from propagating into the active layer | [No construction required] otherwise, such that free propagation of extended lattice defects into the active layer is significantly reduced relative to a device made by the same process without the textured districts | The term "the extended lattice defects" is indefinite. No construction is required for the remainder of this term. |

> a)    Amazon Argues that Claim 1 of the '851 Patent Is Indefinite

Amazon argues that claim 1 of the '851 patent is invalid because it is indefinite. D. 49-1 at 9. Amazon argues that ". . . so as to guide the extended lattice defects away from propagating into the active layer" is indefinite because it does not explain to which "extended lattice defects" the claim refers. Id. at 11.

As an initial matter, the Court must evaluate whether these issues are appropriately decided on the pleadings. "A determination of claim indefiniteness is a legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims. . . . Indefiniteness, therefore, like claim construction, is a question of law." Atmel Corp. v. Info. Storage Devices, Inc., 198 F.3d 1374, 1378 (Fed. Cir. 1999) (citing Personalized Media Communications, LLC v. Int'l Trade Comm'n, 161 F.3d 696, 705 (Fed. Cir. 1998)). In general, however, the issue of indefiniteness is decided on a motion for summary judgment. See, e.g., Baker Hughes, Inc., v. Davis-Lynch, Inc., 31 Fed. App'x 650, 651 (Fed. Cir. 2002) (affirming

district court's grant of partial summary judgment on issue of indefiniteness). That is because a court evaluating whether a claim is indefinite must often construe the claim prior to determining whether the claim is indefinite. <u>See</u> <u>Enzo Biochem, Inc. v. Appelera Corp.</u>, 599 F.3d 1325, 1332-36 (Fed. Cir. 2010) (evaluating indefiniteness in part based upon district court's claim constructions). Many courts, however, do not rely on their claim constructions in determining whether a claim is sufficiently definite. <u>See</u> <u>Verve, LLC v. Crane Cams, Inc.</u>, 311 F.3d 1116, 1119-20 (Fed. Cir. 2002) (determining that the word "substantially" did not render claim indefinite where the district court did not construe the term). Moreover where, as here, however, the sections of the claim in dispute have already been construed as a matter of law, disposition of the issues raised by Amazon are appropriate for a motion for judgment on the pleadings. <u>See</u> <u>Curran</u>, 509 F.3d at 45 (affirming district court's entry of judgment on the pleadings where the court only needed to decide issues of law).

      b)    The Word "The" Without Any Further Explanation Does Not Render the Claim Indefinite

Amazon argues that the '851 patent's requirement that the "lower portions" "guide <u>the</u> extended lattice defects away from the active layer" is indefinite because it fails to specify which lattice defects to which the claim refers. D. 49-1 at 6 (emphasis in original) (internal quotation marks omitted). As put by Amazon:

> [W]hat did the patentee mean when he referred to guiding "<u>the</u> extended lattice defects?" Did he mean that his invention would guide **all** extended lattice defects away from the active layer? Or, by using the plural "defects," that the invention would simply guide **more than one** extended lattice defect? Or was it that the invention would guide **some other, indeterminate number** of lattice defects away from the active layer?

<u>Id.</u> (emphasis in original).

Amazon fails to meet its burden of proving invalidity as to this argument by clear and convincing evidence. Amazon's argument might be persuasive if the Court read the claim in

isolation.  However, "resolution of any ambiguity arising from the claims and specification may be aided by extrinsic evidence of usage and meaning of a term in the context of the invention." Verve, 311 F.3d at 1119.  Despite Amazon's protestations to the contrary, it is clear that the goal of the invention is to "reduce" the number of lattice defects.  Col. 1:12-15; Col. 1:48; Col. 1:55; Col. 1:63; Col. 2:9; Col. 2:22; Col. 2:36; Col. 3:46; Col. 5:11; Col. 5:19; Col. 5:37 (all references to lattice defect reduction).  Accordingly, "guid[ing] the extended lattice defects away from the active layer" therefore means to reduce their manifestation in the active layer.

In a parallel litigation before another judge in this district, the court construed many of the terms at issue here, including "so as to guide the extended lattice defects away from propagating into the active layer."  See Feit Elec. Co., Inc., 12-11554-WGY, D. 43 (construing same claim).    In that case, Judge Young construed this term in a manner consistent with Lexington's proposed construction.  Id. That court's constructions consistently endorsed the notion that the goal of the invention was to reduce or "minimiz[e]" lattice defects.  Feit Elec. Co., Inc., No. 12-11554-WGY, D. 50 at 24 (transcript of Markman hearing in which the court proposed a construction "'that serves the purpose of minimizing the propagation of lattice defects into the active layer.'  I mean, that's the goal [of the invention]").

Amazon argues that the claim has multiple possible meanings, analogizing this case to Honeywell Int'l, Inc. v. Int'l Trade Comm'n, 341 F.3d 1332 (Fed. Cir. 2003), in which the Federal Circuit found a claim indefinite where "melting point elevation" could be measured in four different ways and each method yielded a different result.  D. 49-1 at 11 (citing Honeywell, 341 F.3d at 1341).  This is not such a case.  Although Amazon argues that the patent fails to specify which lattice defects are guided away from the layer, the invention teaches here that guiding the defects away from the active layer simply means that they are reducing them as

much as possible, or as put by Judge Young, "minimizing" them.  Col. 2:22; <u>Feit Elec. Co., Inc.</u>,

No. 12-11554-WGY, D. 50 at 24.  There is clearly only one definition, unlike in <u>Honeywell</u>, and

the fact that the patent does not specify exactly how many defects will be reduced does not doom

the claim as indefinite.  <u>Kinetic Concepts, Inc. v. Blue Sky Medical Group., Inc.</u>, 554 F.3d 1010,

1022 (Fed. Cir. 2009) (concluding that "reduction . . . by at least 50%" is not indefinite).

        c)      The Court adopts <u>Feit Elec. Co., Inc.</u>'s construction of the term

Accordingly, for the foregoing reasons, the Court adopts the construction of this term in

<u>Feit Elec. Co. Inc.</u>, No. 12-11554-WGY, D. 43, and construes the claim to mean "such that free

propagation of extended lattice defects into the active layer is significantly reduced relative to a

device made by the same process without the textured districts."

       7.    *"Said Substrate Is Selected from the Group Comprising"*

| Term | Lexington's Proposed Construction | Amazon's Proposed Construction |
|------|-----------------------------------|--------------------------------|
| said substrate is selected from the group comprising | [No construction required] otherwise, said substrate is selected from one or more of the following groups | said substrate is selected from the group that includes but is not limited to |

Amazon asserts that the claim language "said substrate is selected from the group

comprising group III-V, group IV, group II-VI elements and alloys, ZnO, spinel and sapphire" is

indefinite because it allows for an unlimited amount of alternative embodiments.  In other words,

Amazon alleges that the group amounts to a <u>Markush</u> group that was incorrectly drafted.  D. 49-1

at 15-21.

        a)      The Group of Elements from Which Those Practicing the Patent
               May Draw for the Claimed Substrate is a <u>Markush</u> Group

A <u>Markush</u> group derives its name from a nearly ninety year-old patent application. <u>See</u> <u>Ex parte Markush</u>, 1925 CD 126 (Com. Pat. 1924). Such a group is "a listing of specified alternatives of a group in a patent claim," with members of the claimed group being functionally equivalent for purposes of claim validity. <u>Abbott Labs. v. Baxter Pharm. Prods., Inc.</u>, 334 F.3d 1274, 1280 (Fed. Cir. 2003). Put another way, a <u>Markush</u> group provides for alternate embodiments of the claimed invention. <u>See</u> <u>In re Harnisch</u>, 631 F.2d 716, 720 (C.C.P.A. 1980). "A Markush group is . . . typically expressed in the form: a member selected from the group consisting of A, B, and C." <u>Maxma v. ConocoPhillips, Inc.</u>, No. 03-421, 2005 WL 1690611, at *5 (E.D. Tex. July 19, 2005) (citing <u>Abbott Labs.</u>, 334 F.3d at 1280). In other words, the group includes and is limited to A, B and C. Thus, in the example discussed in <u>Maxma</u>, the embodiments would be limited to A; B; C; A and B; A and C; B and C; or A, B and C.

Here, the patent claims a substrate where "said substrate is selected from the group comprising group III-V, group IV, group II-VI elements and alloys, ZnO, spinel and sapphire." Col. 8:46-49. The parties have stipulated and the Court takes judicial notice of the fact that groups III-V, IV and II-VI elements and alloys refer to a closed list of certain elements and combinations (i.e., alloys) of elements on the periodic table. D. 54 at 9; <u>see also</u> Encyclopedia Britannica Online, Periodic Table of Elements, http://www.britannica.com/nobelprize/art-91 (last visited Oct. 10, 2013). Thus, it follows that the substrate could be made of any number of these elements and alloys, but can also include any other element or alloy. This is the very essence of a patent claiming alternate embodiments.

Lexington argues that <u>Accenture v. Global Services GmbH v. Guidewire Software, Inc.</u>, No. 07-826, 2010 WL 883019 (D. Del. Mar. 5, 2010) compels the outcome of this case. D. 54 at 8. In <u>Accenture</u>, the court construed claim language in U.S. Patent No. 7,013,284, in which the

patentee claimed a computer program that organized information related to an insurance transaction into four levels. U.S. Patent No. 7,013,284, Col. 107:28-33 (claiming "an insurance transaction database . . . comprising a claim folder containing the information related to the insurance transaction decomposed into a plurality of levels from the group comprising a policy level, a claim level, a participant level and a line level"). In clarifying its construction of this claim, the court noted that it "rejected Guidewire's argument that the four levels specified in the '284 patent constitute a <u>Markush</u> group" because "[t]he four levels set forth in the '284 patent are not functionally equivalent alternatives. Instead, each serves a different function in handling the claim, and each must be present." <u>Accenture Global Servs., GmbH v. Guidewire Software, Inc.</u>, 800 F. Supp. 2d 613, 623 (D. Del. 2011), <u>aff'd,</u> 728 F.3d 1336 (Fed. Cir. 2013), <u>reh'g en banc denied</u> (Dec. 12, 2013). Unlike the '284 patent at issue in <u>Accenture</u>, the invention claimed by the '851 patent are described as functionally equivalent alternatives. Thus, claim 1 of the '851 patent includes a <u>Markush</u> group.

    b)  By Using the Word "Comprising," the '851 Patent Claims an Infinite Number of Possibilities for the Nature of the Substrate, Rendering the Claim Indefinite

   Amazon posits that use of the word "comprising" rather than "consisting" provides for a substrate selected from a group that has no limits. D. 49-1 at 15-16. "A Markush group by its nature is closed. If an applicant tries to claim a Markush group without the word 'consisting,' the PTO will insist upon the addition of this word to ensure a closed meaning." <u>Gillette Co. v. Energizer Holdings, Inc.</u>, 405 F.3d 1367, 1372 (Fed. Cir. 2005). If a <u>Markush</u> group uses the term "comprising" rather than "consisting of," it is not closed. <u>Abbott Labs.</u>, 334 F.3d at 1280-81 (quoting Stephen A. Becker, <u>Patent Applications Handbook</u> § 2:17 (9th ed. 2000)). This is because "'comprising' is a "term of art used in claim language which means that the named

elements are essential, but other elements may be added and still form a construct within the scope of the claim." Sevenson Envtl. Servs., Inc. v. United States, 76 Fed. Cl. 51, 74 (Fed. Cl. 2007) (quoting Genentech, Inc. v. Chiron Corp., 112 F.3d 495, 501 (Fed. Cir. 1997) (internal quotation marks omitted)). In other words, "'comprising' is well understood to mean 'including, but not limited to.'" CIAS, Inc. v. Alliance Gaming Corp., 504 F.3d 1356, 1360 (Fed. Cir. 2007) (citation omitted).

To illustrate the difference between a group "comprising" certain elements and a group "consisting of" certain elements, the Court returns to the example cited in Maxma, 2005 WL 1690611, at *5. Whereas a Markush group expressed in the form "a member selected from the group consisting of A, B and C," id., would be limited to A; B; C; A and B; A and C; B and C; or A, B and C, a Markush group comprising A, B and C would include any one of the aforementioned embodiments, but would not be limited to them such that it could include an infinite number of alternative embodiments.

Here, claim 1 of the '851 patent provides that the "substrate is selected from the group comprising group III-V, group IV, group II-VI elements and alloys, ZnO, spinel and sapphire." Col. 8:46-49. Using the Federal Circuit's definition of "comprising," this means that the substrate may include the enumerated elements or alloys, but may also include an indeterminate number of other elements or alloys. The Manual of Patent Examining Procedure ("MPEP") recognizes that "a Markush group may be so expansive that persons skilled in the art cannot determine the metes and bounds of the claimed invention." MPEP § 2173.05(h).[3] That is exactly the case here, where the claim fails to narrow down the composition of the claimed

_____

[3] While the MPEP does not have the force of law, it is entitled to judicial notice as an official interpretation of statutes or regulations as long as it is not in conflict therewith. Molins PLC v. Textron, Inc., 48 F.3d 1172, 1180 n.10 (Fed. Cir. 1995) (citation omitted).

substrate to any degree of substantial certainty. It is therefore indefinite. See Halliburton Energy Servs., Inc., 514 F.3d at 1253 (finding claim indefinite and noting that "[w]hile patentees are allowed to claim their inventions broadly, they must do so in a way that distinctly identifies the boundaries of their claims").

Lexington argues that the proper way to interpret the claim is to say that the substrate must include one of the enumerated elements or alloys but may include others. D. 54 at 9-10. Even if true, the claim would still envision an infinite number of combinations from which the substrate can be derived, because it uses the word "comprising." Indeed, in the Accenture case that Lexington cites, the court acknowledged that had it found that "the four levels specified in the '284 patent constitute a Markush group," "the use of the term 'comprising' [would] automatically lead to indefiniteness." Accenture, 800 F. Supp. 2d at 623; see also Sevenson, 76 Fed. Cl. at 74 (noting that "[b]y proposing the word 'comprising,' Sevenson improperly broadens the scope of each Markush group by converting it to an open group where other members could be added. Such a construction would contradict the established law relating to Markush groups").

Lexington relies on the district court opinion in Gillette, where another judge in this district noted that "comprising is not a weasel word with which to abrogate all claim limitations." Gillette Co. v. Energizer Holdings, Inc., No. 03-11514-PBS, 2004 WL 3366162, at *5 (D. Mass. Jan. 15, 2004) (citation omitted). However, that ruling was vacated on appeal, with the Federal Circuit applying the term's "open" usage and determining that a claim describing "comprising a group of first, second, and third blades" encompassed more than only three-bladed razors. Gillette, 405 F.3d at 1371 (vacating district court's denial of preliminary injunction). Moreover, because the district court's findings at the preliminary injunction stage addressed only the

plaintiff's likelihood of success on infringement, the Federal Circuit remanded the matter to the district court to consider the defendant's invalidity defenses.  Id. at 1375.  Accordingly, the neither court addressed whether the claim in the patent at issue was indefinite and therefore Gillette is inapposite.

For all these reasons, since the claim fails to narrow the composition of the substrate to any degree of substantial certainty, claim 1 of the '851 patent is indefinite.

## V.        Conclusion

For the foregoing reasons, the Court ALLOWS Amazon's motion for judgment on the pleadings, D. 49.  Judgment shall enter on Amazon's counterclaim for a declaration of invalidity in its favor and Lexington's complaint shall be DISMISSED.[4]

**So Ordered.**

/s/ Denise J. Casper
United States District Judge

---

[4] Where a patent is deemed invalid, judgment must enter against the patentee.  Aspex Eyewear, Inc. v. Altair Eyewear, Inc., 818 F. Supp. 2d 348, 365 (D. Mass. 2011) (entering judgment in favor of defendant upon determination that patent was invalid).



US006936851B2

(12) **United States Patent**
Wang

(10) Patent No.: **US 6,936,851 B2**
(45) Date of Patent: **Aug. 30, 2005**

(54) **SEMICONDUCTOR LIGHT-EMITTING DEVICE AND METHOD FOR MANUFACTURING THE SAME**

(76) Inventor: **Tien Yang Wang**, 468 Lowell St., Lexington, MA (US) 02420

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **10/394,686**

(22) Filed: **Mar. 21, 2003**

(65) **Prior Publication Data**

US 2004/0183078 A1 Sep. 23, 2004

(51) **Int. Cl.**[7] ............................................ **H01L 33/00**
(52) **U.S. Cl.** ........................... **257/79**; 257/89; 257/94; 257/96; 257/97; 257/103; 438/46; 438/47; 372/45; 372/46
(58) **Field of Search** ............................. 257/79, 89, 94, 257/96, 97, 99, 103; 438/22, 24, 46, 47, 481, 483; 372/45–46; 374/45, 46

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,561,916 A | 12/1985 | Akiyama et al. |
| 4,578,142 A | 3/1986 | Corboy, Jr. et al. |
| 6,051,849 A | 4/2000 | Davis et al. |
| 6,177,688 B1 | 1/2001 | Linthicum et al. |
| 6,452,216 B1 * | 9/2002 | Tsuda et al. .................. 257/94 |

OTHER PUBLICATIONS

M.J. Weber, Handbook of laser science and technology, 1982, CRC Press, USA, p. 199.

S. Mahajan, Handbook on semiconductors, v.3A, 1992, Elsevier Science B. V., Netherlands, p. 394.

S.K. Ghandhi, VLSI fabrication principles: silicon and gallium arsenide, 1994, John Wiley & Sons, USA, p. 269.

G.P. Agrawal and N.K. Dutta, Semiconductor lasers, 1993, Van Nostrand Reinhold, NY, USA, p. 163.

G.B. Stringfellow and M.G. Craford, High brightness light emitting diodes, 1997, Academic Press, San Diego, USA, p. 30.

H.S. Nalwa, Handbook of advance electronic and photonic materials and devices, 2001, Academic Press, San Diego, USA, v.1, p. 88.

M. Grayson, Encyclopedia of semiconductor technology, 1983, John Wiley & Sons, USA, p. 429.

(Continued)

*Primary Examiner*—Donghee Kang

(57) **ABSTRACT**

Semiconductor light emitting device and methods for its manufacture comprises a plurality of textured district defined on the surface of the substrate. The initial inclined layer deposition serves to guide the extended defects to designated gettering centers in the trench region where the defects combine with each other. As a result, the defect density in the upper section of the structure is much reduced. By incorporating a blocking mask in the structure, the free propagation of extended defects into the active layer is further restricted. The present invention is useful in the fabrication of semiconductor light emitting devices in misfit systems.

**14 Claims, 7 Drawing Sheets**



**US 6,936,851 B2**

Page 2

OTHER PUBLICATIONS

S. Barnet et al, Dictionary of physics, 2004, Spektrum Akadomischer Verlag, German, V2. p. 1095; V3, p. 1313.

B.D. Joyce et al., "Selective epitaxial deposition of silicon", Nature, vol. 195 (1962) pp. 485–486.

F.W. Tausch, Jr. et al., "A novel crystal growth phenomenon: single crystal GaAs overgrowth onto silicon dioxide", J. Electrochem. Soc. vol. 12 (1965) pp. 706–709.

L. Jastrzebski et al., "Growth process of silicon over $SiO_2$ by CVD: epitaxial lateral overgrowth technique", J. Electrochem. Soc. vol. 130 (1983) pp. 1571–1580.

Y. Ujiie et al., "Epitaxial lateral overgrowth of GaAs on a Si substrate", Jpn. J. Appl. Phys. vol. 28(3) (1989) pp. L337–L339.

A. Usui et al., "Thick GaN epitaxial growth with low dislocation density by hydride vapor phase epitaxy (HVPE)", Jpn. J. Appl. Phys. vol. 36 (1997) pp. L899–L902.

S. Kinoshita et al., "ELO of Si on non–planar substrate", J. Crystal Growth, vol. 115 (1991) pp. 561–566.

D.W. Shaw, "Morphology analysis in localized crystal growth and dissolution", Journal of Crystal Growth, vol. 47 (1979) pp. 509–517.

D.W. Shaw, "Influence of substrate orientation on GaAs epitaxial growth rates", Second International GaAs Symposium (1968) pp. 50–54.

E. Bassous et al., "The fabrication of high precision nozzles by the anisotropic etching of (100) silicon", J. Electrochem. Soc. vol. 125 (1978) pp. 1321–1327.

Y–K Song et al., "A Vertical Cavity Light Emitting InGaN Quantum Well Heterostructure", Appl. Phys. Lett. vol. 74, No. 23 (1999) pp. 3441–3443.

* cited by examiner



— 12
— 10

Fig. 1A



— 14
— 12
— 10

Fig. 1B



— 14
— 12
— 10

Fig. 1C



— 24

— 22

— 20

**Fig. 2A**



— 24C

— 22B

— 20A

**Fig. 2B**



Fig. 3A

Fig. 3B



Fig. 3C



46
44
42
40

Fig. 4A



46A
44A
42A
40A

Fig. 4B



Fig. 5A



Fig. 5B



Fig. 5C



Fig. 6A



Fig. 6B



Fig. 6C



Fig. 7A



Fig. 7B



Fig. 7C

US 6,936,851 B2

**1**

SEMICONDUCTOR LIGHT-EMITTING
DEVICE AND METHOD FOR
MANUFACTURING THE SAME

BACKGROUND OF THE INVENTION

1. Field of Invention

The present invention relates generally to the fabrication of semiconductor devices such as light-emitting devices in misfit systems. In particular, the lattice defects are limited to and contained in designated locations defined by textured districts on the substrate surface. As a result, the free propagation of extended defects through the active region is restricted and the overall defect density of the system is reduced.

2. Description of Prior Art

Lattice-mismatched system such as GaAs/Si is promising to obtain large-area wafers for optoelectronic device applications. However, the quality of the directly disposed layer is inferior due to the penetration of threading dislocations in this material system. M. Akiyama et al demonstrated GaAs layer on Si substrate the using a low-temperature buffer layer and a superlattice intermediate layer in U.S. Pat. No. 4,561,916.

Seeded overgrowth has also been used as an alternative to obtain single crystalline epilayers deposited over the surface of an amorphous mask layer. In the context of epitaxial lateral overgrowth (ELO), the seed layer extends through the apertures and spreads over the mask surface. The building block of the prior art ELO method is the selective epitaxial growth (SEG) where no nucleation takes place on the mask surface. B. D. Joyce et al reported SEG of Si epilayer over the oxide mask using chemical vapor deposition (CVD) in Nature, Vol. 195 (1962) pp. 485–486. F. W. Tausch, Jr. et al demonstrated GaAs on $SiO_2$ mask using ELO in J. Electrochem. Soc. Vol. 12 (1965) pp. 706–709. The ELO method has been used to fabricate silicon-over-insulator (SOI) using CVD as described by L. Jastrzebski et al in J. Electrochem. Soc. Vol. 130 (1983) pp. 1571–1580 and by J. F. Corboy, Jr. et al in U.S. Pat. No. 4,578,142.

The ELO method has also been used to deposit GaAs epilayers on Si substrate by Y. Ujiie et al in Jpn. J. Appl. Phys. Vol. 28(3) (1989) pp. L337–L339. Thus a GaAs layer is first grown on the Si(11) substrate using molecular beam epitaxy. A $SiO_2$ mask is formed on the GaAs surface by photolithography and the GaAs layer is deposited using liquid phase epitaxy. The defect density is reduced in the overgrown layer where the threading dislocations are blocked by the mask layer. Similarly, A. Usui et al described the ELO growth of GaN on sapphire using hydride vapor phase epitaxy (HVPE) in Jpn. J. Appl. Phys. Vol. 36 (1997) pp. L899–L902. R. F. Davis et al described the ELO growth of GaN layer on SiC substrate in U.S. Pat. No. 6,051,849. The influence of the substrate can be further reduced by making the ELO layer suspended above the substrate as described by S. Kinoshita et al in J. Crystal Growth, Vol. 115 (1991) pp. 561–566 and by K. J. linthicum et al in U.S. Pat. No. 6,177,688.

The prior art methods have following drawbacks. The layer growth from the mask openings allows for the free propagation of dislocations into the active layer. As a result, multiple ELO steps are required for defect reduction causing long cycle time and poor process yield. This restraint can be relaxed somewhat by depositing the layers over etched surface features with a specific inclination angle. However, the layer disposition over prescribed surface feature is

**2**

highly sensitive to the etching defects. The etching defects expose random nucleation sites causing adverse microfaceting and layer deterioration. Thus structural defects are inevitably generated as the growth front attempts to negotiate surface defects with sharp corners and abrupt changing curvature. The grown-in defects will multiply and propagate into the active region during operation causing premature degradation of the device. These drawbacks offset the benefits of using the ELO method for defect reduction.

BRIEF SUMMARY OF THE INVENTION

The aforementioned deficiencies are addressed, and an advance is made in the art, by using the substrate member comprising a textured surface district described in the present invention. The controlled layer deposition over the textured surface district proceeds such that the inclined layer growth in the trench region diminishes in the early stage of the process. Since the threading dislocations propagate along the growth direction, they are guided towards designated location and confined therein. The free propagation of the dislocation defects is thus restricted and the defect density in the active layer is significantly reduced. The textured district in the present invention comprises a plurality of smooth trenches without a prescribed angle of inclination. This allows for the nucleation of smooth semiconductor layers over the energetically favorable sites.

In the present invention, the substrate is patterned using conventional lithographic methods, followed by thermal anneal to smooth out sharp corners and etching defects. After thermal etching and solid-state diffusion, the stripe or mesa features become naturally rounded and free of surface irregularities. The textured surface district thus obtained is essential for the growth of smooth layers without the occurrence of chaotic micro-faceting.

The defect density is further reduced by using the mask to block the defect propagation. In this case, the mask district is spaced by a plurality of smooth trenches and the layer is allowed to dispose around the ledge of the mask. As a result, the free propagation of threading dislocations is further restricted by the mask district. The semiconductor member in the present invention is suitable for the low-cost, large area fabrication of misfit device structures.

Furthermore, the layer deposition around the mask district is altered by varying the aspect ratio of the mask. Due to the excessive supply of adatoms migrating from the mask surface, the thickness and alloy composition of the layer is modulated. As a result, the individual emitter disposed over the present mask district emits at a different wavelength of the spectrum. The chirped mask design in the present invention is useful to digitally synthesize the desirable color output of the light-emitting device by tailoring the light emission from its component emitters.

The present invention will be best described in detail with reference to the figures listed and is described below.

BRIEF DESCRIPTION OF THE SEVERAL
VIEWS OF THE DRAWING

FIG. 1A is a cross-sectional view showing early layer deposition over the textured surface district in accordance with the embodiment of the present invention. FIG. 1B shows the diminishing inclined layer growth. FIG. 1C shows the direction of defect propagation in the structure.

FIG. 2A and FIG. 2B are cross-sectional views showing layer deposition and defect propagation over the textured surface district in accordance with another embodiment of the present invention.

US 6,936,851 B2

3

FIG. 3A is a cross-sectional view showing transient layer deposition around the ledge of the mask district in accordance with another embodiment of the present invention. FIG. 3B shows the merger of layers grown above the mask. FIG. 3C shows the direction of defect propagation in the structure.

FIG. 4A and FIG. 4B is a cross-sectional view showing layer deposition and defect propagation around the ledge of the mask district in accordance with another embodiment of the present invention.

FIG. 5A is a cross-sectional view showing of the chirped mask district in accordance with another embodiment of the present invention. FIG. 5B shows the layer deposition and defect propagation in the structure. FIG. 5C illustrates the structure of light emitters fabricated over the chirped mask district.

FIG. 6A shows the mask district comprising blocking mask and divider masks in accordance with another embodiment of the present invention. FIG. 6B shows crystallographic etching profile of the structure. FIG. 6C shows formation of the trench array inside the window after isotropic etching.

FIG. 7A shows the layout of the mask district comprising blocking mask and bridge masks in accordance with another embodiment of the present invention. FIG. 7B is a cross-sectional view showing the bridge masks hanging over the center of the trench. FIG. 7C shows transient layer deposition the direction of defect propagation in the structure.

DETAILED DESCRIPTION OF THE INVENTION

The semiconductor device in the present invention is fabricated on a substrate having a textured district defined on the substrate surface. The textured surface district comprises a plurality of etched features such as trenches and mesa having a smooth rotation of micro-facets. Accordingly, the direction of inclined layer growth is not uniquely prescribed by mesa etching. Instead, a spectrum of micro-facets is exposed to allow preferential layer nucleation over facets with energetically favorable sites. The epilayer deposition is solely determined by the growth chemistry and is less prone to the etching defects. As the inclined growth proceeds, the extended defects such as misfit dislocation are guided to designated locations and the overall defect density in the misfit system is reduced.

In accordance with an illustrative embodiment of the present invention, mesa or stripe features are first defined over the surface of the substrate using conventional photolithography methods. Alternatively, the surface feature is defined on the surface of a buffer layer predisposed on the substrate. Exemplary substrates include GaAs, InP, spinel, sapphire, GaN, GaN-on-sapphire, GaAs, Si, Si-on-insulator, SiC, SiC-on-Si. For example, stripes along the [011] or the [01$\bar{1}$] direction are defined on the (100)GaAs surface using a resist mask or nitride mask following by wet etching in an isotropic etchant such as $H_2SO_4$:$H_2O_2$:$H_2O$ (10:1:1 by volume). In this case, the etching is diffusion limited resulting in a curved etching profile. Alternatively, the substrate is dipped in an anisotropic etchant such as $H_2SO_4$:$H_2O_2$:$H_2O$, $H_3PO_4$:$H_2O_2$:$H_2O$ and $NH_4OH$:$H_2O_2$:$H_2O$. Due to the presence of the slow etching (111)Ga face, reverse mesa structure or trapezoidal trenches are formed for ridges aligned in the [011] and the [01$\bar{1}$] direction, respectively. The detailed etching profile has been described by D. W. Shaw in Journal of Crystal Growth, Vol. 47 (1979) pp. 509–517. The nitride mask is then removed

4

using plasma etching in $CF_4$ after the surface trenches are formed. The etched surface thus obtained contains sharp corners and etching defects that may cause excessive layer distortion during the layer deposition.

In accordance with an illustrative embodiment of the present invention, the substrate is further etched after stripping off the etch mask to reduce surface trenches and mesa to desirable shapes. For example, the patterned GaAs substrate is solvent cleaned and dipped in HCl to remove surface oxide, followed by isotropic etching in $H_2SO_4$:$H_2O_2$:$H_2O$ (10:1:1 by volume) or $Br_3$/$CH_3OH$ to produce a sloped etching profile comprising a smooth rotation of micro-facets. The surface features in the present invention can be defined on the surface of various substrates using wet etching, dry etching and photoelectrochemical etching. For example, windows along [110] or [1$\bar{1}$0] are opened in $Si_3N_4$ mask on the surface of Si substrate. After dipping in an anisotropic etchant such as KOH; isopropyl alcohol solution, V-shape grooves with (111) sidewalls are obtained due to the presence of the slow etching (111) plane. Alternatively, the masked substrate is directly dipped in an isotropic etchant to produce trenches with a curved etching profile. After stripping off the mask, the patterned substrate is further isotropically etched in $HNO_3$:$CH_3COOH$:HF.

In accordance with an illustrative embodiment of the present invention, the substrate is further thermally annealed to polish off sharp corners and etching defects. After dipping in $H_2SO_4$:$H_2O_2$:$H_2O$ and HCl to desorb the surface oxide, the substrate is loaded into the growth chamber and heated to the anneal temperature. Exemplary process conditions are 820° C. for 30 minutes in an arsine ambient for GaAs substrate to preserve surface quality. This effectively converts the sharp corners into a sloped profile comprising a smooth rotation of micro-facets. The smooth surface feature in the present invention is essential for the deposition of low defect density structures suitable for device applications.

The preferred method for the layer deposition on the patterned substrate in the present invention includes metalorganic vapor phase epitaxy (MOVPE) and hydride vapor phase epitaxy (HVPE). Typical source nutrients in MOVPE include trimethyl compounds such as TMGa, TMIn, TMAl for group III elements, and group V hydrides such as $NH_3$, $PH_3$ and $AsH_3$ for the group V elements. Disilane, $H_2Se$ and $(Me)_2Zn$, $Cp_2Mg$ are used as the n- and p-type dopants, respectively.

FIG. 1A is a cross-sectional view showing initial layer deposition over the textured substrate surface in accordance with the embodiment of the present invention. The layer deposition proceeds in a manner such that the inclined layers 12 emerging from the adjacent slopes meet and combine in the trench region. As the growth proceeds, the inclined growth diminishes and the upper section 14 of the structure becomes planar as shown in FIG. 1B. Thus the inclined layers are confined and embedded in the early stage of the deposition. Since the dislocation propagates along with the advance of the growth front, it is also inclined away from propagating upwards. The dislocation defects are guided towards the center of the trench where the counter approaching dislocations confront each other and combine as illustrated in FIG. 1C.

In contrast to the prior art methods, there is no prescribed plane for the layer to grow. The layer has an equal opportunity to grow on all of the exposed facets. During the course of deposition, the surface adatoms migrate over growing surface and preferentially incorporate into facets of energetically favorable sites. Thus the precession of layer depo-

US 6,936,851 B2

5

sition does not necessary register the contour of the starting substrate. Instead, the growth behavior is uniquely determined by the growth ambient such as substrate temperature, V/III ratio, growth rate, reactor pressure, and carrier gas composition. The orientation-dependent layer deposition has been described by D. W. Shaw in GaAs symp. (1968) pp. 50–54. By incorporating the present textured surface district, the inclined layer growth is further optimized such that the extended defects are deliberately routed to designated gettering centers in the trench region. As a result, the overall defect density in the trench system is much reduced.

FIG. 2A is a cross-sectional view showing layer deposition and defect propagation using the textured layer district in accordance with another embodiment of the present invention. As the growth proceeds, the transient nonplanar growth 22 becomes planar 24 as the inclined layer merges with its counter part. The results are similar when the trenches are spaced by a base feature as illustrated in FIG. 2B where the arrows indicates the direction of defect propagation. The defect level is much reduced after the counter propagating threading dislocations combine in the trench region.

The emerging planar surface is suitable for the deposition of semiconductor device structures. Direct penetration of misfit dislocations is only possible from the open ridge and from the trench center where the traveling dislocations combine. Thus the present trench array acts as a chain of local defect gettering centers. Furthermore, the misfit stress and thermal stress of the system is distributed across the trench array in the present invention. As a result, the overall interfacial stress is lower and the bending of the epiwafer is reduced. The present invention is suitable for the fabrication of high quality device structures on large area, low-cost substrates. Due to the lack of insulating mask, the present device is advantageous for low voltage operations with a vertical or lateral current injection scheme.

In accordance with another embodiment of the present invention, the misfit defects from the open ridge are further reduced by the etch mask. Specifically, the layer is allowed to deposit around the ledge of the mask overhang. In this case, the mask is retained as part of the device structure. For example, a nitride mask is formed on the surface of the substrate followed by anisotropic etching. Due to the presence of the slow etching (111)Ga face, reverse mesa or trapezoidal trenches are formed for ridges aligned in the [011] and the [01$\bar{1}$] direction, respectively. Examples of the dielectric etch mask include $SiO_2$, $Si_3N_4$ and their combinations. In this case, the extent of mask undercut U is expressed by $U=R_{(111)}t/\sin\theta$ where $R_{(111)}$ is the etch rate of the (111) planes and t is the etching time. The angle $\theta$ between the {111} planes and the (100) surface is ~55°. Examples of the anisotropic etching of Si using an aqueous solution containing pyrocatechol and ethylene diamine has been described by E. Bassous et al in J. Electrochem. Soc. Vol. 125 (1978) pp. 1321–1327. The wafer is then subjected to isotropic etching to render a smooth etching profile suitable for layer deposition.

The geometry of the mask district in the present invention facilitates the inclined layer growth inside the trench region as shown in FIG. 3A. As the growth proceeds, the inclined growth 34 becomes planar 38 as shown in FIG. 3B. The defects extended from the undercut region are blocked by the ledge of the mask district as depicted in FIG. 3C. As a result, the free propagation of threading dislocations from the open ridge is prohibited. The defects outside of the undercut region are guided to the trench region as described above.

FIG. 4A is a cross-sectional view showing layer deposition and defect propagation using the mask district in

6

accordance with another embodiment of the present invention. In this case, trenches are first formed by etching of the substrate 40 through openings defined in the mask district 42. As the deposition proceeds, planar layers 44 develop at the expense of the inclined layer growth in the trench. The layers emerging from the trenches confront and combine at the center of the mask. Further growth leads to layer planarization 46 of the upper section of the structure. The mask district 42 is embedded in the structure and retains a part of the device. The results are similar when the trenches are spaced by a base feature as illustrated in FIG. 4B where the arrows indicate the direction of defect propagation. The defect level in the upper section 46 and 46A is much reduced as the counter propagating threading dislocations combine in the trench region. The structure of the present semiconductor member is advantageous since only the threading dislocation from the center of the trench may find its way to reach the active layer.

The present mask design is not restricted by the extent of the mask overhang. Changing the window-to-mask ratio affects the layer deposition rate and alloy composition in the trench region while the growth habit remains unaltered. In the extreme case of excessive mask overhang, voids may be left behind owing to the restricted supply of nutrients reaching the corner of the undercut. In the extreme case of excessive trench width, inclined growth is less effective in preventing the extended defect from reaching the active region. A thicker layer is required to contain the defects causing bow and warp of the wafer. It is another objective of the present invention to alleviate the constraint of trench width by dividing the wide trench into a plurality of spaced narrow trenches.

In accordance with another embodiment of the present invention, the mask district further provides desirable functionality to the device. For light-emitting devices, the mask district may contain a plurality of reflective mirrors spaced by etched trenches. After deposition, the reflective mask is embedded at the substrate interface. Thus the downward emitted light is reflected back and redirected to the top surface for exit. As a result, the substrate absorption loss of light emission is reduced and the extraction efficiency of the device is enhanced. The reflective mask district in the present invention allows for the use of substrate that is either transparent or absorbing at the wavelength of the light emission. Examples of dielectric mirror masks include $Si/SiO_2$, $SiO_2TiO_2$ in the infrared, $SiO_2/ZrO_2$ in the visible, $HfO_2/SiO_2$ in the blue and UV region of the spectrum, respectively. Conventional e-beam evaporation and reactive ion beam sputtering methods are employed to dispose the mirror stacks. Examples of reflective metal masks include transitional metal elements such as W, Ta, Ti, Pt, Pd, Ni, Au, Cr, Ag, Cu. The mask districts are fabricated by conventional photolithographic methods followed by wet etching or plasma etching of the substrate. Conventional etchants for the dielectric masks include HF, BHF, $H_3PO_4$, $H_2SO_4$, NaOH(~30%). The fabrication of the dielectric mirror masks has been described by Y-K Song et al in Appl. Phys. Lett. Vol. 74, No. 23 (1999) pg. 3441–3443. The selection of the metal mask is solely based on its thermal and chemical stability in the growth ambient and the low absorption loss at the emission wavelength of the device. Both types of the mirror masks have a high reflectivity and a broad bandwidth. The dielectric mirror mask has a high index ratio suitable for the design of highly reflective mirrors using a minimum number of quarterwave pairs. The metal mask has a high thermal conductivity suitable for heat dissipation and continuous operation of the device. The low resitivity of the metal mask further allows for low voltage operation of the device.

US 6,936,851 B2

**7**

In accordance with another embodiment of the present invention, the mask district further comprises chirped trenches with modulated window/mask ratio. As illustrated in FIG. 5A, mask district 52 with variable openings is photolithographically defined on the surface of the substrate 50, followed by substrate etching to form isotropic trenches 54A and 54B with mask undercut. After dipping in acids to remove surface oxide, the substrate is loaded into the growth chamber and heated to the growth temperature. During the growth, the surface adatoms migrate across the mask surface before lodging into facets of energetically favorable site. The incorporation efficiency depends on the distribution of the surface adatoms across the structured surface. As shown in FIG. 5B, the alloy composition and thickness is different in local layer depositions 56A and 56B in the chirped trench array. This effect is more profound for layer deposition in narrow mask opening due to the abundance of adatom supply from the non-sticking dielectric mask.

The chirped mask district in the present invention provides another degree of freedom in the fabrication of devices with desirable properties. As illustrated in FIG. 5C, a light-emitting device is disposed on the surface of the chirped mask array 52 comprising a buffer layer, a lower cladding layer 58, an active layer 51, an upper cladding layer 53, and a contact layer. Lateral injection schemes are then deployed for insulating substrate such as sapphire while vertical injection schemes are deployed for conductive substrates such as GaAs, SiC and Si. The mask district also provides the isolation between the individual emitters. The path of current flow is confined by the openings in the SiO$_2$ film 55 and mask district 52 after forming front contact metal 57A and back metal 57B. Since the rest area is not pumped, the heat dissipation is reduced leading to reliable operation of the device. It also minimizes the influence of edge distortion of the layer disposed under non-optimized conditions. As a result, the uniformity of light emission of the device is improved. The individual emitters 59A and 59B emit at a different wavelength of the spectrum uniquely determined by the thickness and composition of the active layer. The hybridization of the light emission from the component emitters determines the light output of the device. The weight of color components can be readily modulated by adjusting the number of emitters in each group. Thus by proper design of the mask layout, the color and the brightness of individual emitter can be tailored to achieve the desirable color gamut of the light output of the device. Moreover, the hybrid emitter design in the present invention has a high quantum efficiency and thus more energy-efficient than the conventional phosphor-based lighting devices.

In accordance with another embodiment of the present invention, the constraint of window size is alleviated by dividing the wide window into a plurality of narrow trenches. The initial layer deposition comprises a series of inclined portions within the window. Instead of freely propagating upwards, the extended defects are routed to the bottom of the window region where they are contained. As a result, the defects are distributed across the local gettering centers prescribed inside the window and the defect density of the device is reduced. The fabrication process is illustrated in FIG. 6A–6C. The mask district 62 is defined on the substrate surface using conventional photolithographic methods, comprising blocking mask 62A and divider mask 62B spaced within the etch mask. After anisotropic etching, spaced trenches 64A and 64B are formed undercutting the etch masks 62. The substrate 60 is then subjected to isotropic etching to achieve the desirable etching profile. Further etching triggers the liftoff of the narrow divider mask as it

**8**

becomes unsupported, leaving behind an array of narrow trenches 66A and 66B in the window. The layer deposition and defect reduction in the window region follows that depicted in FIG. 1. Thus the constraint of window size is alleviated using the present divider mask design. The use of subdivided window in the present invention is advantageous since a thinner layer is needed for defect confinement. The diffused metallurgical interface between the layer and substrate further contributes to a lower stress level in the wafer. Thus the wafer bow and warp is reduced leading to a high process yield of the present device.

In accordance with another embodiment of the present invention, the defect propagation in the trench region is restricted by using mask districts further comprising a plurality of bridge masks. In this case, the bridge mask is hanging over the trench region and is retained as part of the finished structure. FIG. 7A shows a planar view of the layout of the mask district. The mask districts are mechanically supported by spaced posts aa which is aligned with the sawing street. FIG. 7B is a cross sectional view of the mask district 72 along bb showing the blocking mask 72A and bridge mask 72B. Due to its narrower width, the bridge masks 72B become suspended during anisotropic etching. The etching is complete after undercutting the blocking mask 72A. The substrate 70 is further isotropically etched to obtain a smooth etching profile. FIG. 7C shows the gettering of the extended defects in the layer disposed around the suspension bridge. In this case, the planar layer growth in the center of the trench is suppressed while the inclined growth is enhanced. As a result, the defect gettering is more efficient as the escaping defects are blocked by the bridge mask array. Further deposition leads to planarization of the layer 74 with a low defect density suitable for the fabrication of semiconductor devices such as light-emitting devices in the misfit systems.

I claim:

1. A semiconductor light-emitting device comprising:

a substrate;

a textured district defined on the surface, of said substrate comprising a plurality of etched trenches having a sloped etching profile with a smooth rotation of micro-facets without a prescribed angle of inclination;

a first layer disposed on said textured district; comprising a plurality of inclined lower portions so as to guide the extended lattice defects away from propagating into the active layer, said first layer and said substrate form a lattice-mismatched misfit system, said substrate is selected from the group comprising group III-V, group IV, group II-VI elements and alloys, ZnO, spinel and sapphire; and

a light-emitting structure containing an active layer disposed on said first layer.

2. The device or claim 1, wherein said first layer has an upper planar portion with slow defect density.

3. The device of claim 1, wherein said textured district is formed on a buffer layer disposed on said substrate.

4. The device of claim 1, wherein said textured district comprises a plurality of chirped trench array.

5. A semiconductor light-emitting device comprising:

a substrate;

a textured district defined on the surface of said substrate comprising a plurality of mask districts spaced by etched trenches having a sloped etching profile with a smooth rotation of micro-face without a prescribed angle of inclination;

a first layer disposed on said textured district; comprising a plurality of inclined lower portions so as to guide the

US 6,936,851 B2

**9**

extended lattice defects away from propagating into the active layer, said first layer and said substrate form a lattice-mismatched misfit system, said substrate is selected from the group comprising group III-V, group IV, group II-VI element, and alloys, ZnO, spinel and sapphire; and

a light-emitting structure containing an active layer disposed on said first layer.

**6**. The device of claim **5**, wherein said mask district comprises a plurality of edge undercut portions such that the propagation of extended defects from said undercut portions is blocked by the ledge of said mask district.

**7**. The device of claim **5**, wherein said mask district further provides isolation for independent operation of the individual light emitters disposed on said mask district.

**8**. The device of claim **7**, wherein said individual light emitters emit at a different wavelength.

**10**

**9**. The device of claim **8**, wherein the light output of the device relies on color mixing of the component light emission from said individual light emitters.

**10**. The device of claim **5**, wherein said mask district further comprises a plurality of reflective mirror stack.

**11**. The device of claim **10**, wherein said reflective mirror stack is selected from the group comprising metal and dielectric quarter-wave plates.

**12**. The device of claim **5**, further comprising a bridge mask hanging over said etched trenches.

**13**. The device of claim **5**, wherein said etched trenches are further subdivided into a plurality of narrow trenches.

**14**. The device of claim **5**, wherein said mask district further comprises a chirped mask district having a modulated window-to-mask ratio.

\* \* \* \* \*

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

PATENT NO.     : 6,936,851 B2                            Page 1 of 1
APPLICATION NO.  : 10/394686
DATED            : August 30, 2005
INVENTOR(S)     : Tien Yang Wang

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Col. 6, line 44, replace "$SiO_2TiO_2$" with --$SiO_2/TiO_2$--.

Col. 8, line 38, delete the ","; line 53, replace "or" with --of--; line 54, replace "slow" with --a low--; line 64, replace "micro-face" by --micro-facets--.

Signed and Sealed this
Third Day of January, 2012

*David J. Kappos*

David J. Kappos
*Director of the United States Patent and Trademark Office*

**A40**

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that, on this the 27th day of May, 2014, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered users:

Robert P. Courtney
FISH & RICHARDSON P.C.
3200 RBC Plaza, 60 South Sixth Street
Minneapolis, MN 55402
(612) 335-5070
courtney@fr.com

Jeffrey H. Dean
Amazon.com, Inc.
440 Terry Avenue, North
Seattle, WA 98109-5210
(206) 740-0521
jeffdean@amazon.com

Kurt L. Glitzenstein
FISH & RICHARDSON P.C.
One Marina Park Drive
Boston, MA 02210
(617) 542-5070
glitzenstein@fr.com

Michael J. McKeon
Indranil Mukerji
FISH & RICHARDSON P.C.
1425 K Street, NW, Suite 1100
Washington, DC 20005
(202) 783-5070
mckeon@fr.com
Mukerji@fr.com

*Counsel for Appellee*

I further certify that, upon acceptance and request from the Court, the required paper copies of the foregoing will be deposited with United Parcel Service for delivery to the Clerk, UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT, 717 Madison Place, N.W., Washington, D.C. 20439.

*/s/ Robert D. Katz*
Robert D. Katz
Katz PLLC
6060 N. Central Expressway, Suite 560
Dallas, Texas 75206
214-865-8000 (Firm)
888-231-5775 (Fax)
rkatz@katzlawpllc.com

David S. Godkin
Birnbaum & Godkin LLP
280 Summer Street
Boston, MA 02210
617-307-6100 (Firm)
617-307-6101 (Fax)
godkin@birnbaumgodkin.com

*Counsel for Plaintiff-Appellant*
  *Lexington Luminance LLC*

<u>**CERTIFICATE OF COMPLIANCE**</u>
**With Type-Volume Limitation, Typeface Requirements,**
**And Type Style Requirements**

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

    this brief contains <u>13,947</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    this brief has been prepared in a proportionally spaced typeface using <u>Microsoft Word</u> in <u>14 Times New Roman</u>.

Dated:  May 27, 2014          <u>*/s/ Robert D. Katz*</u>
                              Robert D. Katz
                              Katz PLLC
                              6060 N. Central Expressway, Suite 560
                              Dallas, Texas 75206
                              214-865-8000 (Firm)
                              888-231-5775 (Fax)
                              rkatz@katzlawpllc.com

                              David S. Godkin
                              Birnbaum & Godkin LLP
                              280 Summer Street
                              Boston, MA 02210
                              617-307-6100 (Firm)
                              617-307-6101 (Fax)
                              godkin@birnbaumgodkin.com

                              *Counsel for Plaintiff-Appellant*
                              *  Lexington Luminance LLC*