IN THE

# United States Court of Appeals
# for the Federal Circuit

LEXINGTON LUMINANCE LLC,

Plaintiff-Appellant,

- vs. -

AMAZON.COM INC. AND AMAZON DIGITAL SERVICES, INC.

Defendants-Appellees.

Appeal from the United States District Court for the
District of Massachusetts in Case No. 12-CV-12216,
Judge Denise Jefferson Casper.

**BRIEF OF DEFENDANTS-APPELLEES
AMAZON.COM INC. AND AMAZON DIGITAL SERVICES, INC.**

Michael J. McKeon
Indranil Mukerji
FISH & RICHARDSON P.C.
1425 K Street NW, Suite 1100
Washington, DC 20005
Telephone: 202-783-5070
Facsimile: 202-783-2331

Robert Courtney
FISH & RICHARDSON P.C.
3200 RBC Plaza, 60 South Sixth St.
Minneapolis, MN 55402
Telephone: 612-335-5070

July 10, 2014

*Attorneys for Defendants-Appellees*

## <u>CERTIFICATE OF INTEREST</u>

Counsel for the Defendants-Appellees Amazon.com Inc. and Amazon Digital Services, Inc. certifies the following:

• The full name of every party or amicus represented by me is:

Amazon.com Inc. and Amazon Digital Services, Inc.

• The name of the real party in interest represented by me is:

N/A

• All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Amazon.com Inc. has no parent company and no other publicly held company owns 10% or more of Amazon.com Inc.'s stock.

Amazon Digital Services, Inc. is a wholly-owned subsidiary of parent company Amazon.com Inc., and no other publicly held company owns 10% or more of Amazon Digital Services, Inc.'s stock.

• The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Fish & Richardson P.C.: Kurt L. Glitzenstein, Robert P. Courtney, Indranil Mukerji, Michael J. McKeon, Ajit S. Dang, and Erin P. Alper.

Date: July 10, 2014

/s/*Michael J. McKeon*
Signature of counsel

Michael J. McKeon
Printed name of counsel

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST

TABLE OF CONTENTS ................................................................... i

TABLE OF AUTHORITIES .............................................................. iv

STATEMENT OF RELATED CASES ................................................ 1

STATEMENT OF JURISDICTION ................................................... 1

COUNTER-STATEMENT OF THE ISSUES .................................... 1

COUNTER-STATEMENT OF THE FACTS ...................................... 1

SUMMARY OF THE ARGUMENT ................................................. 5

STANDARD OF REVIEW ............................................................... 6

ARGUMENT .................................................................................. 7

I.    The Definiteness Requirement ...................................................... 7

II.   Claim 1 of the '851 Patent Is Indefinite ..................................... 9

    A.  Claim 1 Improperly Uses an "Open" *Markush* Group
        Lacking Clear, Discernible Boundaries ............................... 9

        1.  The Court should reject any suggestion that the
           term "comprising" is not open-ended ........................... 13

        2.  Claim 1 is indefinite because it lacks boundaries,
           not because it is broad .................................................... 14

        3.  The district court properly analyzed the
           "selected from the group comprising" term
           under the law of *Markush* groups .................................. 16

i

# TABLE OF CONTENTS (cont'd)

                                                                    **Page**

    4.  Amazon is aware of no case finding the term
        "selected from the group comprising" to be
        definite ............................................................ 18

B.  Claim 1's Requirement of Shapes So As To Guide
     *The* Extended Lattice Defects" is Indefinite ...................... 20

    1.  No reasonably certain construction is possible
        for "*the* extended lattice defects" ................................... 22

    2.  The district court erred in construing "the
        extended lattice defects"............................................... 25

      a.  The district court's construction is itself
          indefinite ................................................................ 27

      b.  Even were it not indefinite, the district court's
          construction contradicts the intrinsic record............. 33

III.  This Court Should Decline to Review, or in the Alternative
    Reject, Lexington's Other Claim Construction Arguments ....... 34

    A.  This Court Should Not Review Claim Constructions
       Unrelated to the Judgment.................................................... 34

    B.  Lexington's Other Arguments Concerning Claim
       Constructions Should Be Rejected in the Event
       Reached by the Court ........................................................ 35

      1.  "trenches" .................................................................. 35

      2.  "having"..................................................................... 40

      3.  "microfacets"............................................................. 48

      4.  "sloped etching profile with a smooth rotation of
         microfacets"............................................................... 49

        a.  The "sloped etching profile" is the profile of the
            entire trench, and does not exclude the trench
            bottom .................................................................... 50

# TABLE OF CONTENTS (cont'd)

**Page**

b.  The "sloped etching profile" is evaluated from a cross-sectional perspective ................................... 53

c.  The district court's order is compatible with the term "sloped" ........................................... 54

d.  The district court properly required a "gradual, incremental rotation in slope from micro-facet to micro-facet" ........................................... 55

e.  Figure 2B cannot be reconciled with the requirements of the claim ........................................ 56

f.  The district court committed no error in its phrasing "when viewed in cross-section" ................. 56

g.  This Court should reject Lexington's proposed reinterpretation of this term ..................................... 57

5.  "a sloped etching profile . . . without a prescribed angle of inclination" ..................................... 58

a.  For the reasons already stated, this Court should reject all of Lexington's arguments concerning the "sloped etching profile" ..................................... 58

b.  "Without a prescribed angle of inclination" means "without linear portions" ............................. 59

CONCLUSION ................................................................... 60

CERTIFICATE OF SERVICE ........................................... 62

iii

# TABLE OF AUTHORITIES

<u>**Page(s)**</u>

**Cases**

*Abbott Labs. v. Baxter Pharm. Prods., Inc.*,
   334 F.3d 1274 (Fed. Cir. 2003) ................................................. 9, 10

*Allergan, Inc. v. Athena Cosmetics, Inc.*,
   640 F.3d 1377 (Fed. Cir. 2011) ...................................................... 6

*Amgen, Inc. v. Chugai Pharm. Co.*,
   927 F.2d 1200 (Fed. Cir. 1991) .............................................. 15, 28

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
   314 F.3d 1313 (Fed. Cir. 2003) .................................................... 27

*Aventis Pharma S.A. v. Hospira, Inc.*,
   637 F.3d 1341 (Fed. Cir. 2011) .................................................... 35

*Bayer CropScience AG v. Dow AgroSciences LLC*,
   728 F.3d 1324 (Fed. Cir. 2013) .................................................... 36

*Bridgelux, Inc. v. Cree, Inc.*,
   No. 9:06-cv-240 .......................................................................... 19

*Cent. Admixture Pharm. Servs. v. Advanced Cardiac
   Solutions, P.C.*,
   482 F.3d 1347 (Fed. Cir. 2007) .................................................... 24

*Crystal Semiconductor Corp. v. TriTech Microelecs.
   Int'l, Inc.*,
   246 F.3d 1336 (Fed. Cir. 2001) ................................... 11, 13, 42, 45

*Datamize, LLC v. Plumtree Software, Inc.*,
   417 F.3d 1342 (Fed. Cir. 2005) .................................................... 30

*Dippin' Dots, Inc. v. Mosey*,
   476 F.3d 1337 (Fed. Cir. 2007) .................................................... 13

*Energizer Holdings v. Int'l Trade Comm'n*,
   435 F.3d 1366 (Fed. Cir. 2006) .................................................... 23

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*Exergen Corp. v. Wal-Mart Stores, Inc.*,
575 F.3d 1312 (Fed. Cir. 2009) ..................................... 11

*Exxon Research & Eng'g Co. v. United States*,
265 F.3d 1371 (Fed. Cir. 2001) ....................................... 9

*Function Media, L.L.C. v. Google, Inc.*,
708 F.3d 1310 (Fed. Cir. 2013) ....................................... 8

*Gillette Co. v. Energizer Holdings, Inc.*,
405 F.3d 1367 (Fed Cir 2005) ....................................... 10

*Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*,
336 U.S. 271 (1949) ..................................................... 15

*Haemonetics Corp. v. Baxter Healthcare Corp.*,
607 F.3d 776 (Fed. Cir. 2010) ......................................... 8

*Halliburton Energy Servs., Inc. v. M-I LLC*,
514 F.3d 1244 (Fed. Cir. 2008) ..................................... 21

*Halliburton Oil Well Cementing Co. v. Walker*,
329 U.S. 1 (1946) ......................................................... 15

*Honeywell Int'l, Inc. v. Int'l Trade Comm'n*,
341 F.3d 1332 (Fed. Cir. 2003) ..................................... 29

*Ex parte Hughes*,
Appeal No. 1998-0653, 2002 WL 465369 (B.P.A.I.
May 24, 2001)......................................................... 17, 18

*IPXL Holdings, LLC v. Amazon.com, Inc.*,
430 F.3d 1377 (Fed. Cir. 2005) ......................... 8, 12, 25

*Lampi Corp. v. Am. Power Prods.*
228 F.3d 1365 (Fed Cir 2000) ..................................... 41

*Lexington Luminance LLC v. Feit Electric Co., Inc.*,
No. 12-11554, slip op. (D. Mass. June 25, 2013)........................ 26

v

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*Lexington Luminance LLC v. Google, Inc.*,
  No.1:12-cv-12218 (D. Mass. filed Nov. 29, 2012) ........................ 1

*In re Lowry*,
  93 F.2d 909 (C.C.P.A. 1938) ......................................................... 19

*Mass. Inst. of Tech. v. Abacus Software*,
  462 F.3d 1344 (Fed. Cir. 2006) ..................................................... 34

*Merrill v. Yeomans*,
  94 U.S. 568 (1876) ............................................................. 8, 12, 25

*Metrologic Instruments, Inc. v. PSC Inc.*,
  No. 1:99-cv-4876, 2004 U.S. Dist. LEXIS 28422
  (D.N.J. May 6, 2004) ..................................................................... 19

*Mobil Oil Corp. v. Amoco Chems. Corp.*,
  779 F. Supp. 1429 (D. Del. 1991), *aff'd without op.*,
  980 F.2d 742 (Fed. Cir. 1992) ....................................................... 42

*Moleculon Research Corp. v. CBS, Inc.*,
  793 F.2d 1261 (Fed. Cir. 1986) ..................................................... 13

*Nat'l Cable Television Assoc., Inc. v. Am. Cinema
  Editors, Inc.*,
  937 F.2d 1572 (Fed. Cir. 1991) ..................................................... 18

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
  572 U.S. ___, 2014 WL 2440536 (June 2, 2014) ................... *passim*

*Nazomi Commc'ns, Inc. v. Arm Holdings, PLC*,
  403 F.3d 1364 (Fed. Cir. 2005) ..................................................... 11

*Novo Indus., L.P. v. MicroMolds Corp.*,
  350 F.3d 1348 (Fed. Cir. 2003) ..................................................... 20

*PPG Indus. v. Guardian Indus. Corp.*,
  156 F.3d 1351 (Fed. Cir. 1998) ..................................................... 18

## <u>TABLE OF AUTHORITIES (cont'd)</u>

<u>**Page(s)**</u>

*Pérez-Acevedo v. Rivero-Cubano*,
   520 F.3d 26 (1st Cir. 2008) ........................................ 6, 7

*Pfizer, Inc. v. Teva Pharms. USA, Inc.*,
   518 F.3d 1353 (Fed. Cir. 2008) ..................................... 18

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) (en banc) ..................... 33

*Process Control Corp. v. Hyd-Reclaim Corp.*,
   190 F.3d 1350 (Fed. Cir. 1999) .............................. 14, 20

*Rates Tech., Inc. v. Mediatrix Telecom, Inc.*,
   688 F.3d 742 (Fed. Cir. 2012) ...................................... 42

*Rolls-Royce, PLC v. United Techs. Corp.*,
   603 F.3d 1325 (Fed. Cir. 2010) .............................. 44, 46

*Schoenhaus v. Genesco, Inc.*,
   440 F.3d 1354 (Fed. Cir. 2006) .............................. 43, 45

*Seattle Box Co. v. Indus. Crating & Packaging, Inc.*,
   731 F.2d 818 (Fed. Cir. 1984) ...................................... 24

*Takeda Pharm. Co. v. Zydus Pharms. USA, Inc.*,
   743 F.3d 1359 (Fed. Cir. 2014) ..................................... 29

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
   723 F.3d 1363 (Fed. Cir. 2013), *cert. granted*, 134 S.
   Ct. 1761 (Mar. 31, 2014) ............................................. 28

**Statutes**

35 U.S.C. § 112 ................................................... *passim*

America Invents Act, Pub. L. No. 112-29, sec. 4(e), 125
   Stat. 283, 297 (2011) ..................................................... 7

## STATEMENT OF RELATED CASES

No other appeal in or from this case has been before either this Court or any other appellate court. The undersigned counsel is aware of the following case, pending in another court, which will be directly affected by this Court's decision in the pending appeal: *Lexington Luminance LLC v. Google, Inc.*, No.1:12-cv-12218 (D. Mass. filed Nov. 29, 2012). Counsel is also aware of re-examination proceedings at the U.S. Patent & Trademark Office concerning the patent-in-suit, application number 90/012,964 (filed Aug. 30, 2013).

## STATEMENT OF JURISDICTION

Amazon agrees with Lexington's jurisdictional statement.

## COUNTER-STATEMENT OF THE ISSUES

Amazon disputes Lexington's statement in so far as it contends that the district court's order construing certain terms from the sole patent at issue, entered concurrently with its judgment of indefiniteness, is properly before this Court. The sole issue for this appeal is: whether claim 1 of U.S. Patent No. 6,936,851 is invalid for indefiniteness.

## COUNTER-STATEMENT OF THE FACTS

Appellant's patent—U.S. Patent No. 6,936,851 ("the '851 patent")—describes a microscopic structure for the crystal substrate on which a light-

1

emitting diode ("LED") is formed. '851 patent, at [54], A26. According to the patent, if the substrate is textured in a certain way—*i.e.*, without any sharp corners—then when the LED is subsequently formed, it will have fewer defects that would otherwise compromise the device's performance. Col.1:60–2:26, A35.[1]

The patent shows the shape for such a substrate:



**Fig. 1C**

'851 patent fig.1C (coloring and annotation added), A28. The patent calls the curved features above "trenches," "stripes," or "grooves." Col.3:47–50, 3:54–55, 4:5–24, 3:65–66, A35–36.

But by any name, the patent promises they address a type of defect called a "lattice defect" or a "threading dislocation" that forms when crystal layers are deposited atop a substrate. Col.1:8–25, A35. These defects "propagate along the growth direction" of the crystal layer, col.2:18–20, A35, but are supposedly cured by smooth, curved trenches that help guide

---

[1] Herein, references to "col.X:YY" refer to the column and line of the '851 patent, A26.

such propagating defects away from important parts of the LED.  Col.2:18–26, A35.

Claim 1 is the sole claim at issue, and suffers at least two fundamental defects: (a) it recites a *Markush* group in an open-ended "comprising" manner rather than the proper closed-ended manner; and (b) lacks antecedent for "the extended lattice defects" that are supposedly guided away from propagating into the active layer:

> 1. A semiconductor light-emitting device comprising:
>
> a substrate;
>
> a textured district defined on the surface of said substrate comprising a plurality of etched trenches having a sloped etching profile with a smooth rotation of micro-facets without a prescribed angle of inclination;
>
> a first layer disposed on said textured district; comprising a plurality of inclined lower portions *so as to guide **the** extended lattice defects* away from propagating into the active layer, said first layer and said substrate form a lattice-mismatched misfit system, said substrate is *selected from the group comprising* group III-V, group IV, group II-VI elements and alloys, ZnO, spinel and sapphire; and
>
> a light-emitting structure containing an active layer disposed on said first layer.

'851 patent, cl.1 (emphasis added), A38; *see also* '851 patent, cert. of correction (Aug. 30, 2005), A40.

On August 14, 2013, Amazon moved for judgment on the pleadings, citing both of the above grounds. Amazon MJP, A566; *see also* Lexington Opp., A591; Amazon Reply, A641; Lexington Surreply, A671. The District Court held a hearing, coordinated with Markman proceedings. Hr'g Tr. (Nov. 21, 2013), A835.

On March 18, 2014, the district court granted Amazon's motion because the claimed "group comprising" lacked sufficient boundaries. Op., A2. The district court also found that the phrase "so as to guide the extended lattice defects" did not violate § 112's definiteness requirements. It entered judgment for Amazon the following day. Judgment, A1. This appeal followed.[2]

---

[2] Lexington's Statement of Facts, and particularly its "Technology Background," includes numerous allegations that are not of record. Lexington relies on arguments and contentions that its counsel presented only in its technology tutorial to the district court—an inadmissible attorney-generated demonstrative. Blue Br. 4–5 (repeatedly citing to Lexington's technology tutorial slides). Lexington presented no fact or opinion evidence in purported support of these statements. Its counsel's allegations were neither authenticated nor subject to cross-examination, and are not part of the record on which the district court's judgment rests. They appear on the docket only because the parties filed them pursuant to an order of the district court specifically concerning access to tutorials, and not because they contain admissible evidence. Amazon thus

## SUMMARY OF THE ARGUMENT

As part of the patent bargain, a patentee must tell the public the bounds of the invention—a requirement very recently reaffirmed and expanded in *Nautilus* (which issued after the blue brief here was filed).

The patent here is indefinite in two ways. First, it uses the "*Markush* group" claiming technique, but recites an "open," and infinite, group. Numerous of this Court's opinions are in accord with the district court's judgment striking the claim for that reason.

Second, the claim recites a shape ("inclined lower portion") whose function is to guide "*the* extended lattice defects" in a certain way, but no piece of intrinsic evidence explains *what defects* are invoked by the definite article "the." That definite article tells the reader there is some specific, previously-defined object in mind, but no such object can be determined in claim 1. Does the claim require the function of guiding *all* lattice defects? Those of a particular type? Those at a particular location? Lexington has no answers. The district court, grappling with this issue, erroneously concluded that the problem could be solved with corrective claim interpreta-

---

disputes each and all of Lexington's purported facts, to the extent they are based solely on Lexington's technology tutorial.

tion.  Even that well-intentioned attempt fails to render the claim definite. The Court should thus affirm on this alternate ground as well.

Finally, Appellant devotes much of its brief to arguing matters not necessary to the judgment.  Appellant attacks five of the district court's claim constructions, all of which are unrelated to the definiteness issue.  In light of this Court's precedent regarding the interlocutory nature of such review, the Court should decline to issue advisory opinions about these constructions, particularly in light of the judgment of invalidity of the claim under review.  In any event, the district court's claim construction analysis for these five terms is well-reasoned and, with one clarifying exception discussed *infra*, this Court should—if it elects to consider the issue—affirm.

## STANDARD OF REVIEW

This Court reviews a judgment on the pleadings under regional circuit procedural law.  *Allergan, Inc. v. Athena Cosmetics, Inc.*, 640 F.3d 1377, 1380 (Fed. Cir. 2011).  In the First Circuit, an appellate court reviews a district court's grant of judgment on the pleadings *de novo*.  *Pérez-Acevedo v. Rivero-Cubano*, 520 F.3d 26, 29 (1st Cir. 2008).  Judgment on the pleadings is appropriate where, viewing the facts contained in the pleadings in the light most favorable to the nonmovant, and drawing all

reasonable inferences therefrom, the complaint fails to set forth any right to relief above the speculative level. *Id.*

## ARGUMENT

## I.    THE DEFINITENESS REQUIREMENT

The patent statute requires claims to "particularly point [] out and distinctly claim[]" the invention:

> The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

35 U.S.C. § 112, ¶ 2 (2011).[3]  The claims, "viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. ___, 2014 WL 2440536, at *7 (June 2, 2014). That is, the claim must set forth its metes and bounds in a reasonably-ascertainable way that is amenable to a single objective meaning. *See also id.* at *8 ("If reasonable efforts at claim construction result in a definition that does not provide sufficient particularity and clarity to inform skilled artisans of the bounds of the claim, the claim is . . . invalid for indefinite-

---

[3] The 2011 amendments do not apply.  America Invents Act, Pub. L. No. 112-29, sec. 4(e), 125 Stat. 283, 297 (2011) (applying amendments only to later-filed patent applications).

ness." (quoting with approval *Biosig Instruments, Inc. v. Nautilus, Inc.*, 715 F.3d 891, 898 (Fed. Cir. 2013), *vacated* 2014 WL 2440536 (U.S. June 2, 2014))); *IPXL Holdings, LLC v. Amazon.com, Inc.*, 430 F.3d 1377, 1384 (Fed. Cir. 2005) ("[A claim] 'not sufficiently precise to provide competitors with an accurate determination of the 'metes and bounds' of protection involved' . . . is 'ambiguous and properly rejected' under section 112, paragraph 2." (quoting *Ex parte Lyell*, 17 U.S.P.Q.2d 1548, 1550 (B.P.A.I. 1990))).

The indefiniteness inquiry can be interlinked with claim construction. If one sets out to construe a claim but finds the ability to do so negated by some aspect of the claim's drafting—if a reasonable claim construction cannot be reached—then the claim is indefinite. *Haemonetics Corp. v. Baxter Healthcare Corp.*, 607 F.3d 776, 783 (Fed. Cir. 2010); *see also Merrill v. Yeomans*, 94 U.S. 568, 573 (1876) (Where a patentee uses "ambiguous language or vague descriptions," the public unfairly is "deprived of rights supposed to belong to it, without being clearly told what it is that limits these rights.").

Like claim construction, indefiniteness is a question of law. *E.g.*, *Function Media, L.L.C. v. Google, Inc.*, 708 F.3d 1310, 1317-19 (Fed. Cir. 2013). As such, judgment on the pleadings is an appropriate vehicle to ad-

dress indefiniteness. *Cf. Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1376 (Fed. Cir. 2001) (endorsing the use of summary judgment on indefiniteness issues).

## II. CLAIM 1 OF THE '851 PATENT IS INDEFINITE

The district court properly concluded that claim 1 fails the definiteness standards of § 112. Op. at 19–24, A20–25. Its judgment was correct both under the law at the time and according to the additional guidance in *Nautilus*. This Court should affirm, either for the reason adopted by the district court, or, alternatively, because the claim requires satisfying an indefinite condition caused by insufficient antecedent basis.

### A. Claim 1 Improperly Uses an "Open" *Markush* Group Lacking Clear, Discernible Boundaries

The term "*Markush* group" refers to a style of claiming in which the patentee instructs that a certain element of his invention may be selected from a closed group of possibilities. *See, e.g., Abbott Labs. v. Baxter Pharm. Prods., Inc.*, 334 F.3d 1274, 1280 (Fed. Cir. 2003). Such a claim is commonly formatted as "selected from the group *consisting of* A, B, and C[.]" *Manual of Patent Examining Procedure* § 2173.05(h)(I.) (emphasis added).

Use of closed language such as "consisting of" is a key requirement for *Markush* groups. Unless closed language is used, *Markush*-style claiming would lead to an unbounded set of possible alternatives. That is, an open-ended *Markush* group would indicate that some element of a claimed invention could be satisfied by using alternative A, or alternative B, or alternative C, or any one of an infinite number of alternatives not specifically identified. Because of such problems, this Court has repeatedly required that *Markush* groups use only closed language—*i.e.*, with language clearly limiting the set of alternatives to those expressly identified. *See, e.g.*, *Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1372 (Fed Cir 2005) ("A *Markush* group by its nature is closed. If an applicant tries to claim a *Markush* group without the word 'consisting,' the PTO will insist upon the addition of this word to ensure a closed meaning."); *Abbott Labs.*, 334 F.3d at 1281 ("[A] *Markush* group, incorporated in a claim, should be 'closed,' *i.e.*, it must be characterized with the transition phrase 'consisting of,' rather than 'comprising' or 'including.'" (quoting, with approval, S. Becker, *Pat. Applications Handbook* § 2:17 (9th ed. 2000))).

In view of these clear rules, the district court properly concluded that claim 1 of the '851 patent failed to meet requirements for *Markush*-style claiming. Referring to the required substrate, the claim requires that it be

"selected from the group *comprising* group III-V, group IV, group II-VI elements and alloys, ZnO, spinel and sapphire." Col.8:46–50, A38 (emphasis added). This Court's opinions repeatedly confirm that "comprising" is a transition term of open-ended meaning. *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1319 (Fed. Cir. 2009) ("[T]he term 'comprising' . . . is well understood in patent law to mean 'including but not limited to.'"); *Nazomi Commc'ns, Inc. v. Arm Holdings, PLC*, 403 F.3d 1364, 1370 (Fed. Cir. 2005) ("'Comprising' is often synonymous with 'including.'"); *Crystal Semiconductor Corp. v. TriTech Microelecs. Int'l, Inc.*, 246 F.3d 1336, 1348 (Fed. Cir. 2001) ("When a patent claim uses the word 'comprising' as its transitional phrase, the use of 'comprising' creates a presumption that the body of the claim is open."). Applying those cases, the district court properly concluded that claim 1's "selected from the group comprising" language amounted to a claim that "the substrate could be made of any number of these elements and alloys, *but can also include any other element or alloy*." Op. at 20 (emphasis added), A21.

Confronted with such language, it is logically impossible to discern the boundaries of the phrase "selected from the group comprising . . . ." That the claim contemplates several *enumerated* materials is clear. But for any *unenumerated* material, it is impossible to know whether it might fall

11

inside or outside of the phrase's scope. Nothing in the claim, or anything else in the '851 patent, provides the criteria for whether a given material falls within the scope of this defective quasi-*Markush* group.[4] Those seeking to apply the claim would be at sea, with mere guesswork their only option. Section 112's definiteness requirement prohibits precisely this situation. *Nautilus*, 2014 WL 2440536, at *7; *Merrill*, 94 U.S. at 573; *see also IPXL Holdings*, 430 F.3d at 1384 ("[A claim] 'not sufficiently precise to provide competitors with an accurate determination of the 'metes and bounds' of protection involved' . . . is 'ambiguous and properly rejected' under section 112, paragraph 2." (quoting *Lyell*, 17 U.S.P.Q.2d at 1550)).

---

[4] Lexington posits that the claim's recitation of "lattice mismatch" somehow serves to rescue the defective *Markush* group. Blue Br. 21. Lexington is wrong. Though the claim generally contemplates a "lattice-mismatched misfit system," such restriction establishes no meaningful boundaries on the defective *Markush* group. A "mismatch" can exist only between two different materials—first, the substrate, and second, the "first layer." Claim 1, A38. The claim imposes no limits at all for the material composition of the "first layer," and offers only the defective *Markush* claim to address the composition of the substrate. Lexington's attempt to cure the unboundedness of the "substrate" term by linking it to a term with no limits to its material composition *at all* fails as a matter of both logic and law. Such a claim is not capable of interpretation with reasonable certainty. *See, e.g.*, *Nautilus*, 2014 WL 2440536, at *7.

## 1. The Court should reject any suggestion that the term "comprising" is not open-ended

Lexington's brief intermittently suggests that, as used in the claim, the word "comprising" might not be open-ended after all. *E.g.*, Blue Br. 13–15. None of the authority Lexington cites commands, or even supports, such a conclusion.

As set forth *supra*, this Court's opinions uniformly hold that the term "comprising" means "including but not limited to," *i.e.*, it is by definition an open-ended term. Lexington has presented no contrary authority. *Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337, 1343 (Fed. Cir. 2007), is entirely consistent with the judgment of the district court here. And *Crystal Semiconductor*, 246 F.3d at 1348, did not construe "comprising" at all, but noted that it is traditionally construed in open-ended fashion. Finally, in *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1272 n.8 (Fed. Cir. 1986), the Court confirmed, yet again, that "'comprising' . . . does not exclude additional unrecited elements[.]"[5] There could not be any other term in a patent claim that has such universal and well-known meaning.

---

[5] *Moleculon* went on to reject a patentee's argument that, because his claim used the phrase "comprising," an "open" reading permitted him to abrogate certain numerical limits set forth in the claim. 793 F.2d at 1271 (declining to read "comprising" so as to vitiate an expressly recit-

Nor can Lexington credibly contend that the '851 applicant acted "as his own lexicographer," assigning to the term "comprising" special meaning contrary to its normal interpretation. *Process Control Corp. v. Hyd-Reclaim Corp.*, 190 F.3d 1350, 1357 (Fed. Cir. 1999). There is simply nothing anywhere in the '851 specification or file history supporting such argument. In view of "comprising's" status as a staple term of art in patent law, and one that this Court has repeatedly defined, this Court should reject Lexington's suggested redefinition.

### 2. Claim 1 is indefinite because it lacks boundaries, not because it is broad

Lexington suggests that the district court's judgment should be reversed because "[b]readth is not indefiniteness." Blue Br. 16. But Lexington misses the point entirely.

The defect in claim 1 is not that its boundaries are too broad. The defect in claim 1 is that, as to the "substrate selected from the group comprising" clause, it lacks any cognizable boundaries. The group of claimed

---

ed number of "cube pieces"). That situation is not present here; the "selected from the group comprising" clause is the only part of '851 claim 1 that anywhere discusses the material composition of the claimed substrate.

14

substrates is indistinguishable from unclaimed substrates, and thus Lexington's patent fails the essential notice function of the patent laws.

Lexington practically admits as much: "The specification merely identifies exemplary substrates and *the claim is not limited to them*." *Id.* at 17 (emphasis added). If the claim is not limited to the enumerated substrates, then it fails to place any limitation on the claimed substrate. As the Court has repeatedly cautioned, claims lacking any limiting principle are per se invalid as indefinite. *See, e.g.*, *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 336 U.S. 271, 277–78 (1949); *Amgen, Inc. v. Chugai Pharm. Co.*, 927 F.2d 1200, 1217–28 (Fed. Cir. 1991).

Indeed, Lexington's argument raises the same issues noted by the Supreme Court over sixty-five years ago in *Halliburton Oil Well Cementing Co. v. Walker*, 329 U.S. 1 (1946), *partially superseded by* 35 U.S.C. § 112. In that case, the Supreme Court noted the problems surrounding the "broadness, ambiguity, and overhanging threat" of claims drafted without meaningful limitations on scope. 329 U.S. at 12. Such claims, said the Supreme Court, are invalid: "[A] patentee cannot obtain greater coverage by failing to describe his invention than by describing it as the statute commands." *Id.* at 13. And while Congress cabined *Halliburton*'s reach with the enactment of § 112, ¶ 6, *Halliburton*'s larger point still stands for

all kinds of claims: a claim, like claim 1 here, that fails to set forth mean-
ingful boundaries on its application, is invalid as indefinite.

Lexington also complains that "the District Court failed to require
evidence regarding the understanding of a person having ordinary skill in
the art[.]" Blue Br. 7–8. Yet, Lexington itself failed to proffer evidence on
this point, and the record is bereft of any indication that an ordinarily
skilled artisan would take issue with the district court's reasoning. Beyond
this, the term at issue is indefinite as a legal matter, not a technical one.
Lexington's argument on this point is unsupported.

> ### 3. The district court properly analyzed the "selected from the group comprising" term under the law of *Markush* groups

Lexington contends that the district court reasoned that "use of the
term 'group' in the claim required it to be a *Markush* group." Blue Br. 18.
That is wrong. The district court analyzed the "selected from the group
comprising" term under the law of *Markush* groups not merely because it
used the word "group," but because the claim reflected "the very essence of
a patent claiming alternate embodiments." Op. at 20, A21. It went on to
note that the substrates identified in the "selected from the group compris-
ing" clause were "described as functionally equivalent alternatives." *Id.* at
21, A22. But, the court correctly continued, because the "selected from the

group comprising" language was open-ended, it failed standards for definiteness in *Markush* claiming. *Id.* at 22–23, A23–24.

Lexington is correct that a properly-formed *Markush* group is not the only way for a patentee to validly claim functionally equivalent alternatives. Blue Br. 18–19. But it has shown no non-*Markush* basis on which its claim is valid. Instead, it offers an unsupportable syllogism. It concedes that the "selected from the group comprising" term is not a properly-formed *Markush* group because it is open-ended. *Id.* From this it argues that because the term is not a *Markush* group, legal precepts barring patents from claiming an unbounded set of alternatives somehow do not apply. Such argument makes an elementary logical error. Simply because an item does not satisfy the requirements of one category does not mean it automatically satisfies the requirements of another. A bicycle without wheels may not be a bicycle, but it surely is not a car.

Lexington cites no law supporting this reasoning, and to Amazon's knowledge none exists. For example, one case cited by Lexington—*Ex parte Hughes*, Appeal No. 1998-0653, 2002 WL 465369 (B.P.A.I. May 24, 2001) (non-precedential)—actually entirely supports the district court's judgment. In *Hughes*, the B.P.A.I. approved a claim's use of the phrase "consisting essentially of" as not indefinite because the boundaries of the

17

claimed group were clear: "[The group] includes the specific members of the grouping plus other members which *do not affect the basic and novel photochromic characteristics* of the claimed compound." *Id.* at *3 (emphasis added); *see also PPG Indus. v. Guardian Indus. Corp.*, 156 F.3d 1351, 1354 (Fed. Cir. 1998) (approving similar interpretation of "consisting essentially of").

But here claim 1 does not say "consisting essentially of." It says "comprising." As noted *supra*, nothing in '851 claim 1 teaches the sort of bounding principle that was present in *Hughes*. This Court should reject Lexington's suggestion that the phrasing of '851 claim 1 meets definiteness standards, regardless of whether it is called a "*Markush* group."

### 4. Amazon is aware of no case finding the term "selected from the group comprising" to be definite

Lexington's suggestion that other courts have approved the definiteness of "selected from the group comprising" is highly misleading. *See* Blue Br. 19–20. None of the cases that Lexington cites so much as considers the issue presented here. *See Pfizer, Inc. v. Teva Pharms. USA, Inc.*, 518 F.3d 1353, 1362 (Fed. Cir. 2008) ("Since the issue now before us was not decided by those cases, they are not binding authority."); *Nat'l Cable Television Assoc., Inc. v. Am. Cinema Editors, Inc.*, 937 F.2d 1572, 1581

18

(Fed. Cir. 1991) ("When an issue is not argued or is ignored in a decision, such decision is not precedent to be followed in a subsequent case in which the issue arises.").

*In re Lowry*, 93 F.2d 909 (C.C.P.A. 1938), Lexington's lead case, nowhere analyzes the definiteness issue presented here. *Lowry* substantially predated the modern Patent Act. It considered several claims using the verbiage "selected from the group comprising," but considered them only for nonobviousness, and did not analyze whether the "comprising" language posed definiteness problems. *Id.* at 913–14 (finding some claims properly rejected, and others not, on obviousness grounds); *see also id.* at 914 (finding some of the same claims indefinite on unrelated grounds). Nowhere does *Lowry* discuss, much less endorse, Lexington's theory of definiteness.

Lexington's other citations are even further afield. Though Lexington fails to identify it as such, its citation of the *Bridgelux* matter is not to any judicial opinion, but to a claim construction notice filed by the parties. *See* Blue Br. 19–20; *see also* Not. of Submission of Claim Charts, *Bridgelux, Inc. v. Cree, Inc.*, No. 9:06-cv-240, Ex. 1, at 3 (E.D. Tex. filed Sept. 14, 2007), ECF No. 121-2. The filing includes no discussion, anywhere, of definiteness. Nor is there support in *Metrologic Instruments, Inc. v. PSC*

*Inc.*, No. 1:99-cv-4876, 2004 U.S. Dist. LEXIS 28422, at *7–9 (D.N.J. May 6, 2004). Though analyzing a request for reconsideration of a previously-entered construction for a phrase including "selected from the group comprising," the district court nowhere analyzed whether the word "comprising" imposed definiteness concerns.

Lexington has failed to cite a single case that actually embraces its novel and counter-intuitive view of the law.[6]

## B. Claim 1's Requirement of Shapes So As To Guide "*The Extended Lattice Defects*" is Indefinite

As noted, to satisfy § 112, ¶ 2, a claim must "inform those skilled in the art about the scope of the invention *with reasonable certainty*." *Nautilus*, 2014 WL 2440536, at *7 (emphasis added). Claims that leave such a person guessing as to claim scope—claims that are not amenable to a single

---

[6] Not even Lexington suggests that this Court might judicially correct its claim, as that path is foreclosed. "[N]o matter how great the temptations of fairness or policy making," this Court's role is not to redraft claims. *Process Control Corp. v. HydReclaim Corp.*, 190 F.3d 1350, 1357 (Fed. Cir. 1999) (quoting *Quantum Corp. v. Rodime, PLC*, 65 F.3d 1577, 1584 (Fed. Cir. 1995)). Judicial correction is only appropriate in the very narrow circumstance where "(1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the claims." *Novo Indus., L.P. v. MicroMolds Corp.*, 350 F.3d 1348, 1357 (Fed. Cir. 2003) (reversing a district court's substitution of "and" for "a"). The '851 patent's malformed *Markush* group is not correctable under this high standard.

reasonably-ascertainable meaning—have failed the basic purpose of this section. That is, they have neglected to "inform the public of the bounds of the protected invention, *i.e.*, what subject matter is covered by the exclusive rights of the patent." *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008).

In addition to the defective *Markush* group discussed above, claim 1 fails the definiteness test in its recitation of:

> a plurality of inclined lower portions *so as to guide **the** extended lattice defects away* from propagating into the active layer . . . .

'851 patent, cl. 1 (emphasis added), A38. Even read in the light of the entire intrinsic record, this language is irreducibly uncertain about *which, or how many, defects must be guided* for a device to fall within the claim. Must every defect be guided away, or just two, or some arbitrary measure in between?

Grappling with this issue, the district court erroneously concluded that the uncertainty here could be judicially erased via claim construction. From certain statements in the written description, the court reasoned that the claim must require reducing defects "as much as possible," but cited nothing in the claim itself supporting that reasoning. Op. at 18–19, A20–21. Amazon respectfully disagrees that the claim can be so construed. As

the Supreme Court's recent decision in *Nautilus* (which the district court did not have the benefit of) highlights, to be definite claims must be understandable with reasonable certainty. Claim 1's purported requirement of shapes to guide "the extended lattice defects" fails that test, and is indefinite.

### 1. No reasonably certain construction is possible for "*the* extended lattice defects"

Claim 1 requires that the "first layer" have a "plurality of inclined lower portions" disposed "so as to guide *the* extended lattice defects away from propagating into the active layer." This is a critical feature of the alleged invention, as the patent purports to solve the "drawbacks" of the prior art precisely by the presence of these "inclined portions." Col.1:13–16, 1:20–22; 1:60–62; 2:18–22, A35.

That the patent requires "a plurality of inclined lower portions" is not disputed. Nor is it disputed that the "portions" must be configured to perform a certain function—"guid[ing] the extended lattice defects." But neither the claim nor the patent ever sets forth this function in a definite way. It is impossible for a skilled artisan to understand whether a given structure does or does not perform the claimed function. As such, it is impossible to

know with reasonable certainty which "inclined lower portion" structures are covered by the claim, and which are not.

First, the claim itself includes no antecedent for "the extended lattice defects." *See* '851 patent, cl. 1, A38. Such a lack of antecedence is sufficient to invalidate the claim—unless the specification somehow resolves the uncertainty. *See Energizer Holdings v. Int'l Trade Comm'n*, 435 F.3d 1366, 1371 (Fed. Cir. 2006) (finding claim lacking antecedent basis definite because meaning was apparent from other claim language or the specification).

The '851 specification is no help for establishing antecedence. While the written description repeatedly refers to "the" extended lattice defects (or similar language), it nowhere actually identifies—either specifically or quantitatively—the defects that purport to set the boundary of the claimed invention. *See, e.g.*, col.1:48–50 (referring to "the threading dislocations"), 2:18–22 (referring to "the threading dislocations" and "the dislocation defects"); 3:43–46 (referring to "the extended defects"); 4:58-61 ("the dislocation defects"), 5:7–10 ("the extended defects"), 5:22–25 ("the traveling dislocations"), 5:35–37 ("the misfit defects"), 5:59–61 ("the defects extended"), 6:14–17 ("the threading dislocation"), 7:54–59 ("the extended defects" and "the defects"), 8:24–30 ("the extended defects" and

"the escaping defects") , A35–38. Though each of the noted references uses the verbiage "the extended defects," or the like, none actually describes or defines what they are. Thus, one is left with the same central question: to fall within the invention, how many extended lattice defects must be guided? Two or more, all, or some amount in between?

The specification makes things more opaque. It makes vague statements that the patentee's goal was to reduce defect density. *E.g.*, Col.1:12-16, 2:20–22, A35. That "goal" was unclaimed.[7] *Cf. Cent. Admixture Pharm. Servs. v. Advanced Cardiac Solutions, P.C.*, 482 F.3d 1347, 1355 (Fed. Cir. 2007). What is claimed are certain shapes "so as to ***guide***" the extended lattice defects. On this point, the specification provides zero guidance.

To the extent Lexington may argue that "the extended lattice defects" is some sort of "word of degree" (and thus precision is less expected), the '851 patent fails the requirements even for such a term. This Court has held that patentees using such "words of degree" must provide "some standard for measuring that degree." *Seattle Box Co. v. Indus. Crat-*

---

[7] Even if "reducing defect density" were part of the claim language, and it is not, the specification also fails to provide any guidance as to what level of defect reduction is contemplated. *See generally* '851 patent, A26.

*ing & Packaging, Inc.*, 731 F.2d 818, 826 (Fed. Cir. 1984). While an exact figure (*e.g.*, precisely ten extended lattice defects) may not be required here to establish definiteness, the patentee must provide some guidance as to the quantity of guided extended lattice defects sufficient to practice claim 1. As explained above, the specification and file history are devoid of any such guidance; "the extended lattice defects" could mean as little as two or as many as all. In the absence of the requisite specificity, the public and the court are simply left to guess.

It is precisely this guesswork that is prohibited in determining a term's meaning and, by extension, a claim's scope. *See Nautilus*, 2014 WL 2440536, at *7; *Merrill*, 94 U.S. at 573; *see also IPXL Holdings*, 430 F.3d at 1384. Rather, to satisfy the definiteness requirement, a claim term must have a single, objective meaning that is reasonably discernible by a person of ordinary skill in the art. *See Nautilus*, 2014 WL 2440536, at *7. In the absence of such an objective meaning, as here, the term is indefinite.

## 2. The district court erred in construing "the extended lattice defects"

While recognizing that an issue exists with the term "the extended lattice defects" as written, the district court believed it could solve the problem by embracing a construction that explicitly incorporated patentee's

goal of reducing defect density.  *See* Op. at 17–18 ("Amazon's argument might be persuasive if the Court read the claim in isolation.").  However, without the benefit of *Nautilus* or, as discussed above, guidance from the specification, the district court ended up impermissibly re-writing claim 1.

The district court construed "the extended lattice defects" with language that was agreed to by separate parties in a parallel litigation (Amazon was not a party to that case), which appears nowhere in either the claims or the intrinsic record, *i.e.*:

> such that free propagation of extended lattice defects into the active layer is significantly reduced relative to a device made by the same process without textured districts.

Op. at 19, A20.[8]

This construction is flawed.  It is itself indefinite, and so merely confirms the invalidity of claim 1.  And even if it were not, it is entirely divorced from the actual language of claim 1, and is unsupported by the intrinsic record.

---

[8] *See Lexington Luminance LLC v. Feit Electric Co., Inc*., No. 12-11554, slip op., at 2 (D. Mass. June 25, 2013), A240.

### a. The district court's construction is itself indefinite

The district court's construction defines "the extended lattice defects" by setting up a flawed comparison against unidentified prior art. This does nothing to resolve the central question: how many extended lattice defects must be guided to practice claim 1?

Under the district court's approach, a person of ordinary skill must first determine the baseline propagation of "extended lattice defects" in some (undefined) set of unclaimed devices. Devices that exhibit better "guiding" than that baseline would, according to the district court, fall within this part of the claim.

But neither the '851 patent nor the district court's order provides any objective content to this inquiry. This Court has previously considered and rejected the definiteness of claims seeking to apply such a vague inquiry. For example, in *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313 (Fed. Cir. 2003), the Court concluded that a claim directed to a protein "having glycosylation which differs from" another protein was indefinite because it failed to set up "a standard by which the appropriate comparison can be made." 314 F.3d at 1341. That is precisely the problem that the district court's interpretation confronts. If a skilled artisan is unable to

determine precisely the standard for comparison—*i.e.*, if she does not know what is meant by "a device made by the same process without textured districts"—then the claim's scope is not reasonably certain.

Indeed, the district court's construction poses numerous obstacles to any effort at understanding claim scope. First, the district court's reference to "the same process without textured districts" is not readily understandable. When it says, "same process," what is it the same as? The '851 patent discloses (and the prior art is replete with) numerous "processes" for fabricating semiconductor devices in misfit systems, both with and without textured districts. *See, e.g.*, col.2:27–29 (referring to "conventional lithographic methods"); 3:47–4:5 (describing three "alternative" lithographic methods"); 4:13–15 ("The surface features in the present invention can be defined on the surface of various substrates using wet etching, dry etching and photoelectrochemical etching."), A35–36. This Court has repeatedly held that, where multiple methods are disclosed to ascertain the presence of a claim element, and the patentee fails to specify which method should be used, the claim is indefinite. *Amgen*, 314 F.3d at 1341–42; *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 723 F.3d 1363, 1368-1369 (Fed. Cir. 2013) (finding the term "molecular weight" indefinite where there were two ways to measure molecular weight and none of the claims, specification, or file his-

tory specified which method to use), *cert. granted*, 134 S. Ct. 1761 (Mar. 31, 2014); *Honeywell Int'l, Inc. v. Int'l Trade Comm'n*, 341 F.3d 1332, 1340 (Fed. Cir. 2003) (affirming indefiniteness where the claims required a specific melting point elevation range, there were four methods of computing the same resulting in differing results, and none of the claims, specification, or file history provided guidance as to which method to use).

Further, depending on how a skilled artisan defined "the same process," the yardstick for evaluating the claim would change. If, for example, "the same process" meant the techniques used to make certain goods accused of infringement, then the claim would have different meaning depending on the case. Such would transform the claim into an improper "moving target." As a result, the district court's construction cannot be salvaged by concluding that the baseline process does not matter, or that any process chosen would provide substantially similar results. *See generally Takeda Pharm. Co. v. Zydus Pharms. USA, Inc.*, 743 F.3d 1359, 1367 (Fed. Cir. 2014) (noting that "moving target" claims are improper).

Nor would it be sufficient to define "the same process" (as used in the district court's construction) as the process that is used to create an accused product. That, too, would make claim interpretation a moving target, with the claim having different meanings depending on the specific case or

controversy. Such a construction would plainly deprive the claim of any reasonably certain meaning, rending it indefinite. *Nautilus*, 2014 WL 2440536, at *7; *see also Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1350 (Fed. Cir. 2005).

The district court's reference to "without textured districts" is equally problematic. Op. at 19, A20. The prior art teaches numerous substrates that have no patterning at all (*i.e.*, they are planar). For example, the '851 patent cites a 1985 patent to Akiyama depicting a planar substrate:



U.S. Patent No. 4,561,916, fig. 1 (coloring added); *see also* Col.1:18–25 (citing same and discussing "directly disposed layer[ing]), A35. The cited prior art also includes substrates with patterns that have "specific angles of inclination" (*i.e.*, linear portions) and non-smooth profiles (*e.g.*, sharp corners), as depicted below.



Fig. 1. Idea of self-planarization by liquid phase ELO.

S. Kinoshita et al., *Epitaxial Lateral Overgrowth of Si on Non-Planar Substrate*, J. Crystal Growth, vol. 115 (1991), fig.1 (coloring added), A557; *see also* Col.1:55–59 (citing same), A35. The phrase "without a textured district" implies that the court's construction refers to planar (non-patterned) substrates. But this cannot be right, because this would open the door to covering within the claim known prior art, such as Kinoshita that used non-planar substrates. In other words, claim 1 would cover any level of defect reduction "significantly" greater than that achieved with planar substrates, even though the patentee recognizes that both mask layers as well as non-planar substrates with linear portions and sharp corners also can reduce defect propagation. Col. 1:48–50; 1:60-66, A35.

Conversely, if the district court intended to limit its construction of "the extended lattice defects" to defect reduction relative to certain devices having non-planar substrates with linear portions and sharp corners (which intent is absent from the express language of the district court's construc-

31

tion), this presents still other unresolvable problems. What amount of patterning is sufficient? And does this include textured districts with profiles having only some linear portions and sharp corners? If so, this conflicts with what the patentee himself regards as his invention, as he alleges (although the district court disagreed)[9] that the patent covers substrates with some linear portions and sharp corners (as seen in Fig. 2B of the '851 patent, annotated below), as well as substrates with no linear portions or sharp corners (as seen in Fig. 1C, annotated below). *See, e.g.*, Blue Br. 63–64.



**Fig. 1C**



**Fig. 2B**

Fig. 1C, showing no linear portions or sharp corners.

Fig. 2B, annotated to show linear portions and sharp corners.

In sum, the district court's construction requiring the use of an unidentified and subjective "same process" and the absence of textured dis-

---

[9] The district court construed "prescribed angles of inclination" to mean without linear portions (*see* Op. at 15, A16) and "smooth rotation of microfacets" to mean no sharp corners. *Id.* at 12–13, A13–14. As discussed herein, the district court did not commit reversible error in construing these terms.

tricts itself creates subjective confusion regarding the meaning of "the extended lattice defects," creating the very problem the Supreme Court sought to prevent in *Nautilus*.

>    **b.**    **Even were it not indefinite, the district court's construction contradicts the intrinsic record**

Even if this Court were to find the district court's construction definite, the construction is still improper. The district court's construction lacks support in the claim language, specification, or file history. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314-15 (Fed. Cir. 2005) (en banc) (patent claims are construed based on the meaning of the claim terms themselves, read in the light of the specification and, where helpful, the prosecution history). There is simply nothing to indicate that the patentee intended "the extended lattice defects" to mean "such that free propagation of extended lattice defects into the active layer is significantly reduced relative to a device made by the same process without textured districts." Indeed, this construction is based entirely upon the patentee's unclaimed intentions expressed at a high level in the specification (*see* Op. at 18-19) A19–20, which, as discussed *supra*, cannot serve as the sole basis for construing the term at issue.

## III.    THIS COURT SHOULD DECLINE TO REVIEW, OR IN THE ALTERNATIVE REJECT, LEXINGTON'S OTHER CLAIM CONSTRUCTION ARGUMENTS

The remainder of Lexington's briefing seeks review of claim constructions on which no aspect of the district court judgment rests.  Such issues are all moot if this Court affirms the indefiniteness judgment.

If the Court reviews these issues notwithstanding their lack of relation to the judgment, it should generally affirm as set forth *infra*.

### A.    This Court Should Not Review Claim Constructions Unrelated to the Judgment

"An appeal is not an opportunity to bring before the appellate court every ruling with which one or more of the parties disagrees without regard to whether the ruling has in any way impacted the final judgment." *Mass. Inst. of Tech. v. Abacus Software*, 462 F.3d 1344, 1350 (Fed. Cir. 2006). The district court here entered early judgment of indefiniteness.  It never reached—nor even heard evidence on—key issues like noninfringement, anticipation, or obviousness.

In light of the foregoing, Amazon respectfully asks that the Court decline Lexington's invitation to review the district court's constructions for terms not implicated by the judgment.

### B.  Lexington's Other Arguments Concerning Claim Constructions Should Be Rejected in the Event Reached by the Court

If the Court reviews those claim constructions not necessary to the judgment, it should reject each and every one of Lexington's arguments. For the term "trenches," it should clarify the district court's construction slightly as discussed herein.  For the remainder of the terms, it should affirm.

### 1.  "trenches"

| District Court's Construction | Amazon's Proposal | Lexington's Proposal |
|---|---|---|
| "depressions bounded on the sides and bottom and open at the top" | "generally elongated depressions bounded on the sides and bottom and open at the top" | [No construction required] otherwise, areas in the surface of the substrate from which some amount of material is removed in order to create a pattern on the surface of the substrate |

Though largely correct, the district court's construction would benefit from modest correction insofar as the district court did not require that the claimed trenches be "generally elongated," as proposed by Amazon.[10]

---

[10] Though the district court rejected in part Amazon's proposed interpretation of "trenches," the posture of this case barred a cross-appeal on the issue.  *Aventis Pharma S.A. v. Hospira, Inc.*, 637 F.3d 1341, 1344 (Fed. Cir. 2011) (dismissing cross-appeal where, if successful, it would "not expand the scope of the judgment in [cross-appellant's] favor").  Ama-

But in all events, the Court should reject Lexington's proposal as inconsistent with the claims, specification, file history, and extrinsic evidence.

Both Amazon's proposal and the construction adopted by the district court comport with the meaning of "trenches" in ordinary usage. Lexington does not dispute this, and the supporting record fully supports the district court's approach. Blue Br. 29; *see also* 2 Oxford English Dict. 3383–84 (1993 ed.), A504–05 ("OED") (defining "trench" to mean "a long narrow (usu. deep) ditch or furrow cut out of the ground"); Am. Heritage Dict. 1839 (2000 ed.), A509 ("AHD") ("a deep furrow or ditch"); Merriam-Webster's Collegiate Dict. 1255 (2005 ed.), A513 ("MWCD") ("a long cut in the ground").

Lexington rejects these definitions, but it has identified nothing in either the claim or the written description that defines "trench" differently. Lexington's argument is that the '851 patent defined "trenches" away from its ordinary meaning by silence and implication alone. All available law on the issue plainly rejects such argument. *See, e.g., Bayer CropScience AG v.*

---

zon's sole vehicle for submitting the appropriate construction of "trenches" is this response brief, and Amazon has no right to reply. Such further demonstrates why this Court should, out of fairness, decline Lexington's invitation to take up claim construction issues not implicated by the judgment.

*Dow AgroSciences LLC*, 728 F.3d 1324, 1328–29 (Fed. Cir. 2013) (declining to interpret term "monooxygenase" away from its ordinary scientific meaning based on implications in the specification).

Consistent with the dictionaries in evidence and the usage in the '851 patent, the district court correctly held that "trenches" are "depressions bounded on the sides and bottom and open at the top." It modestly erred, however, in failing to include the additional requirement that the "trenches" be "generally elongated." The notion of a trench being elongated (long and narrow) is present in the dictionary definitions of "trenches," in common usage (e.g., a round or square depression is a hole, not a trench), and in the usage of the patent. Each of the definitions cited by the parties and applied by the district court included this requirement. *See generally* 2 OED 3383–84, A504–05; AHD 1839, A509; MWCD 1255, A513. Further, the '851 patent used the word "trench" synonymously with both "stripe" and "groove," each of which denotes an elongated feature that extends laterally across the substrate. *E.g.*, Col.3:47–50 ("[M]esa or *stripe* features are first defined over the substrate . . . ."); Col.3:54–55 (discussing the formation of "*stripes* along the [011] or the [011] direction"); Col.4:5–24 (calling for the etching of "V-shaped *grooves*"); Col.3:65–66 (describing the formation of "etched shapes such as *grooves*" (quoting D.W. Shaw, *Morphology Analy-*

*sis in Localized Crystal Growth & Dissolution*, 47 J. Crystal Growth 509, 514 (1979), A440, 445 (emphases added))), A35–36. All this evidence teaches that, in accordance with the lay meaning of "trench," the claimed "trench" is not merely a circular hole or divot, but has distinct length—*i.e.*, it is "generally elongated."

Rather than address the record, Lexington's brief embarks on a winding excursion through cases, patents, and articles with no relationship to the '851 patent. Apparently it does so because its counterintuitive definition of "trenches" lacks any support from the intrinsic record. Lexington's primary problem with the district court's construction seems to turn on the court's correct determination that a "trench" must have both sides and a bottom. *See* Blue Br. 33 (arguing that, in a "trench," "there need not be a bottom wall at all"). Lexington is aggrieved also by the court's requirement that a trench have an open top. *Id.*

Lexington's refusal to define "trench" to require sides, a bottom, and an open top shows how Lexington is trying to expand "trenches" beyond any reasonable boundaries. Lexington is asking this Court to construe

38

"trenches" in a manner lacking any structural definition.[11]    Lexington would construe "trenches" to mean, essentially, empty space, without any of the structural recitation that the term "trenches" typically denotes.  *See* 2 OED 3383–84, A504–05 (defining "trench" to mean "a long narrow (usu. deep) ditch or furrow cut out of the ground"); AHD 1839, A509 ("a deep furrow or ditch"); MWCD 1255, A513 ("a long cut in the ground").  Specifically, Lexington would prefer that "trenches" be construed so that it need have no bottom.  Blue Br. 33 ("[T]here need not be distinct *side* and *bottom* trench walls[.]").  As shown above, such an ethereal approach to claim construction is incompatible with both the law and with the specification.

Amazon, on the other hand, has offered direct, straightforward evidence for the meaning of "trenches," both in lay use and in the '851 patent.  This Court should reject Lexington's wholesale abandonment of any claim limits, and its distortion of the evidence.

---

[11] Even applying Lexington's proffered ordinary meaning for trenches—three–dimensional areas that are removed from the surface of a substrate—the points made by Amazon and adopted by the district court hold true.  The removed area must have sides and a bottom, and an open top.

### 2. "having"

| Term | District Court's Construction |
|------|------------------------------|
| "having" | "consisting of" |

The district court correctly determined that to construe "having" to mean "consisting of" was the only reasonable interpretation, given the term's usage in the '851 claims and file history. That is because "having," as used in the '851 claims, introduces not only requirements of what the covered invention must have, but equally-important requirements of what it must not have.

Claim 1's usage of "having" is as follows:

> a textured district defined on the surface of said substrate comprising a plurality of *etched trenches **having*** a sloped etching profile with a smooth rotation of micro-facets without a prescribed angle of inclination . . . .

Col.8:38–41 (emphasis added), A38. As the quoted matter shows, "having" introduces two claim limitations. To fall within the claim, the etched trenches must have "a sloped etching profile with a smooth rotation of micro-facets." Said profile must also be "without a prescribed angle of inclination."[12]

---

[12] These two limitations are discussed in more detail *infra*.

These limitations state what the covered trenches must have and what they must not have. Because a covered trench must have "a sloped etching profile with a smooth rotation of micro-facets," such a trench must also *not* have such a profile with a *non*-smooth rotation of micro-facets. The same applies to the "prescribed angle of inclination." To fall within the claim, a shape must satisfy the recited claim requirements *and* have no areas that do not satisfy those requirements.

The district court's opinion followed this straightforward reasoning, and the instruction of this Court, in construing "having" to mean "consisting of." Op. at 11 ("[I]t is clear that a closed construction [of "having"] is more consistent with the context of the specification and claims."), A12; *see also Lampi Corp. v. Am. Power Prods.*, Inc., 228 F.3d 1365, 1375–76 (Fed. Cir. 2000) ("Transitional phrases such as 'having' must be interpreted in light of the specification to determine whether open or closed language is intended." (quoting *Manual of Patent Examining Procedure* § 2111.03 (7th ed. 2000))). Applying a "closed" interpretation to "having" maintains the key structural requirements of the claim. To do otherwise would strip the claim of most of its meaning.

Lexington's counter-arguments fail basic examination. First, Lexington incorrectly suggests that this Court has accorded the term "having" a

presumption of open-endedness.[13]  *See* Blue Br. 39 (presenting this argument).  Amazon is aware of no such case, and Lexington has cited none.  To the contrary, this Court expressly held that the presumption Lexington seeks does not exist.[14]  *Crystal Semiconductor*, 246 F.3d at 1348 ("'Having' . . . does not create a presumption that the body of the claim is open.").

Lexington next turns to the figures.  Its main support is figure 2B, which in Lexington's view ought to be covered by claim 1.[15]  Blue Br. 40 *et seq.*  Figure 2B is reproduced below:

---

[13] Its sole legal citation is to a district court case alluding to such a rule.  *Id.* (*citing Mobil Oil Corp. v. Amoco Chems. Corp.*, 779 F. Supp. 1429, 1450 (D. Del. 1991), *aff'd without op.*, 980 F.2d 742 (Fed. Cir. 1992)).  This Court affirmed *Mobil Oil* without opinion under Rule 36; there is no indication that this Court ever reviewed or actually approved the district judge's statement concerning "having."  *See Rates Tech., Inc. v. Mediatrix Telecom, Inc.*, 688 F.3d 742, 750 (Fed. Cir. 2012) ("Since there is no opinion, a Rule 36 judgment simply confirms that the trial court entered the correct judgment.  It does not endorse or reject any specific part of the trial court's reasoning.").

[14] Lexington's citation to *Chisum on Patents* fares no better.  *See* Blue Br. 39.  *Chisum* discusses *Crystal Semiconductor* and acknowledges its rule.  3-8 *Chisum on Patents* § 8.06[1][b][ii][A] n.61 (2014) (stating that there is "NO PRESUMPTION" of openness for the term "having").

[15] The record includes no evidence concerning the structure of the accused LEDs in Amazon's products.  Lexington's infringement contentions before the district court, however, contended that the accused LEDs had structures resembling the cross-section shown in Figure 2B.



'851 patent, fig.2B (coloring added), A29. It depicts a cross-section of a disclosed embodiment. Col.5:12–20, A37. As can be seen, figure 2B depicts a substrate (highlighted) having peaks with round profiles. The figure also depicts flat, open areas between the peaks.

As the district court properly held, there is no way to reconcile the flat, open areas illustrated in figure 2B with the claimed requirement of "etched trenches having a sloped etching profile with a smooth rotation of micro-facets without a prescribed angle of inclination." '851 claim 1 (emphasis added), A38. The claim imposes those structural requirements; the figure does not reflect them. In such circumstances, this Court's precedent is clear: the claims, not the figures, must control claim interpretation. *Schoenhaus v. Genesco, Inc.*, 440 F.3d 1354, 1359 (Fed. Cir. 2006) ("Where a patent specification includes a description lacking a feature, but the claim recites that feature, *the language of the claim controls*." (emphasis added)).

Undeterred, Lexington argues that figure 2B's nonconformance with these negative limitations is no problem. It contends that "having" can include within its scope both those structures that fully conform to the requirements of the claim, and those that only partly conform. Blue Br. 40 ("The claim should not be construed as requiring that the 'etched trenches' consist entirely and exclusively of a 'sloped etching profile.'").

Lexington's approach would distort the meaning of "having" in the claim, would vitiate the "sloped etching profile" term, and would nullify the stated purpose of the invention. The '851 patent states that the shape set forth in the claim is "essential[.]" Col.2:32–34, A35. And it states, in the Summary of the Invention, that a key part of the invention was "*smooth* trenches *without* a prescribed angle of inclination." Col.2:23–25, A35 (emphasis added). As already discussed, these were clear negative limitations on the structure that the claim addressed. This Court should reject Lexington's invitation to misconstrue "having" so as to abandon those negative limits, and to extend the claim over non-conforming structures. *Rolls-Royce, PLC v. United Techs. Corp.*, 603 F.3d 1325, 1334–35 (Fed. Cir. 2010) ("Although reluctant to exclude an embodiment, this court must not allow the disclosed embodiment to 'outweigh the language of the claim, especially when the court's construction is supported by the intrinsic

evidence." (quoting *TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*, 529 F.3d 1364, 1373 (Fed. Cir. 2008))); *Schoenhaus*, 440 F.3d at 1359.

Lexington also criticizes the district court, arguing that excluding figure 2B from the claim was based on "importing what it believed were claim limitations from the specification." Blue Br. 42. As described above, the district court's interpretation of "having" came from the claim language itself, and not from any improper understanding of the written description. Nor did the district court commit any analytic error in concluding "having" should be construed to have "closed" meaning. As *Crystal Semiconductor* requires, the district court considered all appropriate context in making that determination. *See* 246 F.3d at 1348. That figure 2B teaches a structure that contravenes claim 1's requirement of a "sloped etching profile *with* a smooth rotation of micro-facets [and] *without* a prescribed angle of inclination" fully supports the district court's holding.[16]

Lexington's arguments concerning the specification's reference to "similar" results for the structure in figure 2B (when compared to the structure of figure 2A) fare no better. Blue Br. 43 (citing col.5:16–17, A37). That the patentee purported to have observed empirically similar results for

---

[16] Amazon offers further discussion of why figure 2B cannot be reconciled with the "sloped etching profile" claim language *infra*.

two structures does not mean that both structures must be covered by the same claim. *Rolls-Royce*, 603 F.3d at 1334–35 (construing claim to exclude one embodiment, while covering others).

Lexington also offers a series of diagrams that were not in the district court record. Blue Br. 44–45. In these diagrams, Lexington purports to further describe the claimed invention. But these diagrams are pure attorney argument. They are no substitute for the claims and specification of the '851 patent, or the extrinsic evidence of record. This Court should decline Lexington's invitation to rely on them.

The diagrams offer a "top-down" view of rounded peaks that lacks any support in the '851 patent. As the district court noted, Lexington's assertions about such a view is bereft of evidentiary support. Op. at 8 ("An aerial view of 'mesas,' however, does not appear in the specification."), A9. Lexington also suggests that the closer the round peaks are, the better the defect reduction. Blue Br. 44. The '851 patent has no such teaching. *See* Col.5:16 (stating only that results are "similar" for two cross-sectional views depicting peaks at different spacings), A37. This Court should view Lexington's statements skeptically.

Finally, Lexington argues that the specification draws a distinction between "base features" and "surface features" that somehow undermines

the district court's approach. Blue Br. 44–45. Lexington's argument seems to be that the requirements of the claim do not apply to "base features," which Lexington alleges to be the flat portions in figure 2B. That is, Lexington contends that the middle, flat portion of figure 2B's "trench" is not a "trench" at all, but a "base feature." *Id.*

Nothing in the '851 specification or file history supports Lexington's creative interpretation. Discussing figure 2B, the '851 patent refers to "base features" as follows: "The results are similar when the trenches are spaced by a base feature as illustrated in FIG. 2B[.]" Col.5:16–17, A37. Properly read, this means only that the "trench" of figure 2 has a wide base (a "base feature") that spaces its walls out. It certainly does not mean, as Lexington apparently contends, that the "base feature" is not a part of the trench, *i.e.*, that figure 2B depicts a left-hand "trench," a right-hand "trench," and a middle "base feature" not part of any trench.

The '851 patent itself is explicit on this point. It describes the "base feature" region expressly as "the center of the trench." Col.5:22–25 ("Direct penetration of misfit dislocations is only possible from the open ridge and from *the trench center* [i.e., the flat bottom portion of figure 2B] where the traveling dislocations combine." (emphasis added)), A37. This statement cannot be reconciled with Lexington's suggestion that the middle por-

tion of the "trench" in figure 2B is not part of the "trench" at all, but a division between two "trenches."

This Court should reject Lexington's efforts to distort claim 1 by reading "having" to mean "comprising." It should affirm the district court's holding that the term means "consisting of."

### 3.    "microfacets"

| Term | District Court's Construction |
|------|-------------------------------|
| "microfacets" | "very small planar crystal surfaces" |

The district court correctly construed "microfacets" according to the guidance of the '851 patent. Indeed, before the district court Lexington agreed that a "facet" is a "planar crystal surface." Op. at 12, A13. Lexington now abandons that agreement, and renews its effort to force the attorney-created term "surface contour" into the claim.

Lexington's phrase "that make up a surface contour" appears nowhere in the claims, specification, or file history. It is wholly the *post hoc* creation of Lexington's litigation counsel. Nothing in the patent describes what a "surface contour" is, or how it is made, or how it relates to "microfacets." Nor has Lexington submitted any evidence to suggest that "surface

contour" was a term with any established meaning at the time of the invention.

Lexington also bizarrely argues that the term "very small," as used in the district court's construction, lacks appropriate context. It was Lexington that initially proposed the "very small" qualifier. *Id.* at 12. Lexington has thus waived argument that it should not be included.

Lexington's "microfacets" argument is unsupported by any evidence at all. The Court should thus reject it, and affirm the district court's interpretation of "microfacets."

### 4. "sloped etching profile with a smooth rotation of microfacets"

| Term | District Court's Construction |
|------|-------------------------------|
| "sloped etching profile with a smooth rotation of microfacets" | "when viewed in cross-section, the side and bottom walls of the etched trenches are made up of micro-facets with a gradual, incremental rotation in slope from micro-facet to micro-facet such that there are no sharp corners" |

The district court's construction, initially proposed by Amazon, properly establishes the scope of this term. This Court should reject Lexington's attacks on this interpretation.

a.   **The "sloped etching profile" is the profile of the entire trench, and does not exclude the trench bottom**

The district court considered, and properly rejected, Lexington's argument that this term places limitations only on the shape of a trench's sides, and not on its bottom.  Lexington's proposal to inject the term "surface contour" into the interpretation is driven by its desire to prove infringement.  Specifically, Lexington would prefer that the claim include no restriction against covering a structure (*i.e.*, a trench) with curved sides but a flat bottom.

This Court should again reject Lexington's proposal to distort the claim by forcing in "surface contour."  As noted, this term appears nowhere in the patent or file history; "surface contour" is, for Lexington, a flexible concept that conveniently applies to whatever parts of a structure are useful for Lexington to establish (or disclaim) claim coverage.  *See, e.g.*, Blue Br. 49 (apparently defining "surface contour" to apply to the sides, but not the bottom, of the "etched trenches").  But Lexington's proposal is entirely unsupported by the available record.  Nowhere in the patent or file history is there any linkage between the "sloped etching profile" and the attorney-drafted concept of a "surface contour."

Lexington's chief challenge to the district court's construction flows from the exclusion of the Figure 2B embodiment from the claim. *Id.* As discussed earlier, that figure is indeed excluded, because the language of the claim requires excluding it. Indeed, that result extends directly from the one aspect of interpreting this term on which Amazon and Lexington agree.

As the district court noted, both parties agree that the "smooth rotation of micro-facets" limitation refers to the absence of "sharp corners" in the "sloped etching profile." Op. at 13, A14. The parties agree that figure 1A satisfies that requirement:



Fig.1A, A28 (coloring added). As can be seen, the "profile" here is curved and smooth, with no sharp corners.

But when one considers Figure 2B, agreement disappears, and Lexington rescinds. As already discussed, to the district court, and to Amazon, Figure 2B's structure cannot be reconciled with the claim language:



Fig. 2B, A29 (coloring added). As can be seen, this embodiment has sharp

corners where the curved sides meet the flat bottom. The district court

concluded, and Amazon agrees, that the claim cannot cover such a struc-

ture, both literally and in light of the parties' agreement that the claim ex-

cludes "sharp corners" from the claimed "sloped etching profile."

As discussed, Lexington prefers a claim interpretation in which Fig-

ure 2B falls within the claim scope. But, it also wishes to embrace the core

concept that the "profile" must not have "sharp corners." Further compli-

cating matters, Lexington proposes that the "sloped etching profile" term

imposes requirements only to the sides of the profile, and not to any bot-

tom. Blue Br. 49. The result is Lexington's unsupportable construction.

Lexington's approach neglects established claim construction doc-

trine. This Court should reject it.

### b. The "sloped etching profile" is evaluated from a cross-sectional perspective

Lexington also attacks the district court's use of the well-known term "cross-section" to establish the frame of reference for evaluating the term. The district court committed no error in this respect.

In the '851 patent, "profile" and "cross-section" are used interchangeably. *See* Col.2:59, 2:64, 3:1, 3:11, 3:26–27, 3:20–21, A35–36. Similarly, save a single top-down diagram, every figure of the patent that depicts the "profile" of the claimed invention uses a side-facing, cross-sectional view. The district court's construction is amply supported.

As already noted, Lexington's proposal would replace "profile" with the litigation-focused term "surface contour." Lexington's apparent hope is to expand the claim so that the "sloped etching profile" can be evaluated from perspectives other than the side-facing, cross-sectional view used in the patent. Such is beyond any reasonable interpretation of "profile."

As already noted, the patent refers to a "profile" as a "cross section," and universally depicts said "profile" using side-facing, cross-sectional views. And Lexington's own extrinsic evidence demonstrates that such was the ordinary meaning of the term:

> **pro·file** (prō′fīl′) *n.* [[It *profilo* < *profilare*, to outline < *pro-* (< L *pro-*), before + *filo* (< L *filum*), thread, line: see PRO[1] & FILE[1]]] **1 a) a side view of the face b)** a drawing of such a view **2 a view of anything in contour; outline /the *profile* of a distant hill/** ☆**3** a short, vivid biographical and character sketch **4** a degree of expo-sure to or contact with others, esp. the public /a celebrity who

Webster's New World College Dict. 1146 (2001 ed.), A343 (highlighting added). By confirming that "profile" means "side view" or "outline," this definition only confirms the district court's interpretation that the term "profile" denotes a cross-sectional or side-facing view.

### c. The district court's order is compatible with the term "sloped"

Next, Lexington argues—*sans* a single evidentiary citation—that the district court's construction somehow read the term "sloped" out of the claim. Though on appeal Lexington makes this argument only by allusion, before the district court Lexington urged that the word "sloped" meant that the restrictions of this term applied only to the "sides" of a claimed trench, and not the "bottom" (which might be flat, *i.e.*, of zero slope). The district court considered, and properly rejected, this argument, finding that a "sloped" portion could have an angle of "zero" or of "180 degrees." Op. at 15, A16. Lexington has not shown a single piece of evidence to suggest that this term should be construed so as to impose no restrictions on the bottom of the claimed trench, and its invitation for this Court to re-prove basic principles of calculus may be safely declined.

### d. The district court properly required a "gradual, incremental rotation in slope from micro-facet to micro-facet"

Fourth, Lexington contends (in a one-sentence, conclusory statement) that the district court erred in ordering such a construction. Lexington offers no citation to evidence, and barely any argument. Blue Br. 56.

The district court properly held that the only way to reconcile the claim's requirement of planar "micro-facets" with a restriction against the presence of sharp corners was to conclude that the microfacets must be arranged in such a way as to create a smoothly curved surface. That is, the micro-facets must display a "gradual, incremental rotation in slope." Under such an interpretation, the surface can appear smoothly curved, even though it is made up of planar micro-facets. Such interpretation also fits well with the claim text. Its language "smooth rotation of micro-facets" is difficult to fit to any other interpretation.

Lexington attempts to re-raise its poorly-formed concept of a "surface contour." As already discussed, no such notion appears anywhere in the '851 patent or file history. This Court should reject it.

### e. Figure 2B cannot be reconciled with the requirements of the claim

Fifth, Lexington repeats yet again its contention that the district court erred in holding that Figure 2B cannot be reconciled with the claim's requirements. Blue Br. 56–57. As recited *supra*, the district court committed no error. Figure 2B clearly depicts both the "sharp corners" and "linear portions" that the claim prohibits.

In sum, the district court properly analyzed the "sloped etching profile with a smooth rotation of micro-facets" term. This Court should affirm.

### f. The district court committed no error in its phrasing "when viewed in cross-section"

Lexington next contends, again without evidentiary citation, that the district court's claim construction requires that the claimed micro-facets be "visible." Lexington's argument is difficult to understand. To the best of Amazon's understanding, the '851 patent addresses small structures not generally visible to the naked eye, and the district court's construction imposes no contrary requirement.

As noted, the district court in this case took no evidence on Lexington's infringement allegations. It is Amazon's expectation that, should this

case return to district court, Lexington would endeavor to prove its case using microscopy. Nothing in the district court's order bars such an attempt.

Even if the district court's construction did include some express reference to "visibility," Lexington has not cited a single piece of evidence to suggest that a skilled artisan would understand any part of the '851 patent to describe invisible features.

Finally, to the extent Lexington fears it will not be able to muster evidence to prove the presence of "micro-facets" in the accused LEDs, such is no reason for this Court to find error in the district court's claim construction. Should this Court remand, the district court will be well positioned to weigh any and all of Lexington's evidence in this regard.

### g. This Court should reject Lexington's proposed reinterpretation of this term

In sum, Lexington's arguments are confusing, contradict the claim text, and run against the teachings of the '851 patent. This Court should reject both Lexington's proposal that the claim imposes shape limitations only to the sides, and not the bottom surface, of the claimed "trenches." It should also reject Lexington's attempt to inject the attorney-drafted term "surface contour" into this claim. Such is both unnecessary and runs against the available evidence.

### 5. "a sloped etching profile . . . without a prescribed angle of inclination"

| Term | District Court's Construction |
|------|------------------------------|
| "a sloped etching profile . . . without a prescribed angle of inclination" | "when viewed in cross-section, the side and bottom walls of the etched trenches have no constant angle of inclination, and so they have no linear portions" |

Lexington's arguments here echo in large part its arguments *supra* concerning "a sloped etching profile with a smooth rotation of microfacets." Again, Lexington's positions seemed aimed not at properly interpreting the claim as written, but at distorting it so as to serve Lexington's infringement case.

### a. For the reasons already stated, this Court should reject all of Lexington's arguments concerning the "sloped etching profile"

Lexington's brief repeats yet again each of the arguments discussed *supra* concerning the "sloped etching profile." Blue Br. 61–62 (reiterating arguments presented for previous term). As discussed *supra*, the district court's interpretation was not only correct, it was the only reasonable interpretation of the claim as written. Lexington's approach is an improper effort to distort the claim so as to preserve a poorly-formed infringement argument. There is nothing in the '851 claim or file history to suggest that

the claim addressed only the sides of the claimed "trenches," nor that their restrictions would not apply equally to the trenches' bottom surfaces. And Lexington's "surface contour" verbiage is confusing and without support in any of the available evidence.

        **b.**    **"Without a prescribed angle of inclination" means "without linear portions"**

Lexington has abandoned the position it took before the district court. There, it strongly opposed the district court's reasoning that the language "without a prescribed angle of inclination" included a restriction against any "constant angle of inclination." *See* Lexington Claim Constr. Br. 19, A248, 269 (preferring "specific" or "prescribed"). Before this Court, Lexington now admits that the "constant angle of inclination" verbiage is appropriate. But in the same breath, it attempts to strip it of any impact on the claim.

As it has repeatedly, Lexington endeavors yet again to expand the claim so that it will cover trenches with flat "bottom" regions, *e.g.*, the trench of Figure 2B. Here, it bizarrely suggests that such is not an area of "constant angle of inclination"—even though it is plainly flat. In a flat area, the angle of inclination is constant *by definition*.

59

Finally, Lexington ventures that the trench in Figure 2B is not a trench at all, but rather two trenches (*i.e.*, the "sides"), with a "base feature" in between. Blue Br. 63–64. Lexington is misreading the specification. Its bizarre theory that "trench" in the '851 patent is actually half a trench—one side, and no bottom—does not hold up to scrutiny.

In two locations, the '851 patents describes a situation in which "the trenches are spaced by a base feature." Col.5:16–17, 6:10–11, A37. The word "spaced" indicates that the depicted trench *incorporates* a base feature—*i.e.*, a middle region of the trench with a flat base—and so do the other trenches in the device. Such a read fully accords with the normal meaning of "trench" and with all other disclosures in the patent. *See also* col.5:22–25 (describing the flat bottom region as the "center of the trench"), A37. Lexington's effort to willfully misread this language, and to suggest a strange lexicography for "trench," should be rejected.

## CONCLUSION

For these reasons, Amazon respectfully requests that this Court affirm the district court's judgment of invalidity for indefiniteness, both on the grounds applied by the district court and on the alternate grounds set forth herein. Should the Court reverse on indefiniteness, Amazon asks that this Court deny Lexington's request for appellate review of claim construc-

tion matters not implicated by the district court's judgment, and remand for further proceedings.  Should the Court review such matters, Amazon asks that the Court generally affirm, modifying only the district court's construction of "trenches."

Dated:  July 10, 2014                            */s/Michael J. McKeon*
                                                 Michael J. McKeon
                                                 Indranil Mukerji
                                                 FISH & RICHARDSON P.C.
                                                 1425 K Street NW, Suite 1100
                                                 Washington, DC 20005
                                                 202-783-5070
                                                 mckeon@fr.com
                                                 mukerji@fr.com

                                                 Robert Courtney
                                                 FISH & RICHARDSON P.C.
                                                 3200 RBC Plaza, 60 South Sixth St.
                                                 Minneapolis, MN 55402
                                                 612-335-5070
                                                 courtney@fr.com

                                                 *Attorneys for Defendants-Appellees*
                                                 *Amazon.com Inc. and Amazon Digital*
                                                 *Services, Inc.*

## CERTIFICATE OF SERVICE

I certify that on July 10, 2014, a true and correct copy of BRIEF OF DEFENDANTS-APPELLEES AMAZON.COM INC. AND AMAZON DIGITAL SERVICES, INC. was filed electronically through the Court's ECF system, and served upon counsel for Plaintiff-Appellant via the Court's ECF system listed below:

**BRIEF OF DEFENDANTS-APPELLEES**
**AMAZON.COM INC. AND AMAZON DIGITAL SERVICES, INC.**

were filed via the Court's ECF system, and a courtesy copy was served via email on the party below:

**VIA ECF AND EMAIL**

Robert D. Katz                          Counsel for LEXINGTON
KATZ PLLC                               LUMINANCE LLC
6060 N. Central Expressway,
Suite 560
Dallas, TX 75206
Tele: (214) 865-8000
rkatz@katzlawpllc.com

   */s/ Michael J. McKeon*
Michael J. McKeon

## CERTIFICATE OF COMPLIANCE

The Response Brief for Defendant-Appellee complies with the type-volume limitation set forth in FRAP 32(a)(7)(B). The relevant portions of the Brief, including all footnotes, contain 12,171 words, as determined by Microsoft Word® 2010.

 */s/ Michael J. McKeon*
 Michael J. McKeon